**31**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:      (310) 598-4150
Facsimile:      (310) 556-9828

*Proposed Counsel to Oroville Hospital, et al.,*
*the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | Lead Case No. 25-26876 |
| OROVILLE HOSPITAL, *et al.*,[1] | Jointly Administered With: Case No. 25-26877 |
|       Debtors and Debtors in Possession. | **DCN NAK-3** |
| | Chapter 11 |
| ☒  Affects All Debtors | Hon. Christopher D. Jaime |
| ☐  Affects Oroville Hospital ☐  Affects OroHealth Corporation: A Nonprofit Healthcare System | **Hearing Information** Hearing Date:   December 11, 2025 Hearing Time:   11:00 a.m. Location:         Courtroom 32 |
|       Debtors and Debtors in Possession. |         501 I Street         Sacramento, California 95814         *or*         *by Zoom Webinar* |

**DECLARATION OF ROBERT J. WENTZ IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY MOTIONS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and Orohealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

1

**Table of Contents**

I.    Summary of the Debtors ..................................................................................- 5 -

II.   The Debtors' History and Operations .............................................................- 8 -

    A.    Oroville Hospital grew from a small rural hospital to a vital health system for a community in need. .................................................................- 8 -

    B.    Oroville Hospital relies principally on revenue from Medicare and Medi-Cal.- 14 -

    C.    Oroville Hospital is one of the top employers in Oroville. ................................- 15 -

III.  The Debtors' Prepetition Corporate and Capital Structure ...........................- 15 -

    A.    The Debtors share joint management over their healthcare operations. ...........- 15 -

    B.    The Debtors' principal secured obligations are two bond issuances related to hospital improvements and the Tower Project. ...................................- 17 -

    C.    The Debtors' unsecured debt relates primarily to ordinary course claims. .......- 20 -

IV.   Events Leading to These Chapter 11 Cases ..................................................- 20 -

    A.    The Debtors historically grappled with challenges chronic among similar systems that render the Debtors more susceptible to acute cash flow constraints. .........- 20 -

    B.    The Debtors entered two years of protracted negotiations with the Master Trustee over nonmonetary covenant defaults. ...........................................- 23 -

    C.    Delays associated with the Tower Project have deferred expected increases in revenue. ..............................................................................- 24 -

    D.    Actual net benefit from HQAF Program VIII fell short of projections. ............- 25 -

    E.    The 2019 Bond Trustee rejected the Debtors' efforts to liquidate a business line to support continued operations. ....................................................- 27 -

    F.    The 2019 Bond Trustee manufactured a payment default, accelerated the 2019 Bond obligations, and swept $27 million in funds. ...........................................- 28 -

V.    The Debtors' Principal Objectives in These Chapter 11 Cases .....................- 29 -

    A.    The Debtors remain focused on delivering high quality patient care and preserving their health care facilities for their community and stakeholders. ..- 29 -

2

B.     The Debtors have selected a postpetition financing lender after a robust marketing process that included negotiations with the Master Trustee. ...........................- 29 -

C.     The Debtors initiated a process prepetition to sell substantially all their assets to a buyer that can continue operating the Debtors' facilities...............................- 30 -

3

**DECLARATION OF ROBERT J. WENTZ IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Robert J. Wentz, hereby state and declare as follows:

1.  I am the President and Chief Executive Officer of Oroville Hospital ("Oroville Hospital"). I am also the Chief Executive Officer of Oroville Hospital's parent corporation, Orohealth Corporation: A Nonprofit Healthcare System ("OroHealth" and, together with Oroville Hospital, the "Debtors").

2.  I have over 40 years' of nonprofit hospital leadership experience. Prior to joining Oroville Hospital, I served as Assistant Administrator-Human Resources in Chico Community Hospital. I joined Oroville Hospital in 1985 as Assistant Administrator-Human Resources. I have served as Oroville Hospital's President and Chief Executive Officer since 1988.

3.  I hold a Bachelor of Science degree in Psychology from California State University, Sacramento. I am also a current board member and past board chairperson of California Healthcare Insurance Company, Inc., a Risk Retention Group, and a former board member of the California Hospital Association.

4.  In my capacity as President and Chief Executive Officer, I am generally familiar with the Debtors' business, day-to-day operations, financial affairs, and books and records. I am authorized to provide this declaration on behalf of the Debtors. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these cases under title 11 of chapter 11 of the United States Code (the "Chapter 11 Cases") and in support of the Debtors' chapter 11 petitions and certain motions filed today (each a "First Day Motion," and, collectively, the "First Day Motions").

5.  Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including FTI Consulting, Inc. ("FTI") as their financial advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. The documents referenced herein, or otherwise relied upon for purposes of this Declaration, are business records of the Debtors, prepared and kept in the

- 4 -

178761953.3

ordinary course of the regularly conducted business activities of the Debtors and used by me for those purposes. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors. If called upon as a witness, I could and would testify competently to the facts set forth in this declaration.

6. To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases on their business, the Debtors have requested various forms of relief in certain First Day Motions. The First Day Motions seek relief intended to: maintain the Debtors' business operations; to preserve value for the Debtors, their stakeholders, and other parties in interest; and, most importantly preserve Oroville Hospital for the benefit of the communities it has served for over sixty years.

7. To familiarize the Court and parties in interest with the Debtors, their collective business enterprise, the circumstances precipitating these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, the remainder of this declaration is organized as follows:

- **Part I** provides a summary of the Debtors;
- **Part II** provides a general overview of the Debtors' history and operations;
- **Part III** provides an overview of the Debtors' prepetition corporate and capital structure;
- **Part IV** sets forth the events leading to these Chapter 11 Cases; and
- **Part V** provides a summary of the Debtors' objectives in these Chapter 11 Cases.

## I.

## SUMMARY OF THE DEBTORS

8. OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. The Debtors also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, the

Debtors recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986.

9.     **OroHealth.**  Debtor OroHealth is the sole corporate member of Oroville Hospital. OroHealth provides support services to Oroville Hospital, including accounting, finance, supply chain management, purchasing, and executive management.  OroHealth is governed by a nine-member board of trustees that also serve as the board of trustees for Oroville Hospital.  Each trustee serves for a three-year term without compensation.

10.     **Oroville Hospital.**  Debtor Oroville Hospital is licensed as a general acute care hospital by the California Department of Public Health and is certified to participate in the Medicare and Medicaid programs. The Oroville Hospital main campus is located at 2767 Olive Highway, Oroville, California 95966, which is owned by Oroville Hospital. The campus includes the current hospital facilities and is the site of a new hospital tower (the "New Tower") expansion project (the "Tower Project") intended to increase Oroville Hospitals licensed general acute care beds from 133 to 211 upon project completion.

