**31**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:    (310) 598-4150
Facsimile:    (310) 556-9829

*Proposed Counsel to Oroville Hospital, et al.,*
*the Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Lead Case No. 25-26876 |
| OROVILLE HOSPITAL, *et al.*,[1] | Jointly Administered With: Case No. 25-26877 |
|     Debtors and Debtors in Possession. | **DCN KCO-2** |
| | Chapter 11 |
| ☒   Affects All Debtors | Hon. Christopher D. Jaime |
| ☐   Affects Oroville Hospital | **Hearing Information** |
| ☐   Affects OroHealth Corporation: A Nonprofit Healthcare System | Hearing Date:  December 11, 2025 |
|     Debtors and Debtors in Possession. | Hearing Time:  11:00 a.m. |
| | Location:    Courtroom 32 |
| |        501 I Street, Sixth Floor |
| |        Sacramento, California 95814 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION, AND (B) CONTINUE EMPLOYEE BENEFITS; AND (II) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

# **TABLE OF CONTENTS**

Page

I. JURISDICTION AND VENUE ................................................................................ 8

II. FACTUAL BACKGROUND AND RELIEF REQUESTED ................................... 9

    A.    General Background ................................................................................. 9

    B.    The Debtors' Workforce .......................................................................... 10

    C.    The Debtors' Union Workforce ............................................................... 10

    D.    Employee Compensation and Benefits Programs .................................... 11

    E.    Employee Compensation ......................................................................... 13

    F.    Withholding Obligations ......................................................................... 13

    G.    Unemployment Obligations .................................................................... 14

    H.    Reimbursable Expenses .......................................................................... 15

    I.    Employee Benefit Programs ................................................................... 16

        1.    PTO / Sick Leave / Holidays / Vacation / Bereavement / Jury Duty ........ 16

        2.    Primary Medical and Prescription Drug Plan ........................................... 18

        3.    CNA Medical and Prescription Drug Plan ................................................ 19

        4.    Primary Dental Plan ................................................................................. 19

        5.    Primary Vision Plan ................................................................................. 19

        6.    Primary Insurance Plans ........................................................................... 19

        7.    Other Primary Health Benefits ................................................................. 20

        8.    Health Plan Administration Fees .............................................................. 20

        9.    Retirement Plans ...................................................................................... 21

        10.    Profit Sharing Plan ................................................................................... 22

        11.    Workers' Compensation Program .............................................................. 22

III. BASIS FOR RELIEF ............................................................................................ 23

    A.    Payment of Withheld Amounts and Deductions that are not Property of the Estate is Required by Law and Should be Allowed ....................................................... 24

    B.    Certain Employee Compensation and Benefits Programs are Entitled to Priority Treatment .............................................................................................................. 25

    C.    Payment of the Employee Compensation and Employee Benefits is Necessary and Authorized by 11 U.S.C. §§ 363(b) and 105(a) ................................................ 25

    D.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate Here .................................................................................................. 28

IV. PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS ......................... 28

V. EMERGENCY CONSIDERATION ........................................................................ 29

VI. RESERVATION OF RIGHTS ............................................................................. 30

VII. WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H) ............................. 30

VIII. NOTICE ....................................................................................................... 30

IX. CONCLUSION ................................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re B & W Enters., Inc.*,
   713 F.2d 534 (9th Cir. 1983) ..............................................................................27

*In re Beverly Community Hospital Association*,
   No. 23-12359-SK, Docket No. 335 (Bankr. C.D. Cal. May 26, 2023) ...............................8, 27

*City of Farrell v. Sharon Steel Corp.*,
   41 F.3d 92 (3d Cir. 1994) ..............................................................................24

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983).............................................................................26

*In re CoServ*,
   273 B.R. 487 (Bankr. N.D. Tex. 2002) ..............................................................26

*In re Downey Reg'l Med. Ctr.-Hosp., Inc.*,
   Case No. 09-34714-BB, Docket No. 37 (Bankr. C.D. Cal. Sept. 17, 2009)............................28

*In re DuCharmes & Co.*,
   852 F.2d 194 (6th Cir. 1988) ..............................................................................24

*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
   Case No. 16-17463-ER, Docket No. 68 (Bankr. C.D. Cal. June 10, 2016)............................27

*In re Gordian Med., Inc.*,
   Case No. 12- 12399-MW, Docket No. 57 (Bankr. C.D. Cal. March 5, 2012) ........................27

*In re Gulf Air*,
   112 B.R. 152 (Bankr. W.D. La. 1989) ..............................................................27

*In Burchinol v. Cent. Wash. Bank (In re Adam's Apple, Inc.)*,
   829 F.2d 1484 (9th Cir, 1987) ..............................................................................26, 27

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989)..............................................................................27

*In re Just for Feet, Inc.*,
   242 B.R. 821 (D. Del. 1999)..............................................................................26, 27

*In re Lehigh & New Eng. Ry.*,
   657 F.2d 570 (3d Cir. 1981) ..............................................................................26

*In re Montgomery Ward Holding Corp.*,
   242 B.R. 147 (D. Del. 1999)..............................................................................25

*In re Pleasant Care Corp.*,
   Case No. 07-12312-EC, Docket No. 47 (Bankr. C.D. Cal. Mar. 27, 2007) ............................28

*In re R&T Roofing Structures & Commercial Framing, Inc.*,
 887 F.2d 981 (9th Cir. 1989) ........................................................................................24

*In re Verity Health System of California*,
 No. 18-20151-ER, Docket No. 75 (Bankr. C.D. Cal. Sept. 5, 2018)..............................27

*In re Victor Valley Cmty. Hosp.*,
 Case No. 10-39537-CB, Docket No. 30 (Bankr. C.D. Cal. Sept. 17, 2010)....................28

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................... *passim*

11 U.S.C. § 362 ......................................................................................................................28

11 U.S.C. § 362(a) .................................................................................................................28

11 U.S.C. § 362(a)(1) .............................................................................................................28

