13

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:    (310) 598-4150
Facsimile:    (310) 556-9829

*Proposed Counsel to Oroville Hospital, et al.,
the Debtors and Debtors-in-Possession*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re: <br><br> OROVILLE HOSPITAL, *et al.*,[1] <br><br> Debtors and Debtors in Possession. <br><br> ☒ Affects All Debtors <br> ☐ Affects Oroville Hospital <br> ☐ Affects OroHealth Corporation: A Nonprofit Healthcare System <br><br> Debtors and Debtors in Possession. | Lead Case No. 25-26876 <br><br> Jointly Administered With: <br> Case No. 25-26877 <br><br> **DCN KCO-2** <br><br> Chapter 11 <br><br> Hon. Christopher D. Jaime <br><br> **Hearing Information** <br><br> Hearing Date:  December 11, 2025 <br> Hearing Time:  11:00 a.m. <br> Location:       Courtroom 32 <br>                    501 I Street <br>                    Sacramento, California 95814 <br>                    *or* <br>                    *by Zoom Webinar* |

## DECLARATION OF ROBERT J. WENTZ IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND (B) CONTINUE EMPLOYEE BENEFITS, AND (II) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

- 1 -

I, Robert J. Wentz, hereby state and declare as follows:

1. I am the President and Chief Executive Officer of Oroville Hospital ("Oroville Hospital"). I am also the Chief Executive Officer of Oroville Hospital's parent corporation, Orohealth Corporation: A Nonprofit Healthcare System ("OroHealth" and, together with Oroville Hospital, the "Debtors"). I make this declaration in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to (a) Pay Prepetition Wages, Salaries, and Other Compensation and (b) Continue Employee Benefits, and (ii) Granting Related Relief* (the "Motion") filed concurrently herewith and for all other purposes authorized by law.[2]

2. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including FTI Consulting, Inc. ("FTI") as their financial advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. The documents referenced herein, or otherwise relied upon for purposes of this Declaration, are business records of the Debtors, prepared and kept in the ordinary course of the regularly conducted business activities of the Debtors and used by me for those purposes. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors. If called upon as a witness, I could and would testify competently to the facts set forth in this Declaration.

3. OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. The Debtors also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, the

---

[2] Unless otherwise defined herein, all capitalized terms have the definitions set forth in the Memorandum of Points and Authorities filed concurrently herewith.

Debtors recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986. A more detailed description of the Debtors, including their current and historical business operations and the events precipitating these bankruptcy cases (the "Chapter 11 Cases"), will be set forth in the *Declaration of Robert J. Wentz in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") to be filed subsequent to this Declaration.

4. On December 8, 2025 (the "Petition Date"), the Debtors initiated these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").³ As of the date of this Declaration, the Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

**A.　The Debtors' Workforce**

5. As of the Petition Date, the Debtors' workforce consists of approximately 1,589 full-time employees, 172 part-time employees, and 369 per-diem employees (collectively, the "Employees"). The Debtors are additionally served by medical staff of more than 147 physicians and surgeons, and 2 physician medical directors (the "Physicians"). Due to California's ban on the Corporate Practice of Medicine, the Physicians are all independent contractors or employees of physician groups that contract with the Debtors.

6. Both full-time employees and part-time employees are regularly scheduled to work every 14-day pay period; per-diem employees, meanwhile, are used on an as-needed basis. Notably, California mandates specific nurse-to-patient ratios. Therefore, the Debtors' use of per-diem employees helps to ensure that the Debtors comply with those mandatory requirements.

---

³ Unless otherwise indicated herein, all references to "§" and "Section" refer to a Section of the Bankruptcy Code.

