**27**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:     (310) 598-4150

*Proposed Counsel to Oroville Hospital, et al.,*
*the Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>Debtors and Debtors in Possession.<br><hr>☒  Affects All Debtors<br><br>☐  Affects Oroville Hospital<br>☐  Affects OroHealth Corporation: A Nonprofit Healthcare System<br><br>Debtors and Debtors in Possession. | Lead Case No. 25-26876<br><br>Jointly Administered With:<br><br>Case No. 25-26877<br><br>**DCN KCO-3**<br><br>Chapter 11<br><br>Hon. Christopher D. Jamie<br><br>**Hearing Information**<br>Hearing Date:   December 11, 2025<br>Hearing Time:   11:00 a.m.<br>Location:          Courtroom 32<br>                       501 I Street, Sixth Floor<br>                       Sacramento, California 95814 |

**MEMORANDUM OF POINTS & AUTHORITIES**
**IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EXISTING BANK**
**ACCOUNTS; (B) CONTINUE USE OF CASH MANAGEMENT SYSTEM;**
**(C) CONTINUE USE OF BUSINESS FORMS; (D) PERFORM INTERCOMPANY**
**TRANSACTIONS; (E) CONTINUE CREDIT CARD PROGRAM; (F) HONOR CERTAIN**
**PREPETITION OBLIGATIONS RELATED THERETO; AND (G) CONTINUE ISSUING**
**PATIENT REFUNDS; (II) WAIVING REQUIREMENTS OF LBR 2015-1; (III) GRANTING**
**LIMITED WAIVER OF SECTION 345(b) DEPOSIT REQUIREMENTS;**
**(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

# **TABLE OF CONTENTS**

**Page**

I. RELIEF REQUESTED ............................................................................................... 7

II. JURISDICTION AND VENUE ............................................................................... 7

III. FACTUAL BACKGROUND ................................................................................. 8

    A.    General Background ...................................................................... 8

    B.    Overview and Need for Relief ....................................................... 8

    C.    The Cash Management System ....................................................... 9

    D.    Flow of Funds ............................................................................ 12

        1.    Receipts ........................................................................ 12

        2.    Internal Funds Movement, Liquidity Management, and Restricted Accounts ...................................................... 13

        3.    Outflow Channels ......................................................... 15

    E.    Intercompany Transactions .......................................................... 17

    F.    Corporate Card Program .............................................................. 17

    G.    Bank Fees .................................................................................. 18

    H.    Business Forms ........................................................................... 18

    I.    Compliance with the United States Trustee Guidelines and the Bankruptcy Code 19

        1.    U.S. Trustee Authorized Depositories ............................. 19

        2.    Section 345(b) of the Bankruptcy Code ........................... 20

IV. BASIS FOR RELIEF REQUESTED ...................................................................... 20

    A.    The Court Should Authorize the Debtors to Maintain Existing Bank Accounts and Continue Using the Cash Management System. .................................... 20

    B.    The Court Should Authorize Ordinary-Course Intercompany Transactions and Grant Administrative Priority Status to Postpetition Intercompany Claims. ......... 23

    C.    The Court Should Authorize Continued Use of Prepetition Business Forms. ...... 23

    D.    The Court Should Grant a Limited Waiver of § 345(b) for Cause. ..................... 24

V. PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS .......................... 25

VI. EMERGENCY CONSIDERATION ..................................................................... 25

VII. WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)................................. 26

VIII. NOTICE ........................................................................................................ 26

IX. CONCLUSION .................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Baldwin-United Corp.*,
   79 B.R. 321 (Bankr. S.D. Ohio 1987) ................................................................................. 22

*In re Columbia Gas Sys., Inc.*,
   136 B.R. 930 (Bankr. D. Del. 1992), *aff'd*, 997 F.2d 1039 (3d Cir. 1993) ............................ 22

*In re Gold Standard Baking, Inc.*,
   179 B.R. 98 (Bankr. N.D. Ill. 1995) .................................................................................... 22

*In re King Mountain Tobacco Co., Inc.*,
   623 B.R. 323 (Bankr. E.D. Wash. 2020) ............................................................................. 25

*In re Madera Community Hospital*,
   Case No. 23-10457 (Bankr. E.D. Cal., Apr. 14, 2023) .................................................. 6, 21

*In re Serv. Merch. Co., Inc.*,
   240 B.R. 894 (Bankr. M.D. Tenn. 1999) ............................................................................ 25

*In re The Roman Cath. Bishop of Stockton*,
   Case No. 14-20371 (Bankr. E.D. Cal., 10 Jan. 24, 2014) .................................... 21, 24, 25

*In re Young*,
   205 B.R. 894 (Bankr. W.D. Tenn. 1997) ............................................................................ 24

*In re Zacky Farms, LLC*,
   Case No. 12-37961 (Bankr. E.D. Cal., Nov. 5, 2012) .................................................. 22, 24

**Statutes**

26 U.S.C § 501(c)(3) .................................................................................................................. 8

28 U.S.C. § 105 ..................................................................................................................... 6, 7

28 U.S.C. § 105(a) ....................................................................................................... 21, 23, 24

28 U.S.C. § 157 .......................................................................................................................... 7

28 U.S.C. § 157(b)(2) ................................................................................................................ 7

28 U.S.C. § 345 ................................................................................................................. 6, 7, 20

28 U.S.C. § 345(a) ................................................................................................................... 25

28 U.S.C. § 345(b) ........................................................................................................... *passim*

28 U.S.C. § 363 ..................................................................................................................... 6, 7

28 U.S.C. § 363(c)(1) ......................................................................................................... 21, 23

28 U.S.C. § 364 ..................................................................................................................... 6, 7

28 U.S.C. § 364(b) ...................................................................................................23, 24