11.     Oroville Hospital also holds the license for the skilled nursing facility that is commonly known as Oroville Hospital Post-Acute Center (the "SNF").  The SNF specializes in post-acute rehabilitation, helping patients regain their strength and offering guidance in areas such as nutrition, wound care, physical therapy, and medication management. Oroville Hospital acquired the SNF from EmpRes Healthcare Group, Inc. through a two-step transaction that ultimately closed on July 1, 2017 (the "EmpRes Transaction"). Through that transaction, Oroville Hospital initially gained a minority interest in the SNF through its prior operating entity, 1000 Executive Parkway, LLC ("1000 Executive Parkway"). Following the closing of the EmpRes Transaction, Oroville Hospital gained a 100% ownership interest in 1000 Executive Parkway and subsequently consolidated the SNF operations under Oroville Hospital. Oroville Hospital is now the SNF license holder and operator. The SNF is licensed for 126 beds and has an average daily census of 113 patients year-to-date with an average length of stay of 57 days.

- 6 -

178761953.3

12.    **Nondebtor Affiliates.**    Oroville Hospital and OroHealth wholly own or control majority interests in the following nondebtor affiliates:

a.    **OHPAC Partners.**    The SNF's operations are located at 1000 Executive Parkway, Oroville, California 95966. OHPAC Partners, LLC ("OHPAC Partners") was formed on January 30, 2017, to own, lease, sell, maintain, manage, finance, and develop the 1000 Executive Parkway, Oroville, California 95966 property. In July 2017, Oroville Hospital obtained a 51.28% interest in OHPAC Partners for total cash consideration of $2 million. OHPAC Partners' sole material assets are the SNF real property and the related lease obligations owed from Oroville Hospital to OHPAC Partners. Oroville Hospital has historically received distributions on its membership interests in OHPAC Partners.

b.    **1000 Executive Parkway.**    As set forth above, Oroville Hospital acquired 100% of the membership interests in 1000 Executive Parkway as a result of the EmpRes Transaction and subsequently consolidated the SNF operations under the Oroville Hospital license.  As such, 1000 Executive Parkway does not have any material operations or assets as of the date of this Declaration.

c.    **Oroville Medical Partners.**    In January 2017, Oroville Hospital entered into an agreement to organize Oroville Medical Partners, LLC ("Oroville Medical Partners"), to own, lease, sell, maintain, manage, finance and develop real estate and commercial buildings located at 2760 and 2780 Oro Dam Boulevard, Oroville, California 95966, and conduct related medical office activities.  Oroville Hospital contributed $303,705 to Oroville Medical Partners for a 51% ownership interest in the entity. The Oroville Medical Partners real estate is currently leased to clinics operated by Oroville Hospital and Oroville Medical Partners' sole material assets are the real property and the related lease obligations. Oroville Hospital has historically received distributions on its membership interests.

d.    **Oroville Medical Complex.**    Oroville Medical Complex, LLC ("Oroville Medical Complex") is a for-profit entity that provides office space for the hospital-based physicians, outpatient imaging services, and an independent retail pharmacy.  Specifically, Oroville Medical Complex owns a three-story medical office building adjacent to the Oroville Hospital campus, located at 2809 Olive Highway, Oroville, California 95966. Oroville Medical Complex's sole material assets

178761953.3

are the medical office building, and related real property, and the related lease obligations owed from Oroville Hospital to Oroville Medical Complex.  OroHealth is an approximately 51% member in Oroville Medical Complex and has historically received distributions on its membership interests.

         e.    **OroLake.**  OroLake Corporation ("OroLake") is a for-profit entity that is wholly owned by OroHealth.  OroLake was formed as a regional sales and service organization for durable medical equipment.  OroLake holds a durable medical equipment provider license, but has not engaged in operations for at least 15 years and has no material assets.

     13.    **Additional Affiliates.**  Oroville Hospital also owns non-majority interests in the following entities: (i) Oroville Solar Partners, LLC; (ii) Comp-OH, LLC; and Tenzing Medical, LLC, the entity that provides Oroville Hospital with its electronic health records software.  Additionally, OroHealth owns non-majority interests in Oroville Sports Club, LLC.

**II.**

**THE DEBTORS' HISTORY AND OPERATIONS**

**A.**    **Oroville Hospital grew from a small rural hospital to a vital health system for a community in need.**

     14.    Oroville Hospital was founded in 1962 as a modest community hospital supported by a small staff of dedicated doctors.  Since its founding, Oroville Hospital has served the residents of Oroville, California, the greater Butte County and surrounding areas in Northern California.  The population has grown since the hospital's founding—more than doubling in the intervening decades—and Oroville Hospital's operations and services have grown to match the community need for healthcare services.  Today, Oroville Hospital operates a 133-bed facility with approximately 2,130 employees and 188 independent contractors, including a medical staff of approximately 147 physicians, 418 nurses, and 1,500 additional patient care and operations staff.

     15.    As a non-profit healthcare system, Oroville Hospital has been guided by its mission:

> Oroville Hospital is dedicated to always providing the finest personalized health care to Oroville and the surrounding foothill and valley communities by offering a medical home with a wide range of integrated services, from prevention through treatment and wellness.

- 8 -

178761953.3

Since its founding, Oroville Hospital has steadily expanded its healthcare offerings with this mission in mind.  Today, Oroville Hospital and its related operations comprise a comprehensive community healthcare system that includes the following array of service lines:

| | | |
|---|---|---|
| Aesthetic Medicine | Endocrinology | Podiatry |
| Allergy and Immunology | Endoscopy | Primary Care |
| Ambulatory Care | Gastroenterology | Psychiatry |
| Anesthesia Services | Hospitalist Services | Pulmonary |
| Anticoagulation Services | Intensive Care Unit | Pulmonary Function Testing |
| Bariatric Surgery | Laboratory Services | Radiology |
| Breast Cancer Services | Nephrology | Respiratory Care |
| Cardiac Catheterization | Neurodiagnostics | Robotic Surgery |
| Cardiology | Neurology | Sleep Disorder Testing |
| Cardiovascular Testing | Nutrition Therapy | Stroke Program |
| Childbirth Services | Obstetrics and Gynecology | Surgical Services |
| Chiropractic Services | Ophthalmology | Telemedicine |
| Colorectal Surgery | Orthopedic Surgery | Urology |
| Dermatology | Pain Management | Valley Medical Imaging |
| Dentistry | Palliative Care Program | Vascular Surgery |
| Ear, Nose and Throat Services | Pediatric Services | Women's Imaging |
| Emergency Care Services | Pharmacy | |

In addition to these specialty areas provided at its hospital and community clinics, Oroville Hospital operates a 126-bed nursing facility, a care facility that supports patients who are displaced or homeless after their discharge from the hospital, a mental well-being clinic, and 24/7 inpatient transport to local psychiatric care hospitals, among other critical healthcare services.

16.     Oroville Hospital's community importance is also a function of geography. Oroville Hospital is considered a "rural" hospital under the California Department of Health Care Access's Medical Service Study Areas analysis, which applies to hospitals in areas with less than 250 people per square mile.  As such, its primary service area (where its market share exceeds 10% of all hospital services) is wide-ranging—spanning 16 zip codes and includes the cities of Briggs, Gridley, and Oroville.

- 9 -

178761953.3

Oroville Hospital, *Community Health Needs Assessment*, at 9 (2022), https://www.orovillehospital.com/media/file/2022CHNA102122FINAL2.pdf (last visited Nov. 20, 2025).

Among other things, Oroville Hospital provides the only emergency services in Oroville and surrounding areas. For context, the nearest 24-hour full-service emergency room to Oroville Hospital—at Enloe Hospital—is an approximately 35-to-45-minute drive away. For time sensitive emergencies, a delay in reaching emergency care can materially increase the risk of mortality.