11 U.S.C. § 362(d) ...............................................................................................................8, 9

11 U.S.C. § 362(d)(1) .............................................................................................................28

11 U.S.C. § 363 ......................................................................................................................11

11 U.S.C. § 363(b) .................................................................................................8, 9, 25, 26

11 U.S.C. § 363(b)(1) .............................................................................................................25

11 U.S.C. § 363(c)(1) .............................................................................................................25

11 U.S.C. § 364(d) .................................................................................................................27

11 U.S.C. § 365 ......................................................................................................................30

11 U.S.C. § 507(a) ......................................................................................................... *passim*

11 U.S.C. § 507(a)(5) .............................................................................................................25

11 U.S.C. § 541 ......................................................................................................................24

11 U.S.C. § 541(b)(7) .............................................................................................................24

11 U.S.C. § 541(d) .................................................................................................................24

11 U.S.C. § 701, *et seq* ..........................................................................................................27

11 U.S.C. § 1101, *et seq* ............................................................................................... *passim*

11 U.S.C. § 1107 ....................................................................................................................25

11 U.S.C. § 1107(a) .................................................................................................................9

11 U.S.C. § 1108 ...............................................................................................................9, 25

11 U.S.C. § 1129(a) ...................................................................................25

11 U.S.C. § 1129(a)(9)(B) ..........................................................................25

26 U.S.C. § 403(b) .....................................................................................14

26 U.S.C. § 501(c)(3) ...................................................................................9

26 U.S.C. § 6672 ........................................................................................24

26 U.S.C. § 7501(a) ...................................................................................24

28 U.S.C. § 157 ............................................................................................8

28 U.S.C. § 157(b)(2) ...................................................................................9

28 U.S.C. § 1334 ..........................................................................................8

28 U.S.C. § 1408 ..........................................................................................9

28 U.S.C. § 1409 ..........................................................................................9

Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161, *et seq.* .......................20, 21

Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq.* .............................22

Federal Insurance Contributions Act, 26 U.S.C. § 3101, *et seq.* ..................................24

**Other Authorities**

2 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 11:386 (2014) ...............26

Fed. R. Bankr. P. 1007(d) ...........................................................................30

Fed. R. Bankr. P. 2002(i) ............................................................................31

Fed. R. Bankr. P. 6003 ........................................................................8, 9, 29

Fed. R. Bankr. P. 6003(b) ............................................................................29

Fed. R. Bankr. P. 6004 .............................................................................8, 9

Fed. R. Bankr. P. 6004(a) ...........................................................................30

Fed. R. Bankr. P. 6004(h) ...........................................................................30

Fed. R. Bankr. P. 6004(h) ...........................................................................30

Fed. R. Bankr. P. 7008 ..................................................................................9

LBR 9014-1(f)(3) ......................................................................................8, 9

LBR 9014-1(f)(4) ......................................................................................8, 9

1

U.S. Const. art. III §§1-2.............................................................................................9

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Oroville Hospital (the "Hospital"), and OroHealth Corporation ("OroHealth), the above-referenced debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned bankruptcy cases (the "Chapter 11 Cases") filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),[2] hereby submit this Memorandum of Points and Authorities in support of its motion (the "Motion") for entry of an order, substantially in the form attached to the Exhibit List as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order" respectively) filed concurrently herewith, pursuant to §§ 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 9014-1(f)(3) and (4) of the Local Rules of Practice (the "LBR"): (i) authorizing the Debtors to (a) pay prepetition wages, salaries, and other compensation, and (b) continue employee benefits; and (ii) granting related relief. In support of the Motion, the Debtors refers to the *Declaration of Robert J. Wentz in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (a) Pay Prepetition Wages, Salaries, and Other Compensation, and (b) Continue Employee Benefits; and (II) Grant Related Relief* (the "Wentz Declaration") and the *Declaration of Robert J. Wentz in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration")[3] filed concurrently herewith, the arguments of counsel at any hearing on the Motion, the record of this Chapter 11 Cases, any other admissible evidence properly brought before the Court, and respectfully states as follows.

## I.

## JURISDICTION AND VENUE

The United States Bankruptcy Court for the Eastern District of California (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and General Orders 182 and 223 of the United States District Court for the Eastern District of California. The Debtors confirm their

---

[2] Unless otherwise defined herein, all references to "Section" and "§" refer to a section of the Bankruptcy Code.

[3] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Motion and the Bankruptcy Cases, are set forth in greater detail in the First Day Declaration. Capitalized terms used but not otherwise defined in the Motion have the meanings given to them in the First Day Declaration or as indicated elsewhere in the Motion.

consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are §§ 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Rules 9014-1(f)(3) and (4) of the Local Rules of Practice.

**II.**

**FACTUAL BACKGROUND AND RELIEF REQUESTED**

**A.    General Background**

On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which initiated the Chapter 11 Cases. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. The Debtors also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, the Debtors recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal

Revenue Code of 1986. A more detailed description of the Debtors, including their current and historical business operations and the events precipitating the Chapter 11 Cases, are set forth in the First Day Declaration.

**B.      The Debtors' Workforce**

As of the Petition Date, the Debtors' workforce consists of approximately 1,589 full-time employees, 172 part-time employees, and 369 per-diem employees (collectively, the "Employees"). The Debtors are additionally served by medical staff of more than 147 physicians and surgeons, and 2 physician medical directors (collectively, the "Physicians"). Due to California's ban on the Corporate Practice of Medicine, the Physicians are all independent contractors or employees of physician groups that contract with the Debtors. As such, compensation for the Physicians will be addressed in the critical vendor motion.[4]

Both full-time employees and part-time employees are regularly scheduled to work every 14-day pay period; per-diem employees, meanwhile, are used on an as-needed basis. Notably, California mandates specific nurse-to-patient ratios. Therefore, the Debtors' use of per-diem employees helps to ensure that the Debtors comply with those mandatory requirements.