**B.　The Debtors' Union Workforce**

7.　Two unions are active at Oroville Hospital. Approximately 418 of the registered nurses employed at Oroville Hospital are members of the California Nurses Association ("CNA") union, and approximately 729 of the Hospital's business, service, and technical employees belong to the United Steelworkers ("USW") union (collectively, the "Unions"). Oroville Hospital's relationship with the Unions is governed by collective bargaining agreements (hereinafter, the "CBAs"). The current CNA collective bargaining agreement is effective from April 11, 2024, through April 11, 2027. The USW has three materially similar CBAs for business, service, and technical units. The most recent collective bargaining agreements appliable to the USW were effective from September 22, 2022, through December 31, 2025. USW and Oroville Hospital are in active negotiations regarding a new CBA.

8.　The CBAs govern: (1) the terms and conditions of employment between Oroville Hospital and Union members including wages, hours, work schedules, and overtime rules; (2) mandatory periodic increases to compensation and benefits; (3) benefit requirements including health insurance, retirement plans, paid leave, and other employee protections; and (4) procedures including grievance and arbitration systems, discipline standards, and seniority rules.

**C.　Employee Compensation and Benefits Programs**

9.　The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Withholding Obligations;
- Unemployment Obligations;
- Reimbursement Expenses;
- PTO Plans (Sick Leave, Holidays, Vacation);
- Health Plans;
- Health Plan Administrative Fees;
- Retirement Plans; and

- Workers' Compensation Programs.

10. The vast majority of Employees rely exclusively or primarily on the Employee Compensation (defined below) and Benefits Programs (defined below) to pay their daily living expenses and support themselves or their families. Thus, Employees and their families will face significant financial hardship if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees and their dependents would suffer if employee obligations were not paid when due or as expected. In addition, the Debtors intend to pursue an affiliation or sale of their business in the Bankruptcy Cases under § 363 consistent with their mission of continuing to deliver high-quality healthcare to the communities of Oroville, Butte County, and the surrounding areas, and must provide continuity and payment of the Employee Compensation and Benefits Programs to ensure that Employees will continue to perform without unnecessary disruption during the Bankruptcy Cases.

**D.　Employee Compensation**

11. The Debtors pay Employees' wages and other compensation (excluding reimbursable expenses, bonuses, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because the Debtors' Employees are paid in arrears, Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid which, upon resolution, may reveal that additional amounts are owed to such Employees. In 2025 (year to date), the Debtors spent an average of approximately $8.2 million per month on Employee Compensation excluding Withholding Obligations (defined below).

12. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $2.9 million on account of Employee Compensation (excluding Withholding Obligations), all of which will come due during the interim period.

**E.    Withholding Obligations**

13.     During each applicable pay period, federal, state, and foreign laws require the Debtors to withhold certain amounts related to federal, state, and local income taxes, Medicare taxes and Social Security (collectively, the "<u>Employee Payroll Taxes</u>") for remittance to the appropriate federal, state or local taxing authorities. The Debtors must then match Employee Payroll Taxes and pay, from their own account, certain amounts for Social Security, Medicare taxes, federal and state unemployment insurance, and certain other taxes (the "<u>Employer Payroll Taxes</u>" and, together with the Employee Payroll Taxes, the "<u>Payroll Taxes</u>"). The majority of Payroll Taxes are processed and forwarded to the appropriate federal, state, or local taxing authorities within a few days of when Employees' payroll checks are disbursed, on a bi-weekly basis—the week after payroll—in accordance with applicable federal, state, and local taxing authority requirements. The Debtors' historical Payroll Taxes are approximately $3.8 million per month. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Payroll Taxes is approximately $3 million, all of which is expected to come due during the interim period.

14.     In addition, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, union dues, garnishments, and pre-tax deductions payable pursuant to certain of the Employee Benefit Programs (as defined below), such as an Employee's share of healthcare benefits and insurance premiums, Internal Revenue Code § 403(b) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "<u>Employee Deductions</u>"), and forwards such amounts to various third-party recipients. As of the Petition Date, the Debtors estimate they have approximately $216,000 in Employee Deductions due as further described in the following table:

| Employee Deductions | |
|---|---:|
| Union Dues | $19,000 |
| Medical | $80,000 |
| Dental | $500 |
| Vision | $500 |
| Other Benefits | $24,000 |
| Retirement (403(b)) | $75,000 |
| Life Insurance | $2,000 |