28 U.S.C. § 503 ..........................................................................................................6, 7

28 U.S.C. § 503(b)(1) ...............................................................................................23, 24

28 U.S.C. § 541(d) ......................................................................................................14

28 U.S.C. § 1107 .........................................................................................................6, 7

28 U.S.C. § 1107(a) ......................................................................................................8

28 U.S.C. § 1108 ......................................................................................................6, 7, 8

28 U.S.C. § 1334 ..........................................................................................................7

28 U.S.C. § 1408 ..........................................................................................................7

28 U.S.C. § 1409 ..........................................................................................................7

Cal. Welf. & Inst. Code § 14169.50 ...........................................................................17

**Other Authorities**

Fed. R. Bankr. P. 1007(d) ...........................................................................................27

Fed. R. Bankr. P. 2002(i) ............................................................................................27

Fed. R. Bankr. P. 6003 ...........................................................................................6, 7, 26

Fed. R. Bankr. P. 6004 ................................................................................................6, 7

Fed. R. Bankr. P. 6004(a) .........................................................................................26, 27

Fed. R. Bankr. P. 6004(h) .........................................................................................26, 27

Fed. R. Bankr. P. 7008 ................................................................................................7

Local R. 1001-1(f) .......................................................................................................6, 7

Local R. 2015-2 ...........................................................................................................6, 7

Local R. 9014-1(f) .......................................................................................................6, 7

U.S. Const. art. III .......................................................................................................7

Oroville Hospital (the "Hospital") and OroHealth corporation ("OroHealth"), debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned bankruptcy cases (the "Bankruptcy Cases") filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),[2] hereby submit this Memorandum of Points and Authorities in support of the Debtors' motion filed contemporaneously herewith (the "Motion") requesting entry of an order, substantially in the form attached to the List of Exhibits (the "Exhibit List") as **Exhibit A** (the "Final Order") filed concurrently herewith, pursuant to §§ 105, 345, 363, 364, 503, 1107, and 1108 of the Bankruptcy Code, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rules 1001-1(f), 2015-2, and 9014-1(f) of the Local Rules of Practice ("LBR"): (i) authorizing the debtors to (a) maintain existing bank accounts; (b) continue use of cash management system; (c) continue use of business forms; (d) perform intercompany transactions; (e) continue credit card program; (f) honor certain prepetition obligations related thereto; and (g) continue issuing patient refunds; (ii) waiving requirements of LBR 2015-1; (iii) granting limited waiver of Section 345(b) deposit requirements; (iv) scheduling a final hearing; and (v) granting related relief. In support of the Motion, the Debtors refer to the *Declaration of Robert J. Wentz in Support of First Day Motions* filed concurrently herewith (the "First Day Declaration"), and the *Declaration of Sean A. Gumbs in Support of the Motion Debtors' Emergency Motion for Interim and Final Orders (i) Authorizing the Debtors to (a) Maintain Existing Bank Accounts; (b) Continue use of Cash Management System; (c) Continue Use of Business Forms; (d) Perform Intercompany Transactions; (e) Continue Credit Card Program; (f) Honor Certain Prepetition Obligations Related Thereto; and (g) Continue Issuing Patient Refunds; (ii) Waiving Requirements of LBR 2015-1; (iii) Granting Limited Waiver of Section 345(b) Deposit Requirements; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* (the "Gumbs Declaration"), the List of Exhibits filed concurrently herewith, and such other evidence as may be submitted at the hearing on the Motion. In further support of the Motion, the Debtors respectfully state as follows:

---

[2] Unless otherwise defined herein, all references to "Section" and "§" refer to a section of the Bankruptcy Code.

I.

**RELIEF REQUESTED**

The Debtors request entry of an interim order: (i) authorizing the debtors to (a) maintain their existing bank accounts; (b) continue using their existing cash management system; (c) continue using existing business forms; (d) perform intercompany transactions; (e) continue their credit card program; (f) honor certain prepetition obligations related thereto; and (g) continue issuing refunds to patients in the ordinary course of business; (ii) waiving the requirements of LBR 2015-2 and the United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession (the "U.S. Trustee Guidelines") to the extent necessary for the Debtors to continue using their cash management system and existing business forms; (iii) granting limited waiver of section 345(b) deposit requirements; (iv) scheduling a hearing to consider granting the Motion on a final basis; and (v) granting related relief.

II.

**JURISDICTION AND VENUE**

The United States Bankruptcy Court for the Eastern District of California (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and General Orders 182 and 223 of the United States District Court for the Eastern District of California. The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are §§ 105, 345, 363, 364, 503, 1107, and 1108, Rules 6003 and 6004 of the Bankruptcy Rules, and Rules 1001-1(f), 2015-2, and 9014-1(f) of the Local Rules of Practice.

### III.

### FACTUAL BACKGROUND

**A.     General Background**

On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which initiated the Chapter 11 Cases. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. The Debtors also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, the Debtors recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986. A more detailed description of the Debtors, including their current and historical business operations and the events precipitating the Chapter 11 Cases, are set forth in the First Day Declaration.

**B.     Overview and Need for Relief**

The Debtors operate a complex enterprise with established cash management and payment processing systems that support ongoing operations, payroll, vendor relationships, and, where applicable, regulatory and mission-driven activities. As with similar enterprises, the Debtors' receipts include payments from governmental units, third-party payor remittances, and card-based

transactions from patients. Disruption to these established channels would adversely affect collections, increase administrative and audit burdens, and cause immediate and irreparable harm.

**C.      The Cash Management System**

The Debtors utilize a cash management system (the "Cash Management System") consisting of thirty-two bank accounts (each, a "Bank Account," and collectively, the "Bank Accounts") maintained at eight banks (the "Cash Management Banks"). A schematic of the Cash Management System identifying each Bank Account and its purpose is set forth on **Exhibit C** of the Exhibit List filed concurrently herewith (the "Schematic").