17. Access to care is already a challenge for residents of Oroville Hospital's service area. Both its primary and secondary service areas, fall almost entirely within "Health Professional Shortage Areas" that indicate health access disparities relative to the state average:

178761953.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



Oroville Hospital, *Community Health Needs Assessment*, at 38 (2022),
https://www.orovillehospital.com/media/file/2022CHNA102122FINAL
2.pdf (last visited Nov. 20, 2025).

18

19

20  The finding is consistent with a 2023 study by the California Department of Healthcare Access and

21  Information ("HCAI") similarly identifying Butte County as having low physician supply.[2]  As of a

22  2022 report, Oroville Hospital's primary service area residents were more likely to have had no

23  routine medical check-up in the past year (32.1%), less likely to get a doctor's appointment within

24

25

26

27

---

28  [2] *See* Cal. Dept. of Healthcare Access & Info., *Physician Supply & Preventable Hospitalizations by County* (2023), https://hcai.ca.gov/visualizations/physician-supply-and-preventable-hospitalizations-by-county/ (last visited Nov. 20, 2025).

two days in the past year when sick or injured (38.8%), and more likely to have had difficulty finding primary care (14.9%) and specialty care (18.5%) treatment, compared with the state average.[3]

18.     The patient population of Oroville Hospital's primary service area has higher mortality rates than the average population in both California and the United States.  Indeed, 12 of the top 16 underlying causes of mortality in Oroville Hospital's primary service area exceed state and national averages:

| Leading Causes of Mortality, Age-Adjusted Rates per 100,000 Population, Annual Average 2016-2020 (ICD-10) | Primary SA No. | Primary SA Pct. | Calif. | U.S.A. | Chico/ Glenn SA Pct. | Yuba/ Sutter SA Pct. | Chico/ Glenn SA No. | Yuba/ Sutter SA No. |
|---|---|---|---|---|---|---|---|---|
| Diseases of heart (I00-I09,I11,I13,I20-I51) | 207 | 200.7 | 141.3 | 164.8 | 153.8 | 165.4 | 367 | 294 |
| Malignant neoplasms (C00-C97) | 198 | 177.3 | 134.6 | 149.4 | 136.9 | 147.6 | 351 | 289 |
| Alzheimer's disease (G30) | 55 | 53.2 | 37.6 | 30.8 | 55.1 | 38.6 | 136 | 69 |
| Accidents (unintentional injuries) (V01-X59,Y85-Y86) | 67 | 85.6 | 35.8 | 50.4 | 56.6 | 48.4 | 116 | 78 |
| Chronic lower respiratory diseases (J40-J47) | 61 | 55.3 | 30.5 | 39.1 | 41.0 | 46.9 | 101 | 87 |
| Cerebrovascular diseases (I60-I69) | 55 | 50.6 | 37.6 | 37.6 | 37.5 | 49.0 | 94 | 90 |
| COVID-19 (U07.1)[1] | 69 | 64.6 | 71.0 | 88.5 | 34.8 | 48.8 | 82 | 87 |
| Diabetes mellitus (E10-E14) | 29 | 29.2 | 22.4 | 22.1 | 17.3 | 21.7 | 39 | 39 |
| Intentional self-harm (suicide) (X60-X84,Y87.0) | 16 | 15.3 | 10.5 | 13.8 | 16.0 | 12.0 | 37 | 24 |
| Chronic liver disease and cirrhosis (K70,K73-K74) | 16 | 18.9 | 12.6 | 11.5 | 16.0 | 17.7 | 33 | 30 |
| Influenza and pneumonia (J09-J18) | 20 | 18.6 | 14.0 | 13.6 | 13.6 | 17.9 | 33 | 32 |
| Parkinson's disease (G20-G21) | 8 | 7.6 | 8.4 | 8.8 | 10.4 | 8.5 | 25 | 14 |
| Essential hypertension and hypertensive renal disease (I10,I12,I15) | 7 | 6.8 | 12.5 | 9.1 | 9.1 | 14.0 | 22 | 25 |
| Nephritis, nephrotic syndrome and nephrosis (N00-N07,N17-N19,N25-N27) | 10 | 8.7 | 9.0 | 12.9 | 7.3 | 15.2 | 18 | 27 |
| Septicemia (A40-A41) | 8 | 7.4 | 1.6 | 2.5 | 6.1 | 9.8 | 15 | 18 |
| Assault (homicide) (X85-Y09,Y87.1) | 6 | 7.4 | 5.1 | 6.4 | 2.1 | 6.2 | 5 | 10 |
| All other causes | 160 | 190.4 | 115.5 | 166.2 | 159.9 | 174.0 | 320 | 260 |
| Annual Average Deaths, 2016-2020 | 928 | 939.2 | 630.7 | 747.6 | 743.4 | 796.6 | 1,723 | 1,393 |

Source: Gary Bess Associates, calculated from California Department of Public Health Master Death Files 2016-20 using the U.S. 2000 Standard Population. County, state, and national data are from Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 2016-2020 on CDC WONDER Online Database, released December, 2021.
[1]One-year mortality rates are calculated for COVID-19, only, for appropriate relative comparison with other

Oroville Hospital, *Community Health Needs Assessment*, at 60 (2022), https://www.orovillehospital.com/media/file/2022CHNA102122FINAL2.pdf (last visited Nov. 20, 2025).

19.     Oroville Hospital also serves a socio-economically vulnerable patient population. As of 2022, primary service area residents are more likely to be unemployed or otherwise do not participate in the labor force than national and state averages.[4]  Additionally, the share of primary service area residents that qualified as low income—income that is 200% or less of the Federal

---

[3] *See* Oroville Hospital, *Community Health Needs Assessment*, at 39 (2022), https://www.orovillehospital.com/media/file/2022CHNA102122FINAL2.pdf (last visited Nov. 20, 2025).

[4] *See id.* at 42.

178761953.3

1 Poverty Guidelines—was as high as 43% in 2022 and far exceeded the state (29.4%) and national

2 (29.8%) averages.[5]



Oroville Hospital, *Community Health Needs Assessment*, at 44 (2022),
https://www.orovillehospital.com/media/file/2022CHNA102122FINAL2.
pdf (last visited Nov. 20, 2025).

To address its community needs, Oroville Hospital provided approximately $38 million in

community financial benefit in Fiscal Year 2024, including charity care, the unpaid cost of public

payment programs, and non-billed services.[6]

---

[5] *See id.* at 43.
[6] *See* Oroville Hospital, *Community Benefits Report*, at 15 (2024),
https://www.orovillehospital.com/media/file/2024%20Community%20Benefit%20Report(2).pdf
(last visited Nov. 20, 2025).

178761953.3

**B.**     **Oroville Hospital relies principally on revenue from Medicare and Medi-Cal.**

20.     California hospitals primarily generate revenue for medical services from "payors" that make payment on behalf of covered patients, e.g., insurers.  Oroville Hospital's revenue is primarily from government payors: Medicare and Medi-Cal.  Medicare is a federal health insurance program funded by the Centers for Medicare & Medicaid Services ("CMS") that provides healthcare benefits to those aged 65 years and over and to disabled beneficiaries of any age.  Medicaid is a public health insurance program that provides free or low-cost medical services and healthcare benefits to low-income individuals, financed from state and federal funds.  California's version of Medicaid is called Medi-Cal.