**C.      The Debtors' Union Workforce**

Two unions are active at Oroville Hospital. Approximately 418 of the registered nurses employed at Oroville Hospital are members of the California Nurses Association ("CNA") union, and approximately 729 of the Hospital's business, service, and technical employees belong to the United Steelworkers ("USW") union (collectively, the "Unions"). Oroville Hospital's relationship with the Unions is governed by collective bargaining agreements (hereinafter, the "CBAs"). The current CNA collective bargaining agreement is effective from April 11, 2024, through April 11, 2027. The USW has three materially similar CBAs for business, service, and technical units. The most recent collective bargaining agreements appliable to the USW were effective from September 22, 2022, through December 31, 2025. USW and Oroville Hospital are in active negotiations regarding a new CBA.

---

[4] The Debtors reserve the right to seek payment of the Physicians on any other grounds permitted by the Bankruptcy Code.

The CBAs govern: (1) the terms and conditions of employment between Oroville Hospital and Union members including wages, hours, work schedules, and overtime rules; (2) mandatory periodic increases to compensation and benefits; (3) benefit requirements including health insurance, retirement plans, paid leave, and other employee protections; and (4) procedures including grievance and arbitration systems, discipline standards, and seniority rules. The Debtors, therefore, request authority, but not direction, to continue honoring their obligations under the CBAs in the ordinary course of business postpetition consistent with the Debtors' prepetition practice.

**D.      Employee Compensation and Benefits Programs**

The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Withholding Obligations;
- Unemployment Obligations;
- Reimbursement Expenses;
- PTO Plans (Sick Leave, Holidays, Vacation);
- Health Plans;
- Health Plan Administrative Fees;
- Retirement Plans; and
- Workers' Compensation Programs.

The vast majority of Employees rely exclusively or primarily on the Employee Compensation (defined below) and Benefits Programs (defined below) to pay their daily living expenses and support themselves and their families. Thus, Employees and their families will face significant financial hardship if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees and their dependents would suffer if employee obligations were not paid when due or as expected. In addition, the Debtors intend to pursue an affiliation or sale of their business in the Chapter 11 Cases under § 363 consistent with their mission of continuing to deliver high-quality

healthcare to the communities of Oroville, Butte County, and the surrounding areas, and must provide continuity and payment of the Employee Compensation and Benefits Programs to ensure that Employees will continue to perform without unnecessary disruption during the Chapter 11 Cases. Consequently, the relief requested is necessary and appropriate.

By the Motion, the Debtors seek authority, but not direction, to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs due as of the Petition Date:

| Employee-Related Obligations | Interim Relief | Final Relief |
|---|---|---|
| Employee Compensation[5] | $2,900,000 | $2,900,000 |
| Payroll Taxes[6] | $3,000,000 | $3,000,000 |
| Employee Deductions | $216,000 | $216,000 |
| Unemployment Administration Fee | $5,500 | $5,500 |
| Reimbursable Expenses | $80,000 | $80,000 |
| Primary Medical, Prescription Drug, Dental, and Vision Plans | $3,000,000 | $3,000,000 |
| Primary Life Insurance Plan (UNUM and Other) | $34,000 | $34,000 |
| Primary Other Health Benefits | $6,000 | $8,000 |
| CNA Medical and Prescription Drug Plan (Steelworkers Health) | $530,000 | $530,000 |
| Health Plan Administration Fees (Advantek) | $80,000 | $80,000 |
| Navia Administration Fee | $600 | $600 |
| Steelworkers Pension Trust (CNA) | $110,000 | $110,000 |
| Workers' Compensation Programs | $160,000 | $1,020,000 |
| **Total** | **$10,122,100** | **$10,984,100** |

By the Motion, the Debtors further request confirmation of their right to modify and change the Employee Compensation and Benefits Programs as allowed and to implement new programs, policies, and benefits in the ordinary course of business during these Chapter 11 Cases, in each instance, in their discretion and without the need for further Court approval, subject to any agreements executed in contemplation of these Chapter 11 Cases and the requirements of the Bankruptcy Code.

---

[5] Accrued wages for eight days period prior to Petition Date.
[6] Covers three weeks of tax obligations (pay periods 11/17 to 11/30 and 12/1 to 12/8).

For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of the $17,150 per employee limit (the "<u>Priority Cap</u>") set forth in § 507(a)(4) for prepetition priority claims earned within the 180 days prior to the Petition Date.

**E.      Employee Compensation**

The Debtors pay Employees' wages and other compensation (excluding reimbursable expenses, bonuses, and paid leave) on a bi-weekly basis (collectively, the "<u>Employee Compensation</u>"). Because the Debtors' Employees are paid in arrears, Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid which, upon resolution, may reveal that additional amounts are owed to such Employees. In 2025 (year to date), the Debtors spent an average of approximately $8.2 million per month on Employee Compensation excluding Withholding Obligations (defined below).

As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $2.9 million on account of Employee Compensation (excluding Withholding Obligations), all of which will come due during the interim period. The Debtors, therefore, seek authority, but not direction, to pay the prepetition Employee Compensation not to exceed the Priority Cap on an interim basis and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

**F.      <u>Withholding Obligations</u>**

During each applicable pay period, federal, state, and foreign laws require the Debtors to withhold certain amounts related to federal, state, and local income taxes, Medicare taxes and Social Security (collectively, the "<u>Employee Payroll Taxes</u>") for remittance to the appropriate federal, state or local taxing authorities. The Debtors must then match Employee Payroll Taxes and pay, from their own account, certain amounts for Social Security, Medicare taxes, federal and state unemployment insurance, and certain other taxes (the "<u>Employer Payroll Taxes</u>" and, together with the Employee Payroll Taxes, the "<u>Payroll Taxes</u>"). The majority of Payroll Taxes are processed and forwarded to the appropriate federal, state, or local taxing authorities within a few days of when Employees'

payroll checks are disbursed, on a bi-weekly basis—the week after payroll—in accordance with applicable federal, state, and local taxing authority requirements. The Debtors' historical Payroll Taxes are approximately $3.8 million per month. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Payroll Taxes is approximately $3 million, all of which is expected to come due during the interim period.