- 6 -

| | |
|---|---:|
| Other Health Benefits | $8,000 |
| Prescription Drugs | $1,000 |
| Garnishments | $6,000 |
| **Total** | **$216,000** |

**F.    Unemployment Obligations**

15.    Oroville Hospital, like other employers in California, provide unemployment benefits to workers who have lost their job and meet certain eligibility requirements established by the State of California's Employment Development Department ("EDD"). The Hospital's share of those obligations is historically billed by EDD in arrears and on a quarterly basis (the "Unemployment Obligations"). The Debtors' third-party unemployment claims processor, Equifax Employers Edge, additionally invoices the Debtors approximately $2,500 in processing fees on a quarterly basis for claim processing and $3,000 monthly for background checks (the "Unemployment Administration Fee").

16.    As of the Petition Date, the Debtors estimate they have $5,500 in unpaid Unemployment Obligations.

**G.    Reimbursable Expenses**

17.    The Debtors customarily reimburse certain Employees for expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically associated with travel, transportation, lodging, and meals incurred in connection with medical-related education travel, and certain other work-related expenses. It would be inequitable to require the Employees to personally bear these expenses, all of which were incurred on behalf of, and for the benefit of, the Debtors with the expectation of prompt reimbursement. It is the policy of the Debtors to reimburse Employees for valid business expenses after submission of appropriate documentation to the Debtors' accounting department and approval thereof. The Debtors pay approximately $80,000 on a monthly basis on account of the Reimbursable Expenses.

18.    As of the Petition Date, based on historical experience and past practice, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $80,000 on account of Reimbursable Expenses.

## H. Employee Benefit Programs

19. In the ordinary course of business, and pursuant to the CBAs, the Debtors have established various benefit plans and policies for its union and non-union Employees. As further detailed below, all union and non-union employees enjoy similar benefits for PTO, sick leave, holidays, vacation, bereavement, and jury duty. Similarly, all union and non-union employees participate in the same life and disability insurance plans, and the same dental and vison insurance plans. This is not the case, however, for medical insurance. Non-union employees and members of the USW receive medical and prescription drug insurance through one program (the "Primary Medical and Prescription Drug Plan"), while Employees that are members of the CNA receive these benefits through a separate program (the "CNA Medical and Prescription Drug Plan"). There is a similar distinction for retirement plans sponsored by the Debtors. All union and non-union employees are allowed to participate in an employer sponsored 403(b) retirement savings plan (similar to a 401(k) program for tax-exempt organizations), while the Debtors make monthly contributions to a pension plan for the benefit of Employees that are members of the CNA (collectively, the "Retirement Plans"). All union and non-union employees benefit from workers' compensation liability insurance under the same policy ("Workers' Compensation Program").

20. Failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship for the Employees and their families.

21. All of the Debtors' full-time union and non-union Employees are eligible to accrue paid leave or paid time-off (PTO"). Existing PTO categories include: (1) sick leave; (2) holidays; (3) vacation; (4) bereavement leave; and (5) jury duty.

22. Regular full-time employees earn sick leave at the rate of eight (8) hours per month of employment. Regular part-time employees earn sick leave based on the same formula, but on a *pro-rata* basis according to hours worked as compared to full-time employees. Unused sick leave accumulates from year-to-year to a maximum of three hundred twenty (320) hours.[4]

---

[4] Employee members of the CNA can accumulate up to 400 hours of unused sick leave.

23. Employees, after completing their first ninety (90) days of employment, receive PTO for seven recognized holidays plus two floating holidays.[5]

24. Employees, after completing their first year of employment, are eligible for paid vacation that increases based on years of employment as summarized in the table below:

| < 4 Years | 4 – 8 Years | 8 – 15 Years | 15 – 20 Years | 20 or More |
|---|---|---|---|---|
| 80 Hours | 120 Hours | 160 Hours | 200 Hours | 240 Hours |

Part-time employees earn paid vacation on the same basis as full-time employees, but on a *pro-rata* basis according to the hours worked as compared to full-time employees.