As detailed below and in the Schematic, the Cash Management System operates using a hub-and-spoke model, centered around the Mechanics Bank account ending in 0262 (the "General Checking Account"), which is subject to a deposit account control agreement ("DACA") for the benefit of Mechanics Bank, as successor to Rabobank, N.A. Eight accounts are designated as receipt-only accounts for payments from certain sources. Seven accounts are designated for disbursing funds to specific entities or for specific purposes. Six accounts are designated as savings or restricted accounts, including an account carrying a higher-than-usual yield, an account serving as collateral for credit card obligations, an account through which certain patient payments pass through before being deposited into the General Checking Account, an account with funds held in trust for the benefit of certain patients, and two accounts with funds held by the Trustee for the 2018 Bonds for the exclusive purpose of expanding the Debtors' cafeteria and pharmacy (all as more fully explained below). Ten accounts are essentially dormant and currently have *de minimis* balances.

Each Bank Account is listed in the following table with its owner, bank, name used by the Debtors to identify the account, and last four digits of its account number:

| | Owner | Bank | Name | Acct # |
|---|---|---|---|---|
| **General Checking Account (Primary Account)** | | | | |
| 1 | Oroville Hospital | Mechanics Bank | General Checking | 0262 |
| **Receipt-Only** | | | | |
| 2 | Oroville Hospital | Mechanics Bank | SNF General | 5005 |
| 3 | Oroville Hospital | Mechanics Bank | Credit Card Clearing | 1245 |

| | | | | |
|---|---|---|---|---|
| 4 | Oroville Hospital | Mechanics Bank | Medi-Cal EFT | 4561 |
| 5 | Oroville Hospital | Mechanics Bank | Comp Mgmt EFT | 3547 |
| 6 | Oroville Hospital | Mechanics Bank | OPG ACH Account | 3554 |
| 7 | Oroville Hospital | Mechanics Bank | Retail Pharmacy | 8727 |
| 8 | Oroville Hospital | Mechanics Bank | SWIFT | 4940 |
| 9 | Oroville Hospital | Comerica Bank | Comerica Credit Card | 1398 |
| **Disbursement** | | | | |
| 10 | Oroville Hospital | Mechanics Bank | Payroll Checking | 0082 |
| 11 | Oroville Hospital | First Citizens Bank | First Citizens Checking | 7407 |
| 12 | Oroville Hospital | Mechanics Bank | Advantek Medical Benefits | 9611 |
| 13 | Oroville Hospital | Mechanics Bank | Patient Refunds | 0090 |
| 14 | Oroville Hospital | Tri-Counties Bank | Business Checking | 7795 |
| 15 | OroHealth Corporation | Mechanics Bank | Payroll Checking | 3267 |
| 16 | OroHealth Corporation | Mechanics Bank | Flexible Spending Plan | 3811 |
| **Savings, Credit Card, and Restricted,** | | | | |
| 17 | Oroville Hospital | Mechanics Bank | Mechanics Bank Secured Business Line | 0980 |
| 18 | Oroville Hospital | Comerica Bank | Comerica Money Market | 4677 |
| 19 | Oroville Hospital | Commerce Bank | Commerce Bank CD | 9608 |
| 20 | Oroville Hospital | Mechanics Bank | SNF Resident Trust | 8955 |
| 21 | Oroville Hospital | Bank of New York Mellon | BNY Project Fund | 2358 |
| 22 | Oroville Hospital | Bank of New York Mellon | BNY Rev Fund | 2353 |
| **Inactive** | | | | |
| 23 | OroHealth Corporation | Mechanics Bank | Professional Group | 8901 |
| 24 | Oroville Hospital | Mechanics Bank | PHA/Farmers Mkt EBT | 8794 |
| 25 | Oroville Hospital | Mechanics Bank | Mechanics Bank Max Savings | 1384 |

| 26 | Oroville Hospital | US Bank | US Bank Money Market | 9658 |
| 27 | Oroville Hospital | Tri-Counties Bank | Tri-Counties Money Market | 1827 |
| 28 | Oroville Hospital | First Citizens Bank | First Citizens Checking | 5812 |
| 29 | OroHealth Corporation | First Citizens Bank | First Citizens Checking | 5000 |
| 30 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Securities | 4089 |
| 31 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Active Assets | 5089 |
| 32 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Active Assets | 2089 |

The Debtors' Cash Management System facilitates timely and efficient receipt and disbursement of funds, including payments to physicians, employees, vendors, utility and other service providers, governmental units, and any other disbursements required for the Debtors' operations.

The Debtors estimate that deposits into the Cash Management System average approximately $32 million per month (net of intercompany transfers and transfers among the Bank Accounts), which consists primarily of payments from Medi-Cal and Medicare, private payor insurance plans, patients, and the Hospital Quality Assurance Fees ("HQAF") program and other supplemental funding programs. While the Cash Management System's efficiency in receiving, managing, and disbursing funds results in a net benefit to the estates, the Debtors incur certain expenses in maintaining the Cash Management System, as summarized in the following table and detailed below (the "Cash Management Expenses"):

| Bank Fee | Monthly Average (last 12 months) | Estimated Amount Accrued as of Petition Date (Final Amount) | Estimated Amount Owed Within 21 Days (Interim Amount) |
|---|---|---|---|
| Mechanics Bank Fees | $7,300 | $2,650 | $1,200 |
| Comerica Bank Fees | $380 | $480 | $380 |
| First Citizens Bank Fees | $310 | $85 | $0 |
| Tri-Counties Bank Fees | $240 | $300 | $240 |
| **Total** | **$8,230** | **$3,515** | **$1,820** |

Because of the nature of the Debtors' operations and the disruption to the business that would result from closure of the Bank Accounts, the Debtors' continued use of the Cash Management System is critical to the Debtors' ongoing operations. By this Motion, the Debtors request authority, but not direction, to pay all prepetition and postpetition Cash Management Expenses in the ordinary course of business and consistent with the Debtors' prepetition practices.