21.     As discussed more fully above, the patient population in Oroville Hospital's primary service area is more likely to face financial limitations when accessing healthcare than the average state or national population. Relatedly, the population in Oroville Hospital's primary service area relies on Medi-Cal and Medicare coverage at far higher rates than state or national averages, and less than half the population is privately insured (including insurance through Covered California):

| Primary Health Insurance | Primary SA No. | Primary SA Pct. | Calif. | U.S.A. | Chico/ Glenn SA Pct. | Yuba/ Sutter SA Pct. | Chico/ Glenn SA No. | Yuba/ Sutter SA No. |
|---|---|---|---|---|---|---|---|---|
| Private insurance (incl. purchase through state insurance exchange) or VA coverage | 32,945 | 47.0 % | 62.8 % | 65.6 % | 62.3 % | 56.4 % | 112,504 | 89,100 |
| Medicare (incl. Medi-Medi) | 10,502 | 15.0 % | 10.1 % | 10.9 % | 11.2 % | 10.4 % | 20,131 | 16,473 |
| Medi-Cal (Medicaid or other means-tested coverage) | 22,334 | 31.8 % | 19.9 % | 14.8 % | 20.1 % | 26.2 % | 36,305 | 41,410 |
| None/uninsured | 4,364 | 6.2 % | 7.2 % | 8.7 % | 6.4 % | 7.0 % | 11,500 | 11,059 |
| Total noninstitutionalized persons | 70,145 | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 180,440 | 158,042 |
| Total Uninsured or on Medi-Cal | 26,698 | 38.1 % | 27.1 % | 23.5 % | 26.5 % | 33.2 % | 26,698 | 26,698 |

Source: Gary Bess Associates. Estimates derived from U.S. Census Bureau, 2019 American Community Survey 5-Year Estimates, Table B27010. Some values extrapolated by Gary Bess Associates.

Oroville Hospital, *Community Health Needs Assessment*, at 47 (2022), https://www.orovillehospital.com/media/file/2022CHNA102122FINAL2.pdf  (last visited Nov. 20, 2025).

22.     For this reason, Oroville Hospital relies principally on revenue from government payors. In 2021, the state reported that Medi-Cal (41.6%) and Medicare (37.2%) represented a combined 78.8% of the hospital's net patient revenue, whereas private insurance accounted for just

178761953.3

19.9%.[7] This distribution among payors has remained roughly consistent. As of August 2025, approximately 81% of the Debtors' gross revenue was derived from government payors—50% from Medicare programs and 31% from Medi-Cal programs.

**C.      Oroville Hospital is one of the top employers in Oroville.**

23.      Oroville Hospital employs approximately 2,130 employees and 188 independent contractors (collectively, the "Employees").  Notably, the scope of the hospital's operations make it the second largest employer in the City of Oroville with its operations comprising ***31.6% of the City's total workforce***.[8]

24.      Approximately 54% of the Debtors' employees—nearly 1,147 in total—are represented through two labor unions: the California Nurses Association ("CNA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW" and, together with CNA, the "Unions").

**III.**

**THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE**

**A.      The Debtors share joint management over their healthcare operations.**

25.      As set forth above, the Debtors are each governed by an identical nine-member board of trustees with the following roles and occupations:

| Trustee | Occupation |
| --- | --- |
| Matthew J. Bazzani, M.D., Chair | Physician, Obstetrics/Gynecology |
| James H. Moll, Vice Chair | Vice President, Investments, Stifel |
| Roy C. Shannon, M.D., Secretary | Physician, Hospitalist |
| Sultan M. Chopan, M.D. | Physician, Family Medicine |
| Edward R. Gilbert | General Manager, Feather Falls Casino (*Retired*) |
| Margaret Mallette | Retired, Registered Nurse/Director, Intensive Care Unit |

[7] *See* Cal. Dept. of Healthcare Access & Info., *Net Patient Revenue, Discharges, and Outpatient Visits by Payer and Facility* (2021), https://hcai.ca.gov/visualizations/net-patient-revenue-discharges-and-outpatient-visits-by-payer-and-facility/ (last visited Nov. 20, 2025).
[8] *See* City of Oroville, Cal., Dept. of Fin., *Annual Comprehensive Financial Report for the Fiscal Year Ended June 30, 2024*, Table 15 at 160 (Jun 12, 2025), https://www.orovilleca.gov/ArchiveCenter/ViewFile/Item/86 (last accessed Nov. 10, 2025).

178761953.3

| | |
|---|---|
| Seng Yang | Director, Hmong Cultural Center of Butte County |
| Robert J. Wentz, President and CEO[9] | Oroville Hospital (*Ex-Officio*) |

The bylaws limit the number of "interested persons" serving as trustees, *i.e.*, a person who is also an employee of the relevant Debtor, to a minority of the board of trustees.

26.      The Debtors' boards of trustees are charged with the authority to appoint the Debtors' executive management team, comprised of the chief executive officer and the chief restructuring officer.  The chief executive officer selects other officers not appointed by the board of trustees. OroHealth has the following executives:

| **Role** | **Executive** |
|---|---|
| President & Chief Executive Officer | Robert J. Wentz |
| Administrator & Chief Operating Officer | Scott Chapple |
| Chief Financial Officer | Colleen Sue Duncan |
| Chief Restructuring Officer | Michael Lane |
| Chief Nursing Officer | Edie Fischer, R.N., B.S.N. |
| Chief Information Officer | Denise L. LeFevre |
| Chief Privacy Officer | Tanushri Kohli |
| Revenue/Reimbursement Officer | Jo Dilbeck |

OroHealth provides the services of the above executives and other administrative personnel to Oroville Hospital under a management services arrangement. Oroville Hospital reimburses OroHealth for the cost of these individuals who serve Oroville Hospital but are employed by OroHealth.

In addition to the above executives, Oroville Hospital has the following additional executives either through employment or independent contractor arrangements:

| **Role** | **Executive** |
|---|---|
| Chief Technology Officer | Zachary Golzalez |

---

[9] The President and Chief Executive Officer of each Debtor serves on each of the Debtors' respective boards as an *ex-officio* voting member with a term that does not expire.

- 16 -

178761953.3

Chief Medical Informatics Officer       Narinder Singh, M.D.