In addition, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, union dues, garnishments, and pre-tax deductions payable pursuant to certain of the Employee Benefit Programs (as defined below), such as an Employee's share of healthcare benefits and insurance premiums, Internal Revenue Code § 403(b) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Employee Deductions"), and forwards such amounts to various third-party recipients. The Debtors estimate they have approximately $216,000 in Employee Deductions due as further described in the table below:

| Employee Deductions | |
|---|---|
| Union Dues | $19,000 |
| Medical | $80,000 |
| Dental | $500 |
| Vision | $500 |
| Other Benefits | $24,000 |
| Retirement (403(b)) | $75,000 |
| Life Insurance | $2,000 |
| Other Health Benefits | $8,000 |
| Prescription Drugs | $1,000 |
| Garnishments | $6,000 |
| **Total** | **$216,000** |

By the Motion, the Debtors seek authority to remit or deduct in a manner consistent with historical practice any unpaid, prepetition Withholding Obligations, and to continue to honor the Withholding Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**G.    Unemployment Obligations**

Oroville Hospital, like other employers in California, provide unemployment benefits to workers who have lost their job and meet certain eligibility requirements established by the State of

-14-

California's Employment Development Department ("EDD"). The Hospital's share of those obligations is historically billed by EDD in arrears and on a quarterly basis (the "Unemployment Obligations"). The Debtors' third-party unemployment claims processor, Equifax Employers Edge, additionally invoices the Debtors approximately $2,500 in processing fees on a quarterly basis for claim processing and $3,000 monthly for background checks (the "Unemployment Administration Fee").

As of the Petition Date, the Debtors estimate they have $5,500 in unpaid Unemployment Obligations. The Debtors, therefore, request authority, but not direction, to pay the outstanding Unemployment Obligations on an interim and final basis and to continue to honor Unemployment Obligations in the ordinary course of the Debtors' business on a postpetition basis.

**H.      Reimbursable Expenses**

The Debtors customarily reimburse certain Employees for expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically associated with travel, transportation, lodging, and meals incurred in connection with medical-related education travel, and certain other work-related expenses. It would be inequitable to require the Employees to personally bear these expenses, all of which were incurred on behalf of, and for the benefit of, the Debtors with the expectation of prompt reimbursement. By the Motion, the Debtors seek authority, but not direction, to continue and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed on account of Reimbursable Expenses incurred through Employees' personal funds. It is the policy of the Debtors to reimburse Employees for valid business expenses after submission of appropriate documentation to the Debtors' accounting department and approval thereof. The Debtors pay approximately $80,000 on a monthly basis on account of the Reimbursable Expenses.

As of the Petition Date, based on historical experience and past practice, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $80,000 on account of Reimbursable Expenses and seek authority, but not direction, to pay amounts as they come due on an interim and final basis, and continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

## I.    **Employee Benefit Programs**

In the ordinary course of business, and pursuant to the CBAs, the Debtors have established various benefit plans and policies for its union and non-union Employees. As further detailed below, all union and non-union employees enjoy similar benefits for PTO, sick leave, holidays, vacation, bereavement, and jury duty. Similarly, all union and non-union employees participate in the same life and disability insurance plans, and the same dental and vison insurance plans. This is not the case, however, for medical insurance. Non-union employees and members of the USW receive medical and prescription drug insurance through one program (the "<u>Primary Medical and Prescription Drug Plan</u>"), while Employees that are members of the CNA receive these benefits through a separate program (the "<u>CNA Medical and Prescription Drug Plan</u>"). There is a similar distinction for retirement plans sponsored by the Debtors. All union and non-union employees are allowed to participate in an employer sponsored 403(b) retirement savings plan (similar to a 401(k) program for tax-exempt organizations), while the Debtors make monthly contributions to a pension plan for the benefit of Employees that are members of the CNA (collectively, the "<u>Retirement Plans</u>"). All union and non-union employees benefit from workers' compensation liability insurance under the same policy ("<u>Workers' Compensation Program</u>").

Failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship for the Employees and their families. To retain the services of the Employees and maintain their morale and loyalty during these Chapter 11 Cases, the Debtors seek authorization, but not direction, to honor their obligations concerning their Employee Benefits and continue to provide the Employee Benefits to the Employees after the Petition Date.

### 1.    **PTO / Sick Leave / Holidays / Vacation / Bereavement / Jury Duty**

All of the Debtors' full-time union and non-union Employees are eligible to accrue paid leave or paid time-off ("<u>PTO</u>"). Existing PTO categories include: (1) sick leave; (2) holidays; (3) vacation; (4) bereavement leave; and (5) jury duty.

Regular full-time employees earn sick leave at the rate of eight (8) hours per month of employment. Regular part-time employees earn sick leave based on the same formula, but on a *pro-*

*rata* basis according to hours worked as compared to full-time employees. Unused sick leave accumulates from year-to-year to a maximum of three hundred twenty (320) hours.[7]

Employees, after completing their first ninety (90) days of employment, receive PTO for seven recognized holidays plus two floating holidays.[8]

Employees, after completing their first year of employment, are eligible for paid vacation that increases based on years of employment as summarized in the table below:

| < 4 Years | 4 – 8 Years | 8 – 15 Years | 15 – 20 Years | 20 or More |
|-----------|-------------|--------------|---------------|------------|
| 80 Hours | 120 Hours | 160 Hours | 200 Hours | 240 Hours |

Part-time employees earn paid vacation on the same basis as full-time employees, but on a *pro-rata* basis according to the hours worked as compared to full-time employees.

The Debtors' full-time employees receive forty (40) hours of bereavement leave and forty (40) hours of paid time for jury duty.[9] The Debtors' part-time employees similarly qualify for these benefits, but on a *pro-rata* basis.