25. The Debtors' full-time employees receive forty (40) hours of bereavement leave and forty (40) hours of paid time for jury duty.[6] The Debtors' part-time employees similarly qualify for these benefits, but on a *pro-rata* basis.

26. As of the Petition Date, the Debtors estimate that they carry approximately 279,034 hours on their books for accrued and unused PTO. This amount, however, is not a current cash payment obligation.

27. In addition to the benefits above, CNA members also receive education leave with pay for up to forty (40) hours annually. Additionally, following one year of employment, full-time CNA members are entitled to a $1,000.00 annual Professional Development Fund contribution. Part-time CNA Employees will receive a pro-rated credit based on hours worked.

28. The Debtors offer self-insured medical insurance coverage to their eligible non-CNA Employees and their dependents under a plan through Anthem Blue Cross of California (the "Primary Medical Plan"). On average, the Debtors fund approximately 82% of the monthly costs associated with the medical coverage under the Primary Medical Plan, and employee deductions fund approximately 18% of the monthly costs (captured above). The Debtors have a stop-loss policy through December 31, 2025, for large claims, with a monthly premium of $103,882. The Debtors' average monthly cost for the Primary Medical Plan is $1.3 million—prior to stop loss coverage—but that figure fluctuates based on Employees' usage of medical services that month.

---

[5] Employee members of the CNA receive three floating holidays.
[6] Employee members of the CNA receive up to 80 hours for jury duty.

29. Based on recent historical claims trends, the Debtors estimate that approximately $3 million[7] remains outstanding as of the Petition Date under the Primary Medical Plan.

30. Non-CNA Employees are also eligible for prescription drug coverage under several program options through Express Scripts (the "Primary Prescription Drug Plan"). The Debtors' monthly cost for the Primary Prescription Drug Plan is included in the Primary Medical Plan monthly cost listed above.

31. The Debtors offers medical insurance coverage and prescription drug coverage to eligible CNA Employees and their dependents under the Steelworkers Health and Welfare Fund (the "CNA Medical and Prescription Drug Plan"). Claims under this plan are administered by Highmark Blue Cross Blue Shield. The Debtors' average monthly cost for the CNA Medical and Prescription Drug Plan is $528,754, but that figure fluctuates based on Employees' usage of medical services that month.

32. Based on recent historical claims trends, the Debtors estimate that approximately $530,000 remains outstanding under the CNA Medical and Prescription Drug Plan as of the Petition Date.

33. The Debtors also offer all eligible Employees dental insurance through Dental PPA (the "Primary Dental Plan"). The Debtors' monthly cost for the Primary Dental Plan is included in the Primary Medical Plan monthly cost listed above.

34. The Debtors offer all eligible Employees the option of participating in a vision insurance plan through VSP (the "Primary Vision Plan"). The Debtors' monthly cost for the Primary Vision Plan is included in the Primary Medical Plan monthly cost listed above.

35. The Debtors offer all eligible Employees various insurance benefits including: (1) group life and accidental death and dismemberment coverage; and (2) short-term and long-term disability (collectively, the "Primary Insurance Program"). The Primary Insurance Program is offered through UNUM Life Insurance Company of America.

---

[7] This balance also includes the amount due and owing as of the Petition Date under the Primary Prescription Drug Plan, Primary Dental Plan, and Primary Vision Plan.

36. The Debtors' average monthly premium over the last twelve-month period for this coverage is approximately $34,000. As of the Petition Date, the Debtors believe there are approximately $34,000 in prepetition premiums payable on account of the Primary Insurance Program.

37. The Debtors also offer all eligible Employees certain other health benefits, including but not limited to, a flexible savings account ("FSA") and a health savings account ("HSA") (collectively the "Other Health Benefits"). As of the Petition Date, the Debtors believe there is approximately $8,000 in prepetition obligations payable on account of the Other Primary Health Benefits.