**D.      Flow of Funds**

Specialized receipt accounts collect inflows from distinct payors and channels, which are then periodically swept into the General Checking Account. Disbursements for vendors, payroll, payroll taxes, benefits, and program obligations originate either directly from the General Checking Account or from designated disbursement accounts that are funded by transfers from the General Checking Account.

**1.      Receipts**

**Primary Receipt Concentration**: Receipts from Medicare payments, private payor insurance plans, and HQAF and other supplemental funding programs are deposited directly into the General Checking Account. Nearly all other revenue is paid into specialized receipts-only accounts that exist solely to receive funds from specific sources and are not used for disbursements. With one exception identified below, funds deposited into these receipt-only accounts are swept into the General Checking Account on a daily basis via a manually-initiated transfer. These receipt-only Bank Accounts include:

> **Credit Card Receipt Accounts**: Credit card payments are received into one of two receipt-only accounts. Credit card payments that patients initiate through the Debtors' online portal are deposited initially into the Mechanics Bank account ending in 1245. Credit card payments that patients make in-person at the Hospital are deposited into the Comerica Bank account ending in 1398. Unlike all other receipt-only accounts, credit card receipts processed by Comerica Bank are initially routed to a Comerica money market account ending in 4677 before being swept into the General Checking Account on an as-needed basis.

> **Skilled Nursing Facility**: The Debtors operate a skilled nursing facility (the "SNF"). Payments made to the Debtors for services provided at the SNF are deposited into the Mechanics Bank account ending in 5005.

> **Retail Pharmacy**: The Debtors operate a retail pharmacy open to the public and located near the Hospital (the "Retail Pharmacy"). Funds received for purchases made at the Retail Pharmacy are deposited into the Mechanics Bank account ending in 8727.

**SWIFT Account**: International receipts, which are limited in volume, are received into the Mechanics Bank account ending in 4940.

**EFT-designated accounts**: The Debtors receive electronic fund transfers from certain payors into designated accounts held at Mechanics Bank with account numbers ending in 4561 ("Medi-Cal EFT Account"), 3554 ("OPG ACH Account"), and 3547 ("Comp Management EFT Account").

*Medi-Cal*. Electronic payments from Medi-Cal, aside from payments related to physicians' services and the retail pharmacy, as discussed below, are paid into the Medi-Cal EFT Account via electronic fund transfers.

*ACH Payments for Physicians' Services*. Although physicians work for the Debtors full-time, they are not employed directly by the Debtors due to California's prohibition of nonprofessional entities such as hospitals from practicing medicine. As a result, hospitals generally cannot directly hire doctors. Instead, the Debtors contract with medical practice groups, professional corporations, and individual doctors (collectively, the "Physicians") to provide physician services as independent contractors. The Debtors have arrangements in place with certain payors to pay for Physicians' services by making EFT payments through automated clearing house systems. For payors that make payments through this system, and for whom collections are not managed by Comprehensive Management (defined below), ACH payments are received into the OPG ACH Account.

*ACH Payments Comprehensive Management's Billings*. The Debtors operate several health clinics (the "Rural Health Clinics"). Comprehensive Management Inc. ("Comprehensive Management") provides certain billing and collections services to the Debtors for services provided by Physicians in the Rural Health Clinics. Electronic payments made on account of billings processed by Comprehensive Management are deposited into Comp Management EFT Account.

### 2. Internal Funds Movement, Liquidity Management, and Restricted Accounts

Operational liquidity is centralized in the General Checking Account following periodic transfers from receipt accounts and interest-bearing accounts. Funds are swept from receipt-only accounts into the General Checking Account on a daily basis. Funds are transferred from savings accounts to the General Checking Account on an as-needed basis to meet operational needs.

As explained below, some obligations are paid directly from the General Checking Account while others are paid from specific disbursement accounts. Cash is transferred from the General Checking Account into the disbursement accounts both regularly and on an as-needed basis depending on the type of obligation.

Cash that is not needed immediately is occasionally transferred from the General Checking Account to a Mechanics Bank savings account ending in 0980 (the "Savings Account") to optimize interest returns while maintaining access to the funds when needed. For example, the Debtors receive large HQAF program payments that support operations for extended periods. These funds are initially received into the General Checking Account and wholly or partially transferred into the Savings Account while remaining available for transfer back into the General Checking Account as needed. As of the Petition Date, the Savings Account balance is approximately $978,000.

The Hospital receives social security benefits on behalf of inpatients receiving care at the SNF. A designated trust account at Mechanics Bank ending in 8955 (the "SNF Resident Trust Account") receives these funds via ACH and checks from the Social Security Administration at the beginning of each month. Funds received into this account are not commingled with other funds in the Cash Management System. The Hospital issues checks to SNF residents as and when such residents are entitled to receive social security benefits. As of the Petition Date, the SNF Resident Trust Account holds approximately $74,000, none of which is property of the Debtors' estates under § 541(d).

As explained below, the Debtors use credit cards issued by Commerce Bank to pay certain expenses. The Debtors maintain a restricted account at Commerce Bank ending in 9608 that holds approximately $414,000 as collateral to secure credit card obligations. Aside from interest earned on the balance, this account is inactive as funds are neither deposited nor withdrawn from this account, though the restricted account must be maintained per the Debtors' agreement with Commerce Bank.