Compliance Officer       Chris Cox

27.     The prepetition organizational structure of the Debtors and their related nondebtor affiliates is as follows:



**B.**     **The Debtors' principal secured obligations are two bond issuances related to hospital improvements and the Tower Project.**

28.     **The Bond Issuances.** The principal secured obligations of Oroville Hospital relate to two bond issuances by the City of Oroville under which Oroville Hospital is obligated as the sole obligated group member. The City of Oroville previously enacted legislation that established a procedure for the authorization, issuance and sale of revenue bonds by the for the purpose of making loans to provide financing for health facilities located in the city. Such bonds are tax exempt, meaning that interest on bonds issued by the city is not taxable to the bond holders so long as the issuer maintains its qualified tax exempt status and the proceeds for the bonds are used for the tax exempt purposes for which they were originally intended.

a.     **The 2018 Bonds.** In July 2018, the City of Oroville issued its Hospital Revenue Bonds, Series 2018 (the "Series 2018 Bonds") in the aggregate principal amount of $19.6 million. The proceeds from the sale of the Series 2018 Bonds were loaned to Oroville Hospital for the renovation and construction of hospital improvements and to refund certain older bonds under an earlier issuance. The Bank of New York Mellon Trust Company, N.A., is the indenture trustee under the Series 2018 Bonds (the "2018 Bond Trustee"). The Series 2018 Bonds are privately placed and, on information and belief, U.S. Bank, National Association, is the sole holder of the Series 2018 Bonds. The Series 2018 Bonds mature on April 1, 2038, and bear interest at the rate of 3.29% per

annum. As of August 31, 2025, the total outstanding liability associated with the Series 2018 Bonds was approximately $14 million.[10]

b.     **The 2019 Bonds.**  On February 1, 2019, the City of Oroville issued its City of Oroville Revenue Bonds (Oroville Hospital), Series 2019 (the "Series 2019 Bonds" and, together with the 2018 Bonds, the "Bonds") in the aggregate principal amount of $195.63 million, $16.2 million of bond premium, and $1.98 million of bond discount. The proceeds from the sale of the Series 2019 Bonds were loaned to Oroville Hospital to finance substantially all of the costs of the Tower Project. UMB Bank, N.A., is the indenture trustee under the Series 2019 Bonds (the "2019 Bond Trustee" or "UMB Bank").  The Series 2019 Bonds are publicly traded and comprised of 12 bonds maturing as follows: April 1, 2024 through 2031, bearing interest at 5.0%; and April 1 of 2034, 2039, 2049, and 2054 bearing interest at 5.25%. As of August 31, 2025, the total outstanding liability associated with the Series 2019 Bonds was approximately $207.9 million.[11]

c.     **The Master Indenture and Asserted Bond Collateral.** In connection with the issuance of the Series 2019 Bonds, Oroville Hospital entered into that certain Master Indenture of Trust, dated February 1, 2019 (the "Master Indenture"), and certain related amendments and supplements to the Series 2018 Bond documents.  UMB Bank is the master trustee under the Master Indenture (the "Master Trustee").

d.     Generally, under the Master Indenture and related documents, the Master Trustee asserts a security interest in the following collateral: (i) the property, plant, and equipment located on at Oroville Hospital's main hospital campus; (ii) any rents collected by Oroville Hospital related to the foregoing real property; and (iii) the gross revenues of Oroville Hospital, including, without limitation, payor receivables.

---

[10] Nothing contained herein is intended to be, nor shall be construed as, an admission by the Debtors regarding the validity, amount, priority or perfection of the 2018 Bonds.  All rights are expressly preserved.

[11] As of September 30, 2025, the total outstanding liability related to the 2019 Bonds was approximately $204.9 million. Nothing contained herein is intended to be, nor shall be construed as, an admission by the Debtors regarding the validity, amount, priority or perfection of the 2019 Bonds. All rights are expressly preserved.

178761953.3

29.    **Additional Obligations Allegedly Secured by Real Estate.**  Certain of the Debtors' real property not otherwise encumbered by the obligations owing to the Bonds are subject to asserted first deeds of trust in favor of other lenders. In most instances, these deeds of trust relate to either purchase money loans for real estate acquisition or business loan agreements. These asserted secured obligations and the related asserted real property collateral are as follows:

| Lender | Borrower | Current Balance | Alleged Collateral |
|---|---|---|---|
| First-Citizens Bank & Trust Company | Oroville Hospital (OroHealth as guarantor) | $356,705 | 2713 &2711 Oro Dam Boulevard Oroville, CA 95966 |
| | | | 2734 Gilmore Lane Oroville, CA 95966 |
| | | | 2645, 2635, 2655 Olive Highway Oroville, CA 95966 |
| | | | 2784, 2786, 2788 Fay Way Oroville, CA 95966 |
| First-Citizens Bank & Trust Company | Oroville Hospital (OroHealth as guarantor) | $190,312 | 2220 5th Avenue Oroville, CA 95966 |
| First-Citizens Bank & Trust Company | Oroville Hospital (OroHealth as guarantor) | $191,071 | 2828 Feather River Boulevard Oroville, CA 95965 |
| First-Citizens Bank & Trust Company | OroHealth (Oroville Hospital as guarantor) | $1,394,063 | 2721, 2685, 2675, 2665 Olive Hwy. Oroville, CA 95966 |
| Mechanics Bank, N.A. | Oroville Hospital | $276,903 | 3579 Oro Dam Boulevard E Oroville, CA 95966 |
| Mechanics Bank, N.A. | Oroville Hospital | $855,553 | 2971 & 2981 Olive Highway Oroville, CA 95966 |
| Trisha L. Hopps and Pamela Serafine | Oroville Hospital | $305,413 | 5537 Black Olive Drive Paradise, CA 95969 |

As of November 30, 2025, the Debtors' non-Bond obligations secured by real property totaled approximately $3.57 million.[12]

---

[12] Current balances are approximate as of November 30, 2025.  Nothing contained herein is intended to be, nor shall be construed as, an admission by the Debtors regarding the validity, amount, priority or perfection of any liens.  All rights are expressly preserved.

- 19 -

178761953.3

30.     **Additional Obligations Allegedly Secured by Personal Property.**  The Debtors regularly enter into agreements to finance or lease, on a secured basis, certain medical equipment and vehicles utilized in the ordinary course of the Debtors' operations. As of August 31, 2025, the Debtors' obligations secured by personal property and capital lease obligations totaled approximately $8.7 million.[13]

**C.     The Debtors' unsecured debt relates primarily to ordinary course claims.**

31.     The Debtors have approximately $180 million in total unsecured debt, including disputed, unliquidated, or contingent claims, which are generally comprised of trade creditors, employee wages and benefits, lease obligations, litigation claims, and liabilities associated with government payables.

**IV.**

**EVENTS LEADING TO THESE CHAPTER 11 CASES**

**A.     The Debtors historically grappled with challenges chronic among similar systems that render the Debtors more susceptible to acute cash flow constraints.**

32.     Many of the challenges that have affected the Debtors' financial performance are not novel among independent and rural healthcare systems. While no one factor is the sole cause of these Chapter 11 Cases, the following circumstances common among similarly situated hospitals result in chronic challenges maintaining sufficient working capital to bridge during instances of acute financial distress. These historical challenges have made the Debtors more susceptible to recent financial shocks described in greater detail below.

a.     **Payor Mix and Rates.** As discussed above, most of the Debtors' revenue is derived from government payors.  This includes Medicare "fee for service," Medi-Cal "fee for service" and "managed care," and Medicare Advantage programs. However, reimbursement under these programs is often insufficient to reimburse the cost of care—let alone provide sufficient funding for operations. Indeed, a larger share of hospital revenue from Medicaid is associated with increased

---

[13] Nothing contained herein is intended to be, nor shall be construed as, an admission by the Debtors regarding the validity, amount, priority or perfection of any financing or lease obligations.  All rights are expressly preserved.