As of the Petition Date, the Debtors estimate that they carry approximately 279,034 hours on their books for accrued and unused PTO. This amount, however, is not a current cash payment obligation.

In addition to the benefits above, CNA members also receive education leave with pay for up to forty (40) hours annually. Additionally, following one year of employment, full-time CNA members are entitled to a $1,000.00 annual Professional Development Fund contribution. Part-time CNA Employees will receive a pro-rated credit based on hours worked.

By the Motion, the Debtors seek authority, but not direction, to continue to honor their existing policies for PTO Plans to the extent it permits continuing employees to use their prepetition accrued leave in the ordinary course of business and going forward; **provided, however**, that an employee's ability to use prepetition accrued PTO shall not exceed the Priority Cap imposed by § 507(a)(4) for all prepetition Employee obligations taking into account such employee's other obligations. The

---

[7] Employee members of the CNA can accumulate up to 400 hours of unused sick leave.
[8] Employee members of the CNA receive three floating holidays.
[9] Employee members of the CNA receive up to 80 hours for jury duty.

Debtors are not, by the Motion, seeking to cash out any accrued and unused PTO of continuing employees. However, the Debtors request authorization, but not direction, to pay the Employees for unused PTO as permitted per Debtors' policy that accrued within the 180 days prior to the Petition Date so long as the total of payments already then made for prepetition Employee obligations and any other wage-related payments do not exceed the Priority Cap imposed by § 507(a)(4).

## 2. Primary Medical and Prescription Drug Plan

The Debtors offer self-insured medical insurance coverage to their eligible non-CNA Employees and their dependents under a plan through Anthem Blue Cross of California (the "<u>Primary Medical Plan</u>"). On average, the Debtors fund approximately 82% of the monthly costs associated with the medical coverage under the Primary Medical Plan, and employee deductions fund approximately 18% of the monthly costs (captured above). The Debtors have a stop-loss policy through December 31, 2025, for large claims, with a monthly premium of $103,882. The Debtors' average monthly cost for the Primary Medical Plan is $1.3 million—prior to stop loss coverage—but that figure fluctuates based on Employees' usage of medical services that month.

Based on recent historical claims trends, the Debtors estimate that approximately $3 million[10] remains outstanding as of the Petition Date under the Primary Medical Plan, and the Debtors seek authority in the Motion to pay such amount on an interim and final basis, and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

Non-CNA Employees are also eligible for prescription drug coverage under several program options through Express Scripts (the "<u>Primary Prescription Drug Plan</u>"). The Debtors' monthly cost for the Primary Prescription Drug Plan is included in the Primary Medical Plan monthly cost listed above. The Debtors request authority, but not direction, to pay obligations arising under the Primary Prescription Drug Plan on an interim and final basis, and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

---

[10] This balance also includes the amount due and owing as of the Petition Date under the Primary Prescription Drug Plan, Primary Dental Plan, and Primary Vision Plan.

3.     **CNA Medical and Prescription Drug Plan**

The Debtors offers medical insurance coverage and prescription drug coverage to eligible CNA Employees and their dependents under the Steelworkers Health and Welfare Fund (the "CNA Medical and Prescription Drug Plan"). Claims under this plan are administered by Highmark Blue Cross Blue Shield. The Debtors' average monthly cost for the CNA Medical and Prescription Drug Plan is $528,754, but that figure fluctuates based on Employees' usage of medical services that month.

Based on recent historical claims trends, the Debtors estimate that approximately $530,000 remains outstanding under the CNA Medical and Prescription Drug Plan as of the Petition Date, and the Debtors seek authority, but not direction, to pay such amount on an interim and final basis, and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

4.     **Primary Dental Plan**

The Debtors also offer all eligible Employees dental insurance through Dental PPA (the "Primary Dental Plan"). The Debtors' monthly cost for the Primary Dental Plan is included in the Primary Medical Plan monthly cost listed above. The Debtors request authority, but not direction, to pay obligations arising under the Primary Dental Plan on an interim and final basis, and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

5.     **Primary Vision Plan**

The Debtors offer all eligible Employees the option of participating in a vision insurance plan through VSP (the "Primary Vision Plan"). The Debtors' monthly cost for the Primary Vision Plan is included in the Primary Medical Plan monthly cost listed above. The Debtors request authority, but not direction, to pay obligations arising under the Primary Vision Plan on an interim and final basis, and to continue to honor any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

6.     **Primary Insurance Plans**

The Debtors offer all eligible Employees various insurance benefits including: (1) group life and accidental death and dismemberment coverage; and (2) short-term and long-term disability

(collectively, the "<u>Primary Insurance Program</u>"). The Primary Insurance Program is offered through UNUM Life Insurance Company of America.

The Debtors' average monthly premium over the last twelve-month period for this coverage is approximately $34,000. As of the Petition Date, the Debtors believe there are approximately $34,000 in prepetition premiums payable on account of the Primary Insurance Program. The Debtors request authority, but not direction, to make these payments on an interim and final basis, and to continue to honor obligations under the Primary Insurance Program in the ordinary course of the Debtors' business on a postpetition basis.

**7.     <u>Other Primary Health Benefits</u>**

The Debtors also offer all eligible Employees certain other health benefits, including but not limited to, a flexible savings account ("<u>FSA</u>") and a health savings account ("<u>HSA</u>") (collectively the "<u>Other Health Benefits</u>").

As of the Petition Date, the Debtors believe there is approximately $8,000 in prepetition obligations payable on account of the Other Primary Health Benefits. The Debtors request authority, but not direction, to make these payments on an interim and final basis, and to continue to honor obligations under the Other Primary Health Benefits in the ordinary course of the Debtors' business on a postpetition basis.