38. The Debtors utilize the services of a third-party administrator, Advantek Benefit Administrator ("Advantek"), to administer and process claims, including COBRA claims, under the Primary Medical Plan, Primary Prescription Drug Plan, Primary Dental Plan, and Primary Vision Plan. Based on information provided to Advantek by providers on medical service usage, Advantek submits claims invoice each month to the Debtors for reimbursement for medical services rendered through these plans. On a monthly basis, Advantek also invoices the Debtors for the payment of its administration fees (the "Advantek Administration Fees"). The average monthly amount of the Advantek Administration Fees is approximately $80,000. The Debtors utilize Highmark Benefits Administration ("Highmark") to administer and process claims including COBRA claims under the CNA Medical Plan. Highmark processes claim in a similar manner to Advantek as described above. Highmark charges the Debtors an administration fee equal to $4.00 per member per month, and separate 2% fee for COBRA claims (the "CNA Medical Plan Administration Fees"). The CNA Medical Plan Administration Fee is included in the CNA Medical Plan monthly cost listed above. The Debtors utilize Navia Benefits to administer its FSA program. Navia Benefits charges an administrative fee of $6.50 per participant (the "Navia Administration Fee"). As of the Petition Date, the Debtors estimate that they have $80,600 in Advantek and Navia Administration Fees.

39. The Debtors offer all Employees the opportunity to participate in a 403(b) defined contribution plan funded by the employee through pre-tax payroll deferrals or Roth deferrals (the "403(b) Plan"), which is administered by debtor OroHealth. Employees participating in this program

may contribute up to the federal statutory cap per year, and there are currently 296 participating Employees. Each pay period, based on the data provided by the Debtors, OroHealth deducts specified amounts from certain of the Employees' gross wages to pay for the Employee's contributions into the 403(b) Plan. There is no employer contribution under the 403(b) Plan. As of the Petition Date, the Debtors estimate that they have $80,000 in outstanding 403(b) Plan employee contributions.

40. Pursuant to the CBA entered into with CNA, Oroville Hospital is required to make periodic contributions the Steelworkers Pension Trust (the "Trust") for the benefit of its CNA members (the "CNA Retirement Plan"). Oroville Hospital is required to make monthly contributions equal to three percent (3%) of the total gross monthly wages earned by and payable to eligible full-time and part-time registered nurses who have not completed ten (10) years of service with Oroville Hospital and five percent (5%) for those eligible full-time and part-time registered nurses who have completed ten (10) years of service with Oroville Hospital. There are currently 274 eligible participants in this plan, and the average monthly contribution expense over the prior twelve-month period is $110,000. (The 403(b) Plan and CNA Retirement Plan are collectively referred to as the "Retirement Plans").

41. Failure to timely forward the Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted amounts. Failure to make the monthly employer contributions due under the Retirement Plans may also constitute a violation of CBAs with the Unions. Further, the Debtors believe that maintaining the Retirement Plans is critical to maintaining employee morale.

42. The Debtors currently offer eligible Employees the ability to participate in a profit-sharing plan. There are currently 1,816 eligible employee participants and 984 retiree participants. As of the Petition Date, the Debtors have no outstanding obligations due under the Profit Sharing Plan, and employer contributions are discretionary.

43. The Debtors maintain workers' compensation liability insurance to provide Employees with workers' compensation coverage for claims arising from or related to their Employment ("Workers' Compensation Obligations"). The Debtors provide workers' compensation

benefits to the Employees through a high-deductible insurance plan with BETA Risk Management Authority ("BETA RMA"). BETA RMA also administers workers' compensation claims. The Debtors' monthly premium for the BETA RMA policy is approximately $160,000. As of the Petition Date, the Debtors believe there are 6 installment payments remaining for the policy period in an aggregate amount of approximately $1.02 million.

44. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed is approximately $1.02 million on account of Workers' Compensation Obligations. Failure to maintain workers' compensation insurance could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated this 8th day of December, 2025, in Butte County, California.

_____
Robert J. Wentz

- 13 -