In 2018, the Debtors issued bonds to finance expansions of the Hospital's pharmacy[3] and cafeteria. As trustee for the bonds, the Bank of New York Mellon Trust Company, N.A. ("BNY") maintains accounts ending in 2353 and 2358 with an aggregate balance of approximately $9.2 million. Though these funds are held by BNY, the accounts are held under the Hospital's employer identification number. Because these funds are restricted, the Debtors do not anticipate having the ability to draw from these accounts during the pendency of the Bankruptcy Cases.

---

[3] Unlike the Retail Pharmacy described above, this pharmacy is located in the Hospital for use within the Hospital.

### 3.    <u>Outflow Channels</u>

**Vendors**: Vendors are paid through three channels: (1) directly from the General Checking Account; (2) from a dedicated checking account for vendor payments; and (3) by credit card. Certain vendors are paid via electronic fund transfers, which are wired to these vendors from the General Checking Account. The Debtors wire payments to vendors from the General Checking Account on an as-needed basis. Most of the Debtors' vendors are paid by checks from the Tri-Counties Bank account ending in 7795. The Debtors transfer funds from the General Checking Account into the Tri-Counties Bank account on a daily basis to cover these checks. A minority of vendors have elected to be paid by credit card. When a credit card payment is initiated, the vendor receives payment from the card issuer, Commerce Bank, which then draws funds from the Tri-Counties Bank account ending in 7795 to cover the card transaction.

**Payroll**: The Debtors' employees are paid bi-weekly, primarily via direct deposit with some employees electing to be paid by check. The bulk of the Debtors' employees are employed directly by the Hospital, with only a handful of employees having general corporate and management responsibilities employed by OroHealth. As of the Petition Date, the Hospital employs approximately 2,122 employees and OroHealth employs approximately eight employees.

For Hospital employees, the Debtors transfer approximately $4 million bi-weekly from the General Checking Account into the Mechanics Bank account ending in 0082 (the "<u>Hospital Payroll Account</u>") to pay the Hospital employees' wages (payroll taxes and employee benefits are paid from different accounts as described below). For employees of OroHealth, the Debtors transfer approximately $150,000 bi-weekly into the Mechanics Bank account ending in 3267 (the "<u>OroHealth Payroll Account</u>," and together with the Hospital Payroll Account, the "<u>Payroll Accounts</u>") to satisfy OroHealth's employee wage and payroll tax obligations.

Payroll taxes for the Hospital's employees' wages are not deposited into the Payroll Accounts and instead are paid directly from the General Checking Account to the applicable governmental units.

Though the Hospital is self-insured, it uses a third-party administrator, Advantek Benefit Administrators ("<u>Advantek</u>"), to determine insurance benefits. Health, dental, and vision insurance

benefits paid to or on behalf of Hospital employees, after being determined by Advantek, are paid from the Mechanics Bank account ending in 9611, which is funded on an as-needed basis from the General Checking Account.

OroHealth offers a flexible spending plan to its employees, allowing its employees to elect to contribute a portion of their pre-tax Wages to flexible spending accounts. The flexible spending plan is administered by Navia Benefits, which provides various means for employees to use their flexible spending accounts. To disburse funds under the flexible spending plan, Navia Benefits draws funds from the Mechanics Bank account ending in 3811 (the "FSA Account") and pays them to the applicable recipient. The Debtors transfer funds from the General Checking Account to the FSA account as needed to maintain a balance in the FSA Account sufficient to cover amounts drawn by Navia Benefits.

**Physicians**: As explained above, the Physicians are not employees of the Debtors and instead provide services as independent contractors. The Physicians are paid from the First Citizens Bank account ending in 7407, which is funded by transfers from the General Checking Account. The majority of Physicians are paid monthly (mid-month for the previous month's services).

**HQAF**: As stated above, the Hospital participates in HQAF program administered by the California Department of Healthcare Services ("DHCS"). The HQAF program is intended to maximize federal funds available to California hospitals through Medi-Cal. *See* Cal. Welf. & Inst. Code § 14169.50. The Hospital pays fees to the HQAF program based on volumes and program criteria on a schedule determined by DHCS. The Hospital then receives payments from the HQAF program based on similar criteria pursuant to DHCS's payment schedule. Like virtually all California hospitals with a large Medi-Cal population, net receipts from this program exceed payments on an annual basis and are critical to the Debtors' liquidity.

Aside from electronic payments that are paid into the Medi-Cal EFT Account (discussed above), payments to and from the HQAF program are paid from and received into the General Checking Account. As discussed above, when the Hospital receives large HQAF payments that must support operations for extended periods, portions of such payments are transferred into a savings account with a higher yield rate than the General Checking Account.

**Patient Refunds**: Refunds to patients (the "Patient Refunds") are paid from the General Checking Account and may result from (1) duplicate payments, (2) adjustments to a patient's out-of-pocket obligations following receipt of payment from a third party, such as insurance, (3) billing corrections, or (4) changes to patients' insurance coverage, including on account of secondary insurance coverage. When these events occur, a "credit balance" accrues on the patient's account if the total payments from all sources exceed the charges for services rendered to the patient after any adjustments or corrections. When the Debtors receive notice that a patient may be entitled to a Patient Refund, the Debtors review the patient's account to identify and validate any credit balance. Once the credit balance is validated, the patient is entitled to a refund.

The Debtors estimate that approximately $180,000 in Patient Refunds have accrued and are unpaid as of the Petition Date. Continuing issuing Patient Refunds is necessary to maintain goodwill with the Debtors' patients. Failure to continue issuing the Patient Refunds would cause financial hardship to the patients who have overpaid for services. Accordingly, by the Motion, the Debtors seek authority, but not direction, to pay accrued and unpaid Patient Refunds in the ordinary course of business.