odds of financial distress for a healthcare provider.[14] As a result, there are more than 30 supplemental payment programs in California that provide additional payments to Medi-Cal reliant healthcare providers that cover different hospital types and services. The supplemental programs most relevant to the Debtors are the California Hospital Quality Assurance Fee ("HQAF") program, implemented by the California Department of Health Care Services ("DHCS"), and Disproportionate Share Hospital ("DSH") programs. These programs are all approved by CMS, which provides federal supplemental funding through a variety of mechanisms.

          i.      DHCS implemented its first HQAF program in 2010, which was made permanent by the passage of Proposition 52 in November 2016. "The HQAF program provides funding for supplemental payments to California hospitals that serve Medi-Cal and uninsured patients. Revenue from the HQAF also provides funding for children's health care coverage, pays direct grants to public hospitals, and reimburses DHCS for the direct costs of administering the program. The program has been very successful, providing billions of dollars in supplemental payments to California hospitals."[15]

          ii.      DSH is a supplemental payment program "established to reimburse hospitals for some of the uncompensated care costs associated with furnishing inpatient hospital services to Medi-Cal beneficiaries and uninsured individuals."[16] As a technical matter, only certain public hospitals are eligible to receive federal DSH funding. However, California provides an analogous supplemental funding program that permits private hospitals to receive comparable funding. Under this program, known as DSH-Replacement or Virtual DSH, private hospitals that

---

[14] *See, e.g.*, Samuel J. Enumah & David C. Chang, *Predictors of Financial Distress Among Private U.S. Hospitals*, J. SURGICAL RESEARCH (June 20, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8678151/ (last accessed Nov. 21, 2025) ("A larger share of hospital revenue from Medicaid services was associated with increased odds of financial distress as compared to the lowest Medicaid mix quartile (aOR, 2.65 [95% CI 1.87 – 3.77]).").

[15] *See* DHCS, Hospital Quality Assurance Fee Program, https://www.dhcs.ca.gov/provgovpart/Pages/hqaf.aspx#:~:text=The%20California%20Department%20of%20Health,Medi%2DCal%20and%20uninsured%20patients (last accessed Nov. 22, 2025).

[16] *See* DHCS, Disproportionate Share Hospital Program, https://www.dhcs.ca.gov/provgovpart/Pages/DisproportionateShareHospital.aspx#:~:text=The%20Disproportionate%20Share%20Hospital%20(DSH,Cal%20beneficiaries%20and%20uninsured%20individuals (last accessed Nov. 22, 2025).

- 21 -

178761953.3

would have otherwise been eligible to receive DSH funds receive equivalent supplemental payments through the state General Fund and non-DSH federal matching funds.

      b.    **Revenue Cycle.** The Debtors' cashflow is heavily reliant on payments from the HQAF program. The largest HQAF payments the Debtors receive relate to the managed care portion of Medi-Cal services and are commonly disbursed in April and October of each year. Although the payments are significant, their infrequency (and the Debtors' reliance on this source of supplemental government revenue) results in lengthy periods of negative cash flow between payments. Moreover, California law requires that the Debtors first pay a provider "tax" to receive the HQAF payment. As a result, the Debtors' net working capital is further degraded in the months preceding an HQAF receipt as the HQAF program is structured to require qualified hospitals to first pay the HQAF fee to the State.

      c.    **COVID-19 Impacts.** The COVID-19 pandemic negatively impacted the Debtors' cash on hand in three key respects. First, the cost of care increased as a result of increased demand for third party staffing. In Fiscal Year 2022, staffing and registry costs were over $7 million higher than previous years. Second, the Debtors' revenue fell as a result of the limitations placed on outpatient procedures. Third, while the Debtors advanced payments under the CARES Act, the Debtors were required to pay back accelerated revenue ($41 million in the Debtors' case) during 2021 and 2022 through recoupment against the Debtors' Medicare payments. Fourth, the Debtors incurred other non-ordinary expenses in their role as a key community resource for COVID needs related to the treatment of acute illnesses and the operation of vaccination and testing centers. On a net basis, the Debtors estimate that COVID-19 resulted in a $10 million loss to the Debtors' liquidity by the end of 2022.

    33.    As discussed more fully below, like many rural hospitals in California and nationwide that have higher than average Medicare and Medicaid populations, the impacts of these and other historical challenges degraded the Debtors' cash on hand by early 2023. On April 27, 2023, Oroville Hospital provided notice that it was out of compliance with its annual debt service coverage ratio covenants required by the Bonds, based on its audited financial statement for the fiscal year ended November 30, 2022.

178761953.3

**B.** **The Debtors entered two years of protracted negotiations with the Master Trustee over nonmonetary covenant defaults.**

34.     On May 23, 2023, Oroville Hospital provided formal notice that it failed to satisfy its annual debt service coverage ratio under the Master Indenture.  The Master Indenture did not treat the covenant default as an event of default if Oroville Hospital retained an independent consultant to make recommendations to increase the ratio in subsequent years. At the recommendation of the Master Trustee, Oroville Hospital engaged FTI Consulting, Inc. ("FTI"), as independent consultant to perform this review and provide a copy of its report to the Master Trustee. By December 2023, the Master Trustee requested that Oroville Hospital expand FTI's engagement to create a multi-year forecast through Fiscal Year 2028 with a further detailed performance assessment of revenues and expenses.

35.     The intervention successfully improved portions of Oroville Hospital's financial position through 2024. For example, the Debtors increased collections on accounts receivable and decreased labor expenses by reducing reliance on staffing companies but faced challenges with supply expenses and net patient revenues due to volume, payor mix, and rates. Despite these challenges, by the Second Quarter of 2024, Oroville Hospital improved its debt service coverage ratio above the Bond covenants and continued to exceed Bond covenant concerning days cash on hand. Further modeling—publicly posted to the Electronic Municipal Market Access website ("EMMA") operated by the Municipal Securities Rulemaking Board—and investor presentations ensued throughout 2024 as Oroville Hospital continued to assess and implement certain considerations and recommendations presented by FTI.

36.     In March 2024, Oroville Hospital first received a forbearance proposal from the Master Trustee. However, the parties were unable to reach a forbearance agreement despite Oroville Hospital's assessment and implementation of FTI considerations and recommendations, significantly enhanced transparency, and restoration of the Debtors' financial position to exceed the nonmonetary covenants under the Bonds.

178761953.3

**C.**    **Delays associated with the Tower Project have deferred expected increases in revenue.**

37.    Throughout this period, the Tower Project for which the 2019 Bonds were issued was encountered delays due to a variety of factors outside of the Debtors' control. The Tower Project is intended to add an approximately 159,000 square foot New Tower adjacent to the existing hospital. The Tower Project would both increase the total licensed beds from 133 to 211 and also bring Oroville Hospital into compliance with the seismic structural performance ratings for which compliance is required by January 1, 2030. When the 2019 Bonds were issued, the Debtors anticipated that the New Tower would open in the fiscal quarter ending May 31, 2022, and cost approximately $178 million to construct.