**8.     <u>Health Plan Administration Fees</u>**

The Debtors utilize the services of a third-party administrator, Advantek Benefit Administrator ("<u>Advantek</u>"), to administer and process claims, including COBRA claims, under the Primary Medical Plan, Primary Prescription Drug Plan, Primary Dental Plan, and Primary Vision Plan. Based on information provided to Advantek by providers on medical service usage, Advantek submits claims invoice each month to the Debtors for reimbursement for medical services rendered through these plans. On a monthly basis, Advantek also invoices the Debtors for the payment of its administration fees (the "<u>Advantek Administration Fees</u>"). The average monthly amount of the Advantek Administration Fees is approximately $80,000. The Debtors utilize Highmark Benefits Administration ("<u>Highmark</u>") to administer and process claims including COBRA claims under the CNA Medical Plan. Highmark processes claim in a similar manner to Advantek as described above.

Highmark charges the Debtors an administration fee equal to $4.00 per member per month, and separate 2% fee for COBRA claims (the "CNA Medical Plan Administration Fees"). The CNA Medical Plan Administration Fee is included in the CNA Medical Plan monthly cost listed above.

The Debtors utilize Navia Benefits to administer its FSA program. Navia Benefits charges an administrative fee of $6.50 per participant (the "Navia Administration Fee").

As of the Petition Date, the Debtors estimate that they have $80,600 in Advantek and Navia Administration Fees. The Debtors request authority, but not direction, to pay these prepetition obligations, and to continue to pay these fees on a postpetition basis in the ordinary course of business.

**9.      Retirement Plans**

The Debtors offer all Employees the opportunity to participate in a 403(b) defined contribution plan funded by the employee through pre-tax payroll deferrals or Roth deferrals (the "403(b) Plan"), which is administered by debtor OroHealth. Employees participating in this program may contribute up to the federal statutory cap per year, and there are currently 296 participating Employees. Each pay period, based on the data provided by the Debtors, OroHealth deducts specified amounts from certain of the Employees' gross wages to pay for the Employee's contributions into the 403(b) Plan. There is no employer contribution under the 403(b) Plan. As of the Petition Date, the Debtors estimate that they have $80,000 in outstanding 403(b) Plan employee contributions.

Additionally, pursuant to the CBA entered into with CNA, Oroville Hospital is required to make periodic contributions the Steelworkers Pension Trust (the "Trust") for the benefit of its CNA members (the "CNA Retirement Plan"). Oroville Hospital is required to make monthly contributions equal to three percent (3%) of the total gross monthly wages earned by and payable to eligible full-time and part-time registered nurses who have not completed ten (10) years of service with Oroville Hospital and five percent (5%) for those eligible full-time and part-time registered nurses who have completed ten (10) years of service with Oroville Hospital. There are currently 274 eligible participants in this plan, and the average monthly contribution expense over the prior twelve-month period is $110,000. (The 403(b) Plan and CNA Retirement Plan are collectively referred to as the "Retirement Plans").

Failure to timely forward the Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted amounts. Failure to make the monthly employer contributions due under the Retirement Plans may also constitute a violation of CBAs with the Unions. Further, the Debtors believe that maintaining the Retirement Plans is critical to maintaining employee morale.

The Debtors request authority, but not direction, to remit prepetition employee deductions per applicable non-bankruptcy law and employer contributions under the Retirement Plans. Debtors further request authority to continue these programs postpetition in the ordinary course of business and consistent with past practice.

**10.    Profit Sharing Plan**

The Debtors currently offer eligible Employees the ability to participate in a profit-sharing plan. There are currently 1,816 eligible employee participants and 984 retiree participants. As of the Petition Date, the Debtors have no outstanding obligations due under the Profit Sharing Plan, and employer contributions are discretionary. Debtors request authority to continue this programs postpetition in the ordinary course of business and consistent with past practice.

**11.    Workers' Compensation Program**

The Debtors maintain workers' compensation liability insurance to provide Employees with workers' compensation coverage for claims arising from or related to their Employment ("Workers' Compensation Obligations"). The Debtors provide workers' compensation benefits to the Employees through a high-deductible insurance plan with BETA Risk Management Authority ("BETA RMA"). BETA RMA also administers workers' compensation claims. The Debtors' monthly premium for the BETA RMA policy is approximately $160,000. As of the Petition Date, the Debtors believe there are 6 installment payments remaining for the policy period in an aggregate amount of approximately $1.02 million.

As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed is approximately $1.02 million on account of Workers' Compensation Obligations and seek

-22-

1  authority, but not direction, to pay such amounts on an interim and final basis, and continue to honor

2  any such obligations in the ordinary course of the Debtors' business on a postpetition basis.

3       Failure to maintain workers' compensation insurance could result in the institution of

4  administrative or legal proceedings and material fines against the Debtors. Therefore, out of an

5  abundance of caution, the Debtors seek authority, but not direction, to continue paying and/or

6  contesting in good faith, as appropriate in the Debtors' business judgment, all outstanding amounts

7  related to their Workers' Compensation Obligations that arose prior to the Petition Date, including

8  without limitation any payments for workers' compensation claims, premiums and fees owed for

9  administrative costs and other amounts required in connection with the Debtors' workers'

10  compensation program, as such amounts become due in the ordinary course of the Debtors' business.

11  **III.**

12  **BASIS FOR RELIEF**

13       As a result of the commencement of the Bankruptcy Case, and in the absence of an order from

14  the Court providing otherwise, the Debtors will be prohibited from paying or otherwise satisfying

15  their pre-petition obligations described above. Any delay in payment of the Employees' wages and

16  salaries will be detrimental to the Debtors relationship with their Employees and their ability to

17  maintain a stable workforce. The Debtors face the possibility that continued operation including the

18  continued delivery of quality patient care would be significantly impaired if their Employees do not

19  report for work or choose to look for alternative employment. At this early stage in the Bankruptcy

20  Case, the Debtors cannot risk any disruption to their operations. The amounts requested in the Motion

21  are reasonable and necessary when viewed in the context of the number of Employees, the importance

22  of preserving Employee services and morale, and the potential harm to the Debtors, the creditors, and

23  the estates if these amounts are not paid. To maintain Employee morale at this critical time for the

24  Debtors, and to minimize the personal hardship the Employees would suffer if prepetition employee-

25  related obligations are not paid or honored when due, the Debtors seek authority to honor in their

26  discretion such obligations.