**E.     Intercompany Transactions**

Before the Petition Date, in the ordinary course of business, the Debtors engaged in transactions with each other (collectively, the "Intercompany Transactions") related to OroHealth's employees. In the ordinary course of business, OroHealth provides management services to the Hospital and in exchange, as explained above, the Hospital pays OroHealth's employees by transferring funds into the OroHealth Payroll Account.

**F.     Corporate Card Program**

As part of the Cash Management System, the Debtors have three corporate credit cards issued by Commerce Bank (the "Corporate Cards") to be utilized for approved purchases and business expenses as authorized by the Debtors' CFO, Purchasing Director, or Director of Plan Operations. In addition, the Debtors utilize a program offered by Commerce Bank that functions much like a corporate credit card but without a physical card (the "Purchase Card Program," and collectively with Corporate Cards, the "Corporate Card Program"). Under the Purchase Card Program, the Debtors

provide account information to certain vendors that use the information to charge the Debtors' Commerce Bank credit account. Charges to the Corporate Cards and Purchase Card Program are paid initially by Commerce Bank, which then withdraws funds from the Tri-Counties Bank account ending in 7795 to cover the expenses. In the twelve months before the Petition Date, the average monthly amount spent by the Debtors using the Corporate Cards was approximately $383,000.00. As of the Petition Date the Debtors owe a balance of approximately $1,070 on account of the Corporate Card Program. The Debtors' obligations to Commerce Bank under the Corporate Card Program are secured by cash held in the Bank Account ending in 9608. The Debtors seek authority, but not direction, to pay prepetition amounts owed to Commerce Bank on account of the Corporate Card Program.

**G.     Bank Fees**

The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees"). In the twelve (12) months before the Petition Date, the average Bank Fees were approximately $8,200 per month. As of the Petition Date, the Debtors owe approximately $3,500 in Bank Fees, approximately $1,800 of which will come due within the first twenty-one days of the Bankruptcy Cases.

**H.     Business Forms**

As part of the Cash Management System, the Debtors utilize business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and checks (the "Business Forms"). The United States Trustee Guidelines require that the Cash Management Banks print "Debtor-in-Possession" and the bankruptcy case number on checks issued after the Petition Date. The Debtors do not use pre-printed checks. Instead, checks are printed when they are issued.

To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Bankruptcy Cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. The Debtors are in the process of re-configuring their check printing system such that checks printed after the Petition Date will bear the designation "Debtor-in-Possession" and the corresponding bankruptcy

case number. The Debtors anticipate that the reconfiguration will be completed before the first day hearing on the Motion.

## I.     Compliance with the United States Trustee Guidelines and the Bankruptcy Code

### 1.     U.S. Trustee Authorized Depositories

The *Guidelines and Requirements for Chapter 11 Debtors in Possession for All Cases Filed in the Eastern District of California* (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee (the "U.S. Trustee"). Six of the eight Cash Management Banks, are not included on the U.S. Trustee's authorized depositories list, including the Debtors' primary bank, Mechanics Bank. The remaining two Cash Management Banks (US Bank and Comerica Bank) are on the authorized depositories list. With the exception of investment accounts held with Morgan Stanley, which hold an aggregate of only approximately $66,000, all of the Bank Accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"); however, the balances in certain of the Bank Accounts may exceed the insured threshold amounts.

Notwithstanding their absence from the authorized depositories list, the Debtors believe that any funds deposited in the Bank Accounts are secure because the Cash Management Banks are well-capitalized, reputable financial institutions. The Debtors respectfully submit that cause exists to continue to allow the Debtors to utilize the existing Bank Accounts. Instead of closing the existing Bank Accounts, the Debtors request instead that they be allowed to convert the Bank Accounts to "debtor in possession" accounts and continue to use them as necessary. Any risks associated with receiving and holding funds with the Cash Management Banks is negligible and is far outweighed by the immediate irreparable damage that would be caused by shutting down the Cash Management System to open new debtor-in-possession accounts. By this Motion, the Debtors seek approval to maintain all Bank Accounts on an interim basis and will work in good faith with the U.S. Trustee to resolve any concerns regarding the continued use of these Bank Accounts on a final basis.

2. **Section 345(b) of the Bankruptcy Code**

Except for investment accounts held at Morgan Stanley, each Bank Account is insured by the FDIC and, therefore, complies with § 345. The Cash Management Banks are well-capitalized and financially stable institutions, and the Debtors therefore request that the Court waive the requirements of § 345(b) and the U.S. Trustee Guidelines, to the extent not already met, with respect to authorized depository requirements.

The Corporate Card Program is critical to the Debtors' ability to maintain ordinary course operations. Therefore, the Debtors request authority to continue utilizing and making payments on account of the Corporate Card Program in the ordinary course of business on a postpetition basis.

**IV.**

**BASIS FOR RELIEF REQUESTED**

**A.** **The Court Should Authorize the Debtors to Maintain Existing Bank Accounts and Continue Using the Cash Management System.**

In general, LBR 2015-2 and the U.S. Trustee Guidelines require chapter 11 debtors to close prepetition bank accounts, open new debtor-in-possession accounts at authorized depositories and use checks and other business forms that clearly bear the "Debtor-in-Possession" notation and the case number unless otherwise ordered by the Court. The U.S. Trustee Guidelines also expect debtors to maintain accounts only at authorized depositories that comply with the U.S. Trustee's requirements. The Debtors seek a tailored waiver of these requirements to the extent necessary to avoid disruption.

The requested relief is grounded in the Bankruptcy Code and in this Court's discretion to modify local requirements for cause. Section 363(c)(1) authorizes a debtor in possession to use property of the estate in the ordinary course of business. The Debtors' established banking arrangements, disbursement practices, and cash concentration routines are ordinary-course uses of property that facilitate collections, payroll, vendor payments, and patient-care obligations integral to the Debtors' operations. Section 105(a) empowers the Court to enter orders that are necessary or appropriate to carry out the provisions of the Bankruptcy Code, including continuing practices under § 363(c)(1) to avoid disruption at the outset of these chapter 11 cases. Moreover, LBR 1001-1(f)

1　permits modification of local rule requirements for cause, and LBR 2015-2 and the U.S. Trustee

2　Guidelines, while providing important operating standards, yield to case-specific modifications

3　where strict, immediate compliance would cause harm disproportionate to any benefit.