38.    Modern-Sundt, the contractor on the Tower Project, ran into delays less than a year after work commenced on the Tower Project. In February 2020, Modern-Sundt delayed work on the Tower Project's steel framing, which necessarily caused broad project delays. By February 2024, Modern-Sundt had incurred approximately 1,000 days of construction delays. At the same time, Modern-Sundt began issuing disputed change order requests that sought, among other things, payment of salaries notwithstanding the work delays. On February 16, 2024, Modern-Sundt formally abandoned the Tower Project in unfinished condition and recorded a mechanics lien in the approximate amount of $16.9 million.

39.    In March 2024, Modern-Sundt sued Oroville Hospital over the disputed project and Oroville Hospital counterclaimed. On August 14, 2024, the state court ordered the reduction of the Modern-Sundt mechanics lien to approximately $5.4 million based on failure to substantiate a right to the $16.9 million claim. The California Court of Appeals denied a petition for writ of mandate concerning the ruling and the California Supreme Court denied a petition for review. The litigation remains ongoing.

40.    At the same time, Oroville Hospital encountered difficulty obtaining reimbursement of construction expenses from the Master Trustee. The 2019 Bonds established a "Project Fund" under which Oroville Hospital would requisition funds related to Tower Project expenses. Upon receipt of a requisition, the Master Trustee was required to release 2019 Bond proceeds held in the Project Fund to reimburse Oroville Hospital for construction costs incurred. By August 2025,

178761953.3

1    Oroville Hospital had submitted $9.89 million of requisition requests to the Master Trustee that

2    remained unpaid and outstanding. The Master Trustee initially indicated that it had withheld further

3    Project Fund requisitions while the Modern-Sundt mechanics lien remained outstanding. Oroville

4    Hospital's position is that the Master Trustee is not permitted to withhold for this reason. However,

5    the Master Trustee simply ignored Oroville Hospital when pressed on the basis for the Project Fund

6    withhold.

7        41.    The Debtors nevertheless continued to incur obligations related to Tower Project

8    construction on the understanding that Project Fund money would be released. Indeed, the release of

9    Project Fund requisitions was modeled in the Debtors' financial forecasts until just several months

10   ago. However, the growing delay in payment of requisitions began to negatively impact cash flow

11   relative to the Debtors' forecasts, as the Debtors were required to divert operating revenue to fund

12   Tower Project expenses that should have been funded from the Project Fund.

13       42.    As of the date of this Declaration, the Tower Project is substantially complete subject

14   to installation of certain mandated equipment.

15   **D.    Actual net benefit from HQAF Program VIII fell short of projections.**

16       43.    The unanticipated withholding of $9.89 million in requisitioned funds was not the only

17   adverse impact to cash flow in 2025. The Debtors first learned in September 2025 that the forecast of

18   HQAF payments for "Program VIII"—spanning services rendered from January 1, 2023, through

19   December 31, 2023—was overestimated by approximately $10.1 million with respect to the Private

20   Hospital Directed Payment ("PHDP") portion of Program VIII.[17]

21       44.    The HQAF works as follows: The State[18] first develops a proposal to obtain federal

22   matching funds for PHDP through a statewide model based on past utilization (inpatient and

23   outpatient days) and statewide projected utilization growth rates. No individual hospital has input

---

[17] HQAF Program VIII spans services delivered from January 1, 2023, through December 31, 2024. However, as of the date of this Declaration, the Debtors have only actually received PHDP payments for HQAF Program VIII for services delivered through calendar year 2023. The Debtors will receive PHDP payments related to calendar year 2024 in April 2026 and October 2026 but anticipate that those payments will also be less than originally modeled.

[18] The California Hospital Association prepares the statewide model on behalf of DHCS.

178761953.3

into the State's model. The model is subsequently proposed to CMS, negotiated, and funded into the final HQAF PHDP program. The funds are then allocated by hospital based on actual utilization during the program period. While the State model for CY 2023 was roughly accurate based on statewide utilization, the results varied materially on a hospital-by-hospital basis. Indeed, this variability when estimating HQAF revenue is not new among distressed hospital systems in California. *See, e.g.*, *In re Verity Health Sys. of Cal.*, Case No. 2:18-bk-20151-ER, Decl. of Richard G. Adcock, Docket No. 8 at 28 (Bankr. C.D. Cal. Aug. 31, 2018) (noting that "the Debtors have received anywhere from 69.2%-93.3%" lower payments than expected during HQAF Program V (fee for service) among the causes of the bankruptcy filing).

45.    A particular hospital's "net benefit" from a HQAF Program cycle cannot be readily determined until it begins receiving the initial Program payments. This is because a hospital's share of the "pot" is not known until hospitals begin reporting actual utilization versus the modeled utilization for the Program period. Given the outsized significance of HQAF receivables for the Debtors, the Debtors have historically engaged an HQAF consultant to assist in modeling and projecting expected HQAF revenue.

46.    The Debtors did not have confirmation that Program VIII receipts would be lower than modeled until September 2025. The Debtors received the first PHDP payment for Program VIII in April 2025. It was approximately $4.8 million less than projected. The second PHDP payment was made in September 2025 and confirmed that the payments were not as modeled by the State—this payment was approximately $5.3 million less than projected. Following the second payment, the Debtors and their HQAF consultant were able to more accurately model the actual net benefit from Program VIII. For the period from January 1, 2024 through December 31, 2024 (the second calendar year of Program VIII), the Debtors now expect to receive a net benefit that is approximately $16.3 million lower than the original estimates. Overall, the Debtors expect to receive a net benefit from Program VIII that is $26.4 million lower than originally projected in the State model. This will continue to impact revenue through the Program VIII payment cycle, which is expected to conclude in October 2026.

47.     The Debtors have continued to work with their HQAF consultant to model Program IX. The State model is already developed for this program and the State and CMS are already in negotiations to determine the final model for Program IX. Certain other states have already received approval for their models and approval for California is expected in the coming months. In connection with its projections for the duration of these Chapter 11 Cases, management of the Debtors directed their HQAF consultant to perform projections for Program IX net benefit, the first payment of which is expected in October 2026 for Program IX PHDP. Those projections have been provided to the Debtors' advisors and incorporated into the Debtors' financial modeling presented in these Chapter 11 Cases, including, *inter alia*, the 13-week cash flow forecast and the valuation of certain of the Debtors' assets and operations.

**E.     The 2019 Bond Trustee rejected the Debtors' efforts to liquidate a business line to support continued operations.**

48.     In February 2025, the Debtors provided notice that they were considering the sale of a line of business. The notice provided that, in accordance with California law, any such sale would be at fair market value to an arms-length third-party purchaser. The proceeds of such sale would have increased the Debtors' cash on hand. The Debtors' also anticipated that any such sale would necessitate a public filing of the sale documents with California's Office of Health Care Affordability. The Debtors disputed whether Master Trustee consent was required for the transaction to move forward. However, the Master Trustee insisted consent was required and that consent would be withheld as the Debtors' financial deterioration continued. Ultimately, the sale did not move forward and the Debtors did not realize the cash proceeds.

49.     The Master Trustee's Project Fund withholds and HQAF Program VIII adjustments precipitated a cash crisis when coupled with the Debtors' historical issues growing working capital. On August 4, 2025, Oroville Hospital provided public notice to Bond holders that the Hospital's projected cash on hand would run out by September 2025 without release of the requisitioned Project Funds. While forbearance negotiations continued, the Master Trustee did not agree to release Project Funds.