27

28

**A.      Payment of Withheld Amounts and Deductions that are not Property of the Estate is Required by Law and Should be Allowed.**

Section 541(b)(7) excludes from property of the estate money withheld from an employee's wages for contributions to employee benefit plans, such as a 403(b) plan or health insurance plan. 11 U.S.C. § 541(b)(7). Section 541(d) excludes "[p]roperty in which the debtor holds, as of the commencement of the Bankruptcy Case, only legal title and not an equitable interest." 11 U.S.C. § 541(d). Deductions such as legally ordered wage garnishments, child support payments and Employee pension plan contributions as well as money withheld by the Debtors from Employees' paychecks on account of various federal, state and local income, FICA, Medicare and other taxes (i.e., the Withholding Obligations) fall within sections 541(b)(7) or 541(d) and do not constitute property of the estate. *See* 26 U.S.C. §§ 6672, 7501(a); *In re R&T Roofing Structures & Commercial Framing, Inc.*, 887 F.2d 981, 984–85 (9th Cir. 1989) ("It follows that withheld FICA and employee taxes are impressed with a statutory trust for the purposes of section 541."); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). The Debtors, therefore, request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state and local laws may prohibit the Debtors from operating in those states, cities or counties. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize, but not direct, the Debtors to maintain the Workers' Compensation Program.

**B.**  **Certain Employee Compensation and Benefits Programs are Entitled to Priority Treatment.**

Sections 507(a)(4) and 507(a)(5) afford Employee Compensation and certain Employee Benefits earned within 180 days before the Petition Date priority treatment, to the extent such payments do not exceed $17,150 for each qualified individual. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Because priority payment to the Employees is required, the requested relief merely affects the timing of such payment (*i.e.*, whether now or in the near future). *See* 11 U.S.C. §§ 507(a) and 1129(a).

Making such payments now will prevent disruption of the Debtors' operations and services to the community, avoid personal hardship to the Employees and their families, enhance value for the benefit of all interested stakeholders, and ensure continuity of care to patients without interruption. It will also reduce the administrative burden that otherwise would be imposed in the Chapter 11 Cases. The Debtors, therefore, believes it is advisable, prudent, and necessary under the circumstances described above to pay the prepetition wages, compensation and benefits due to its Employees as proposed.

**C.**  **Payment of the Employee Compensation and Employee Benefits is Necessary and Authorized by 11 U.S.C. §§ 363(b) and 105(a).**

Authorizing payment of such prepetition employment expenses is an appropriate exercise of the Court's discretion under §§ 363(b) and 105(a), and bankruptcy courts routinely recognize the justifications set forth above for allowing a debtor to pay prepetition wages, compensation, and benefits. The Debtors have the right to adopt reasonable employment policies pursuant to Sections 1107 and 1108 and may use property of the estate to continue its operations under section 363(b). *See* 11 U.S.C. §§ 1107, 1108, and 363(b). Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b)(1). Section 363(c)(1) allows the Debtors to use property of the estate in

the ordinary course of business without court approval. Under Section 363(b), courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)). Furthermore, courts recognize that a debtor-in-possession has a fiduciary duty to, among other things, protect and preserve the bankruptcy estate. *See In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

Additionally, Section 105(a) provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. Pursuant to § 105(a), courts have invoked the "necessity of payment" doctrine to authorize the immediate payment of a debtor's pre-petition obligations to unsecured creditors before plan confirmation when such payment is essential to the continued operation of the debtor in a chapter 11 reorganization. *See, e.g., In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that Section 105(a) "provides a statutory basis for payment of pre-petition claims"); 2 March, Ahart and Shapiro, California Practice Guide: Bankruptcy, ¶ 11:386, at 11–45 (2014) ("Most courts allow payment of prepetition employee wages up to the priority amount under the '*necessity of payment' doctrine*, which permits immediate payment of creditors who will not supply services or material essential to the conduct of the business until their pre-reorganization claims are paid.") (emphasis in original).

The Ninth Circuit has recognized the "necessity of payment" doctrine. In *Burchinol v. Cent. Wash. Bank (In re Adam's Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir, 1987), the Ninth Circuit discussed the existence of two competing "fundamental tenets" of bankruptcy: (1) equality in the treatment of all creditors; and (2) the rehabilitation of a debtor. The *Adam's Apple* court stated that the rehabilitation of a debtor "may supersede the policy of equal treatment" of creditors, and went on to describe such situations, specifically mentioning the payment of pre-petition wages and benefits to employees. *Id*. ("Cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice

premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.").[11] The court went on to state that section 364(d), for example, "illustrates a Congressional willingness to subordinate the interests of pre-petition creditors to the goal of rehabilitation." *Id.*

In its discussion, the *Adam's Apple* court did not mention an earlier Ninth Circuit case, *In re B & W Enters., Inc.*, 713 F.2d 534 (9th Cir. 1983), which questioned whether the "necessity of payment" doctrine survived the 1978 changes to the Bankruptcy Code, and stated that, if it did, the court would apply the doctrine only to railroad cases "absent compelling reasons." *Id.* at 537. Ultimately, the court in that case declined to apply the doctrine because the appellants had not presented "sufficient justification" for extending the doctrine to the (non-railroad) debtor. *Id.* However, numerous courts throughout the country have held that the doctrine did survive the 1978 Bankruptcy Code changes and can apply to non-railroad debtors. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989); *In re Just for Feet, Inc.*, 242 B.R. 821 (Bankr. D. Del. 1999); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of pre-petition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor, the court granted the debtor's motion to pay pre-petition employee-related expenses). Moreover, the *Adam's Apple* court in its discussion did not limit the doctrine to railroad cases only.