4　　　　Courts recognize that continuation of prepetition bank accounts and cash management

5　practices is routinely approved as a practical necessity, particularly for complex enterprises where

6　integrated systems are essential to efficient collections and disbursements. *See, e.g.*, *In re Madera*

7　*Community Hospital*, Case No. 23-10457 [Docket No. 246] (Bankr. E.D. Cal., Apr. 14, 2023)

8　(granting motion to continue existing cash management system); *The Roman Cath. Bishop of*

9　*Sacramento,* Case No. 24-21326, [Docket No. 270] (Bankr. E.D. Cal., May 4, 2024); *In re The Roman*

10　*Cath. Bishop of Stockton,* Case No. 14-20371, [Docket No. 64] (Bankr. E.D. Cal., 10 Jan. 24, 2014);

11　*In re Zacky Farms, LLC,* Case No. 12-37961, [Docket No. 211] (Bankr. E.D. Cal., Nov. 5, 2012); *see*

12　*also In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987) (recognizing that

13　requests for authority to continue using cash management systems are "simple matters[.]"; *In re*

14　*Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd*, 997 F.2d 1039 (3d Cir.

15　1993) (acknowledging that use of an integrated cash management system "allows efficient utilization

16　of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the

17　many different purposes that require cash."). Further, the U.S. Trustee operating guidelines are

18　guidelines that do not carry the force of law. *In re Gold Standard Baking, Inc.,* 179 B.R. 98, 101-02

19　(Bankr. N.D. Ill. 1995).

20　　　　Here, cause exists to authorize the Debtors to continue to use their existing Bank Accounts as

21　debtor-in-possession accounts and to maintain their Cash Management System. The Debtors' receipts

22　and disbursements are overwhelmingly electronic, including government program remittances

23　(HQAF, Medi-Cal, and Medicare), third-party payor remittances, card transactions, and capitation

24　payments that fund ongoing patient care and hospital operations. Several accounts are specifically

25　designated to receive EFTs from governmental units and managed care organizations. Redirecting

26　this volume of payors to newly opened accounts is not practical without causing interruptions in

27　receipts and disbursements and risking funds being paid into closed accounts.

28

Forcing immediate closure of the Bank Accounts and opening new accounts at authorized depositories would introduce risk and delay that far outweighs any potential benefit.

The Debtors' robust internal controls further support continuation. The Debtors' finance department, including the Chief Financial Officer, maintains daily oversight of cash balances and disbursements, with tiered authority levels, weekly payables reviews, and off-cycle approvals when necessary. Intercompany transactions are tracked and reconciled through the Cash Management System and the Debtors' accounting systems, enabling the Debtors to ascertain, trace, and account for transactions across the Debtors' enterprise. In the rare event that the Debtors' reports and Bank Account records do not match, the finance department works with the Cash Management Banks, insurance providers, or other third parties to resolve such discrepancies quickly and efficiently. These controls mitigate risks and provide a transparent and reliable framework for continued financial operations postpetition.

In addition to authorizing the Debtors to maintain their Bank Accounts and Cash Management System, the Court should authorize the Cash Management Banks to: (1) honor and process postpetition checks, ACH debits, wire transfers, and card transactions; (2) follow the Debtors' instructions to honor or dishonor items, including prepetition items the Debtors determine should not be paid; and (3) charge or debit the Bank Accounts for returned items and related fees in the ordinary course. Further the Debtors should be authorized to pay undisputed, prepetition Bank Fees, which are incidental to preserving ordinary-course banking services.

For all these reasons, and as more particularly described in the First Day Declaration, and the Wentz Cash Management Declaration filed in support of the Motion, cause exists under §§ 105(a) and 363(c)(1) and LBR 1001-1(f) to authorize continued use of the Debtors' existing Bank Accounts and Cash Management System, direct the Cash Management Banks as requested, and waive strict and immediate compliance with LBR 2015-2 and the U.S. Trustee Guidelines to the extent necessary to avoid operational disruption. Denying or delaying this relief would cause immediate irreparable harm by interrupting receivables, jeopardizing payroll and vendor stability, and impairing patient care.

**B.**     **The Court Should Authorize Ordinary-Course Intercompany Transactions and Grant Administrative Priority Status to Postpetition Intercompany Claims.**

The Debtors, as an integrated enterprise, necessarily rely on intercompany transactions to align timing of receipts and disbursements, fund shared services, and manage payroll. Section 363(c)(1) authorizes these ordinary-course transactions, and, to the extent that the postpetition intercompany transactions constitute extensions of credit, §§ 364(b) and 503(b)(1) support administrative expense treatment as actual, necessary costs of preserving the estate.

Courts routinely approve continuation of ordinary-course intercompany transactions in integrated businesses because the alternative—artificially severing enterprise-level liquidity management and cost allocations—produces immediate disruption to operations and increased administrative expense with no countervailing benefit. The Debtors' prepetition internal controls, along with their accounting systems and reconciliation practices, provide the necessary transparency to continue these transactions postpetition while preserving corporate separateness and traceability.