- 27 -

178761953.3

**F.** **The 2019 Bond Trustee manufactured a payment default, accelerated the 2019 Bond obligations, and swept $27 million in funds.**

50.     Oroville Hospital was due to make a $5 million debt service payment to the Bonds by September 30, 2025. By this time, the Debtors were undertaking cash management strategies to stretch payments to critical vendors and physicians, among others, to ensure that the Hospital could remain open. The Debtors offered the Master Trustee a deal: utilize some of the $9.89 million in requisitioned but unpaid Project Funds to satisfy the $5 million debt service obligations. While the Debtors thought they had a deal, they did not.

51.     On October 1, 2025, the Master Trustee issued a notice of monetary default and acceleration under the 2019 Bonds (the "Acceleration Notice") while the Master Trustee and the Debtors' representatives were engaged in forbearance negotiations. The default was premised on the nonpayment of the $5 million debt service obligation due in September. As a result, the 2019 Bond Trustee foreclosed on $27,102,995.55 in money held by it in both the Project Fund and a related Debt Service Reserve Fund established under the Bond documents. The Acceleration Notice and resulting sweep of the Project Funds and other amounts held in reserve for debt service by the Master Trustee, caught the Debtors off guard and was the driving reason why the Debtors were forced to pivot towards a chapter 11 filing.

52.     On November 13, 2025, First-Citizens Bank & Trust Company provided a courtesy notice of default to the Debtors and certain affiliates related to business loan agreements and related guaranties, as well as certain equipment leases. The default was triggered by the Acceleration Notice.

53.     On December 5, 2025, the 2018 Bond Trustee provided the Debtors with a notice of default and acceleration under the 2018 Bonds. The default was triggered by the Acceleration Notice.

54.     The Debtors have remained engaged with the Master Trustee throughout this period in the hopes of striking a deal for use of the $27 million swept following the Acceleration Notice. However, the parties were unable to come to agreement on a proposal that would adequately fund operations and administrative expenses during these Chapter 11 Cases.

178761953.3

**V.**

**THE DEBTORS' PRINCIPAL OBJECTIVES IN THESE CHAPTER 11 CASES**

A.      **The Debtors remain focused on delivering high quality patient care and preserving their health care facilities for their community and stakeholders.**

55.      The Debtors' immediate objective in filing these Chapter 11 Cases is to preserve the continuity of operations at the Debtors' health care facilities. The Debtors remain committed to the continued provision of high-quality patient care to the communities in which they serve. Moreover, the continued operation of the Debtors' facilities—and retention of employees—will serve to preserve the value of the Debtors' operations for the benefit of its stakeholders.

B.      **The Debtors have selected a postpetition financing lender after a robust marketing process that included negotiations with the Master Trustee.**

56.      The Debtors require access to liquidity to run a value-maximizing sale process in these Chapter 11 Cases. In November 2025, the Debtors retained Cain Brothers, a division of KeyBanc Capital Markets Inc. ("Cain Brothers"), to identify postpetition financing sufficient to fund the Debtors' operations during these Chapter 11 Cases. These marketing efforts included lengthy negotiations with the Master Trustee over the course of the months preceding the Chapter 11 Cases to determine whether the Master Trustee could provide sufficient liquidity to fund the Chapter 11 Cases.

57.      In addition, Cain Brothers undertook a robust, expedited marketing and negotiation process to identify potential third party lenders. Cain Brothers identified and contacted 50 potential lenders that Cain Brothers believed, in its experience, constituted third party lenders that fit the need, market, and industry of the Debtors and the Chapter 11 Cases.  Twelve of these potential lenders executed non-disclosure agreements with the Debtors and received access to a data diligence room maintained by the Debtors. On December 1, 2025, the Debtors received four indications of interest from third party lenders.  The Debtors' Board of Trustees reviewed all four of the indications of interest, and directed the Debtors selected two of those parties to engage in further negotiation with to arrive at binding term sheet proposals.  The Board of Trustees further directed the Debtors to

178761953.3

continue negotiations with the Master Trustee. The two remaining third party lenders submitted binding term sheets to the Debtors.

58.     On December 6, 2025, the Board of Trustees reviewed the two third party financing proposals and the proposal from the Master Trustee. The Board of Trustees selected the proposal submitted by Rosemawr Management LLC (the "<u>DIP Lender</u>") as the best proposal based on, among other things, sufficient availability to fund the projected need for operational and administrative expenses in the Chapter 11 Cases and the cost of the proposed financing. On December 7, 2025, the Debtors and the DIP Lender finalized and executed a binding term sheet to provide debtor-in-possession financing.

**C.     <u>The Debtors initiated a process prepetition to sell substantially all their assets to a buyer that can continue operating the Debtors' facilities.</u>**

59.     The Debtors also engaged Cain Brothers prepetition to identify potential buyers for substantially all the Debtors' assets. The Debtors intend to pursue a sale process in these Chapter 11 Cases to maximize the value of their assets and identify one or more transaction partners that can preserve the Debtors' healthcare facilities for the benefit of their community, patients, employees, and other stakeholders. Indeed, the Debtors sought the input of the Master Trustee prepetition on the preferred outcome following the Acceleration Notice and were informed that a transaction in a bankruptcy proceeding was viewed as the most viable path forward to maximize value and obtain continued access to liquidity.

60.     Cain Brothers' efforts have been primarily focused on postpetition financing but that has not delayed diligent efforts to bring the transaction process underway. Cain Brothers has already assembled a diligence request list and has been meeting with the Debtors' executive team and advisors to collect and analyze financial, operational and competitive data about the Debtors and is preparing marketing materials. To date, I understand that Cain Brothers performed the following:

    a.     conducted a site visit and tour of the Debtors' facilities, including the hospital, Tower and ambulatory care sites and had an initial due diligence meeting with executives;

    b.     organized meetings with the Debtors' management and its advisors to collect and review due diligence materials and to understand the historical financial performance, HQAF

178761953.3

program, operational information, the status of the Tower and the reconfiguration of clinical operations once the Tower is operational;

        c.     developed a marketing process timeline for the sale of the Debtors' assets with key milestones and target dates for negotiating a stalking horse agreement, auction and regulatory approval processes;

        d.     developed a target list of likely potential transaction parties;

        e.     prepared a form nondisclosure agreement to provide to interested parties;

        f.     created a confidential information presentation which will summarize key financial, operational, and competitive information about the Debtors and the greater Butte County health care market; and

        g.     initiated contact with potentially interested parties including sending nondisclosure agreements to 39 parties.

61.    While the process is in its early stages, the Debtors anticipate initiating a fulsome process postpetition to identify a stalking horse purchaser not later than early May 2026, subject to the milestones in any approved debtor-in-possession financing.

62.    The Debtors remain committed to their mandate to preserve their critical healthcare facilities and operations for their communities and stakeholders. The Chapter 11 Cases were commenced to further this ultimate objective.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 8th day of December, 2025, in Butte County, California.

Robert J. Wentz

- 31 -

178761953.3