In numerous other recent chapter 11 cases, bankruptcy courts in the Ninth Circuit have approved payment of prepetition claims for wages, compensation, benefits and expenses in various healthcare bankruptcy cases pursuant to § 105(a). *See, e.g.*, *In re Beverly Community Hospital Association,* No. 23-12359-SK, Docket No. 335 (Bankr. C.D. Cal. May 26, 2023) (authorizing the debtors to pay prepetition wages and salaries and employment benefits and continue such on a postpetition basis); *In re Verity Health System of California*, No. 18-20151-ER, Docket No. 75 (Bankr. C.D. Cal. Sept. 5, 2018); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, Case No. 16-17463-

---

[11] *See also In re Ionosphere Clubs, Inc.*, *supra*, at 176 ("The policy of equality among creditor . . . may be of significance in liquidation cases under Chapter 7, however, the paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor.").

1   ER, Docket No. 68 (Bankr. C.D. Cal. June 10, 2016) (same); *In re Gordian Med., Inc.*, Case No. 12-

2   12399-MW, Docket No. 57 (Bankr. C.D. Cal. March 5, 2012) (same); *In re Victor Valley Cmty.*

3   *Hosp.*, Case No. 10-39537-CB, Docket No. 30 (Bankr. C.D. Cal. Sept. 17, 2010) (same); *In re*

4   *Downey Reg'l Med. Ctr.-Hosp., Inc.*, Case No. 09-34714-BB, Docket No. 37 (Bankr. C.D. Cal. Sept.

5   17, 2009) (same); *In re Pleasant Care Corp.*, Case No. 07-12312-EC, Docket No. 47 (Bankr. C.D.

6   Cal. Mar. 27, 2007) (same). Accordingly, the Debtors respectfully request that the Court authorize

7   the Debtors to pay and continue the Employee Compensation and Benefits Programs in the ordinary

8   course of business and consistent with past practice.

9   **D.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is**

10       **Appropriate Here.**

11       Section 362(a) operates to stay "the commencement or continuation, including the issuance

12   or employment of process, of a judicial, administrative, or other action or proceeding against the

13   debtor that was or could have been commenced before the commencement of the case under this title,

14   or to recover a claim against the debtor that arose before the commencement of the case under this

15   title . . . ." 11 U.S.C. § 362(a)(1).

16       Section 362, however, permits a debtor or other parties in interest to request a modification

17   or termination of the automatic stay for "cause." *Id*. at § 362(d)(1). Cause exists here to modify the

18   automatic stay to permit the Employees to proceed with workers' compensation claims in the

19   appropriate judicial or administrative forum. Staying the workers' compensation claims could have a

20   detrimental effect on the financial well-being and morale of the Employees.

21                                    **IV.**

22       **PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS**

23       The Debtors have sufficient funds to pay any amounts described in the Motion in the ordinary

24   course of business by virtue of expected cash flows from ongoing business operations and anticipated

25   access to cash collateral. In addition, under the Debtors' existing cash management system, the

26   Debtors can readily identify checks or wire transfer requests relating to an authorized payment.

27   Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the

28   Court has not authorized will be inadvertently made. Therefore, the Debtors respectfully request that

the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Motion.

**V.**

**<u>EMERGENCY CONSIDERATION</u>**

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, the Court may issue an order within the first 21 days of a chapter 11 case granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition." Fed. R. Bankr. P. 6003(b).

For the reasons discussed herein, and in the Motion and First Day Declaration, the Debtors respectfully request that the Court enter an interim order in the form set forth on **Exhibit A** to the Exhibit List filed concurrently herewith: (a) authorizing, but not directing, the Debtors to: (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs, and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business; and (b) granting related relief as requested herein. The relief requested in this Motion is integral to the Debtors' ability to transition their operations into these Chapter 11 Cases. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. The relief requested is necessary in order for the Debtors to operate their business in the ordinary course, continue to deliver quality patient care without disruption, and preserve the ongoing value of the Debtors' business and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in the Motion on an emergency basis.

## VI.

## **RESERVATION OF RIGHTS**

Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights, objections, or remedies as to any party or claim. The Debtor hereby reserves the right to seek to modify the relief requested herein as may be necessary to facilitate these Chapter 11 Cases and the Debtor's operations, or as may otherwise be necessary to comply with the requirements of any order entered in these Chapter 11 Cases. Moreover, nothing contained herein, or any actions taken pursuant to such relief requested is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under § 365 (or otherwise affect the Debtor's rights under § 365 to assume or reject any executory contract with any party). Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. Finally, the relief requested herein shall not oblige the Debtor to accept any services.

## VII.

## **WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## VIII.

## **NOTICE**

The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the Office of the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured

claims against the Debtors (on a consolidated basis) filed in accordance with Bankruptcy Rule 1007(d); (c) the DIP lender; (d) creditors that assert a security interest in the Debtor's real property or cash collateral; (e) the State of California through the Attorney General for the State of California; (f) the United States of America through the United States Attorney for the Eastern District of California; (g) the California Nurses Association; (h) the United Steelworkers Union; and (i) parties that file with the Court and serve upon the Debtor requests for notice of all maters in accordance with Bankruptcy Rule 2002(i) (collectively, the "Notice Parties"). If the Court grants the relief requested by the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtor submits that such notice is sufficient and that no other or further notice be given.

No prior request for the relief sought herein has been made by the Debtor to any other court.

## IX.

## CONCLUSION

For the reasons set forth herein, the Debtors respectfully request entry of an order: (i) authorizing the Debtors to (a) pay prepetition wages, salaries, and other compensation and benefits; and (b) continue employee benefits; and (ii) granting the Debtors such other and further relief as is just and appropriate under the circumstances.

Dated: December 8, 2025                    **FOX ROTHSCHILD LLP**


                                           */s/ Keith C. Owens*
                                           Keith C. Owens
                                           Nicholas A. Koffroth

                                           *Proposed Counsel to Oroville Hospital, et al.,*
                                           *the Debtors and Debtors-in-Possession*