Applied here, the Debtors' ongoing intercompany transactions are essential to uninterrupted patient care and hospital operations. As stated above, the Debtors track and reconcile intercompany balances through the Cash Management System and their accounting systems, which will continue postpetition. Affording administrative expense priority to postpetition intercompany receivables supports overall stability without prejudice to creditors. This treatment is consistent with §§ 364(b) and 503(b)(1) and preserves the Debtors' ability to manage liquidity efficiently. Accordingly, the Court should authorize ordinary-course intercompany transactions and grant administrative expense status to postpetition intercompany claims, subject to the Debtors' continued maintenance of detailed intercompany records.

**C.**     **The Court Should Authorize Continued Use of Prepetition Business Forms.**

The Court should authorize the Debtors' continued use of their existing preprinted Business Forms, including checks, without immediately stamping a "Debtor-in-Possession" notation. If the Debtors use all of their prepetition Business Forms and require replenishing their supply, they will order Business Forms stamped with a "Debtor-in-Possession" notation and case number on new stock as it is ordered. Section 105(a) and LBR 1001-1(f) permit the Court to tailor the application of local

1  rules and guideline requirements for cause. Courts have permitted continued use of prepetition forms

2  where immediate reprinting would cause waste, confusion, and unnecessary expense, especially early

3  in a case when clarity and continuity with employees, patients, payors, and vendors are critical. *See*

4  *The Roman Cath. Bishop of Sacramento,* Case No. 24-21326, [Docket No. 270] (Bankr. E.D. Cal.,

5  May 4, 2024) *In re The Roman Cath. Bishop of Stockton,* Case No. 14-20371, [Docket No. 64] (Bankr.

6  E.D. Cal., 10 Jan. 24, 2014); *In re Zacky Farms, LLC,* Case No. 12-37961, [Docket No. 211] (Bankr.

7  E.D. Cal., Nov. 5, 2012); *see also In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn. 1997) ("The

8  UST has not been given any additional power to 'require' that this or any other debtor imprint

9  'Debtor–In–Possession' on his checks.").

10  Here, the Debtors seek to minimize needless administrative costs and avoid confusion among

11  stakeholders that interact daily with the Debtors' forms and checks. Given the Debtors' commitment

12  to adopt the required markings on replacement stock if current supplies are depleted, immediate

13  reprinting would create cost and delay with no meaningful countervailing benefit.

14  **D.**     **The Court Should Grant a Limited Waiver of § 345(b) for Cause.**

15  Section 345(a) reflects a policy of promoting the safety of estate funds while permitting

16  investments with reasonable returns. Section 345(b) prescribes bonding or collateralization

17  requirements but expressly allows the Court to waive such requirements "for cause." Courts

18  evaluating "cause" consider factors including the debtor's sophistication, the size and complexity of

19  the case, the safety of the investment vehicles, the existence of appropriate safeguards, and the costs

20  associated with strict compliance. *See The Roman Cath. Bishop of Sacramento,* Case No. 24-21326,

21  [Docket No. 270] (Bankr. E.D. Cal., May 4, 2024); *In re The Roman Cath. Bishop of Stockton,* Case

22  No. 14-20371, [Docket No. 64] (Bankr. E.D. Cal., 10 Jan. 24, 2014)*; see also In re Serv. Merch. Co.,*

23  *Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (enumerating factors to be considered in waiving

24  requirements of § 345(b), including the size of business and safety of debtor's proposed investments);

25  *In re King Mountain Tobacco Co., Inc.*, 623 B.R. 323, 332 (Bankr. E.D. Wash. 2020) (finding cause

26  under totality of circumstance for debtor to retain its investment accounts).

27  The Debtors' banking and investment arrangements, together with their dependence on the

28  investment account, constitute cause for a limited waiver of § 345(b). Except for the investment

accounts at Morgan Stanley (which hold a relatively small amount of funds), the Debtors' Bank Accounts are FDIC-insured and maintained at well-capitalized and financially stable institutions. The Debtors' investment accounts are managed in accordance with prudent-investor standards emphasizing diversification, liquidity, and oversight appropriate to the Debtors' operations. Imposing immediate bonding or liquidation would impose administrative burden, disrupt liquidity planning, and reduce returns without commensurate reductions in risk.

The Debtors will maintain transparent reporting and will engage cooperatively with the U.S. Trustee to address any concerns regarding the Debtors' investments. On this record, the balance of the § 345(b) factors demonstrate cause for a limited waiver tailored to the Debtors' circumstances.

**V.**

**PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS**

The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Insurance Policies. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Motion.

**VI.**

**EMERGENCY CONSIDERATION**

Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the petition date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The relief requested herein integral to the Debtors' ability to transition their operations into these Chapter 11 Cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. The relief requested is necessary in order for the Debtors to operate their business

in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**VII.**

**WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**VIII.**

**NOTICE**

The Debtors will provide notice of the Motion via first class mail, facsimile or email (where available) to: (a) the Office of the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis) filed in accordance with Bankruptcy Rule 1007(d); (c) the proposed DIP Lender; (d) creditors that assert a security interest in the Debtor's real property or cash collateral; (e) the Cash Management Banks; (f) the State of California through the Attorney General for the State of California; (g) the United States of America through the United States Attorney for the Eastern District of California; and (h) parties that file with the Court and serve upon the Debtor requests for notice of all maters in accordance with Bankruptcy Rule 2002(i) (collectively, the "Notice Parties").  If the Court grants the relief requested by the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtor submits that such notice is sufficient and that no other or further notice be given.

No prior request for the relief sought herein has been made by the Debtor to any other court.

**IX.**

**CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that the Court grant this Motion and enter interim and final orders in the forms attached respectively as **Exhibit A** and **Exhibit B** to the List of Exhibits filed concurrently herewith, and grant such other relief as is just and proper.

Dated: December 8, 2025                **FOX ROTHSCHILD LLP**

*/s/ Keith C. Owens*
Keith C. Owens
Nicholas A. Koffroth

*Proposed Counsel to Oroville Hospital, et al.,
the Debtors and Debtors-in-Possession*