**14**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:     (310) 598-4150
Facsimile:     (310) 556-9828

*Proposed Counsel to Oroville Hospital, et al.,
the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| In re: | Lead Case No. 25-26876 |
| OROVILLE HOSPITAL, *et al.*,[1] | Jointly Administered With: Case No. 25-26877 |
| Debtors and Debtors in Possession. | **DCN** KCO-3 |
| | Chapter 11 |
| | Hon. Christopher D. Jamie |
| ☒ Affects All Debtors | **Hearing Information** |
| ☐ Affects Oroville Hospital | Hearing Date:   December 11, 2025 |
| ☐ Affects OroHealth Corporation: A Nonprofit Healthcare System | Hearing Time:   11 A.M. |
| Debtors and Debtors in Possession. | Location:   Courtroom 32 |
| | 501 I Street, Sixth Floor |
| | Sacramento, California 95814 |

**DECLARATION OF SEAN A. GUMBS IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EXISTING BANK ACCOUNTS; (B) CONTINUE USE OF CASH MANAGEMENT SYSTEM; (C) CONTINUE USE OF BUSINESS FORMS; (D) PERFORM INTERCOMPANY TRANSACTIONS; (E) CONTINUE CREDIT CARD PROGRAM; (F) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO; AND (G) CONTINUE ISSUING PATIENT REFUNDS (II) WAIVING REQUIREMENTS OF LBR 2015-1; (III) GRANTING LIMITED WAIVER OF SECTION 345(b) DEPOSIT REQUIREMENTS; (IV) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF AND (V) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

I, Sean A. Gumbs, declare as follows:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), the proposed financial advisor Oroville Hospital (the "Hospital") and OroHealth Corporation ("OroHealth"), the debtors and debtors in possession (collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Bankruptcy Cases"). FTI has served as the financial advisor to the Debtors since its selection and appointment in May 2023. I have been directly involved in this engagement since FTI's selection and appointment. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Bank Accounts; (B) Continue Use of Cash Management System; (C) Continue Use of Business Forms; (D) Perform Intercompany Transactions; (E) Continue Credit Card Program; (F) Honor Certain Prepetition Obligations Related Thereto; and (G) Authorizing the Debtors to Continue Issuing Patient Refunds (II) Waiving Requirements of LBR 2015-1; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion") filed concurrently herewith and for all other purposes authorized by law.[2]

2. I hold a Bachelor of Science degree in Economics from the University of Pennsylvania, and a Master of Business Administration from Harvard Business School. I have approximately 25 years of experience in corporate restructuring, including advising tax-exempt bondholders and municipal issuers on restructuring alternatives, and service as a post-confirmation interim Chief Executive Officer and interim Chief Financial Officer. I am a Certified Insolvency & Restructuring Advisor and a Certified Turnaround Professional.

3. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including others employed by FTI Consulting, Inc. ("FTI") and familiar with this engagement, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. In the course and scope of

---

[2] Unless otherwise defined herein, all capitalized terms have the definitions set forth in the Motion.

FTI's engagement as financial advisor to the Debtors, I am familiar with the Debtors' Cash Management System (defined below), record keeping practices and policies, and the manner in which the Debtors maintain their business records, among other things. Notwithstanding the foregoing, as financial advisor, FTI does not have control over the Debtors' Cash Management System, which is conferred to the Debtors' management team, subject to certain monitoring procedures put in place by FTI to assist the Debtors in cash management initiatives. I am over the age of eighteen and if called upon as a witness, I could and would testify competently to the facts set forth in this Declaration.

**A.     The Cash Management System**

4.     The Debtors operate a complex enterprise with established cash management and payment processing systems that support ongoing operations, payroll, vendor relationships, and, where applicable, regulatory and mission-driven activities. As with similar enterprises, the Debtors' receipts include payments from governmental units, third-party payor remittances, and card-based transactions from patients. I believe that disruption to these established channels would adversely affect collections, increase administrative and audit burdens, and cause immediate and irreparable harm.

5.     The Debtors utilize a cash management system (the "Cash Management System") consisting of thirty-two bank accounts (each, a "Bank Account," and collectively, the "Bank Accounts") maintained at eight banks (the "Cash Management Banks"). A schematic of the Cash Management System identifying each Bank Account and its purpose is set forth on **Exhibit C** of the Exhibit List filed concurrently herewith (the "Schematic").

6.     As detailed below and in the Schematic, the Cash Management System operates using a hub-and-spoke model, centered around the Mechanics Bank account ending in 0262 (the "General Checking Account"), which is subject to a deposit account control agreement ("DACA") for the benefit of the predecessor master trustee related to the Debtors' bond issuances. Eight accounts are designated as receipt-only accounts for payments from certain sources. Seven accounts are designated for disbursing funds to specific entities or for specific purposes. Six accounts are designated as savings or restricted accounts, including an account carrying a higher-than-usual yield, an account serving as collateral for credit card obligations, an account through which certain patient payments

pass through before being deposited into the General Checking Account, an account with funds held in trust for the benefit of certain patients, and two accounts with funds held by the Trustee for the 2018 Bonds for the exclusive purpose of expanding the Debtors' cafeteria and pharmacy (all as more fully explained below). Ten accounts are essentially dormant and currently have *de minimis* balances.

7. Each Bank Account is listed in the following table with its owner, bank, name used by the Debtors to identify the account, and last four digits of its account number:

| | Owner | Bank | Name | Acct # |
|---|---|---|---|---|
| **General Checking Account (Primary Account)** | | | | |
| 1 | Oroville Hospital | Mechanics Bank | General Checking | 0262 |
| **Receipt-Only** | | | | |
| 2 | Oroville Hospital | Mechanics Bank | SNF General | 5005 |
| 3 | Oroville Hospital | Mechanics Bank | Credit Card Clearing | 1245 |
| 4 | Oroville Hospital | Mechanics Bank | Medi-Cal EFT | 4561 |
| 5 | Oroville Hospital | Mechanics Bank | Comp Mgmt EFT | 3547 |
| 6 | Oroville Hospital | Mechanics Bank | OPG ACH Account | 3554 |
| 7 | Oroville Hospital | Mechanics Bank | Retail Pharmacy | 8727 |
| 8 | Oroville Hospital | Mechanics Bank | SWIFT | 4940 |
| 9 | Oroville Hospital | Comerica Bank | Comerica Credit Card | 1398 |
| **Disbursement** | | | | |
| 10 | Oroville Hospital | Mechanics Bank | Payroll Checking | 0082 |
| 11 | Oroville Hospital | First Citizens Bank | First Citizens Checking | 7407 |
| 12 | Oroville Hospital | Mechanics Bank | Advantek Medical Benefits | 9611 |
| 13 | Oroville Hospital | Mechanics Bank | Patient Refunds | 0090 |
| 14 | Oroville Hospital | Tri-Counties Bank | Business Checking | 7795 |
| 15 | OroHealth Corporation | Mechanics Bank | Payroll Checking | 3267 |
| 16 | OroHealth Corporation | Mechanics Bank | Flexible Spending Plan | 3811 |

| | | | | |
|---|---|---|---|---|
| **Savings, Credit Card, and Restricted,** | | | | |
| 17 | Oroville Hospital | Mechanics Bank | Mechanics Bank Secured Business Line | 0980 |
| 18 | Oroville Hospital | Comerica Bank | Comerica Money Market | 4677 |
| 19 | Oroville Hospital | Commerce Bank | Commerce Bank CD | 9608 |
| 20 | Oroville Hospital | Mechanics Bank | SNF Resident Trust | 8955 |
| 21 | Oroville Hospital | Bank of New York Mellon | BNY Project Fund | 2358 |
| 22 | Oroville Hospital | Bank of New York Mellon | BNY Rev Fund | 2353 |
| **Inactive** | | | | |
| 23 | OroHealth Corporation | Mechanics Bank | Professional Group | 8901 |
| 24 | Oroville Hospital | Mechanics Bank | PHA/Farmers Mkt EBT | 8794 |
| 25 | Oroville Hospital | Mechanics Bank | Mechanics Bank Max Savings | 1384 |
| 26 | Oroville Hospital | US Bank | US Bank Money Market | 9658 |
| 27 | Oroville Hospital | Tri-Counties Bank | Tri-Counties Money Market | 1827 |
| 28 | Oroville Hospital | First Citizens Bank | First Citizens Checking | 5812 |
| 29 | OroHealth Corporation | First Citizens Bank | First Citizens Checking | 5000 |
| 30 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Securities | 4089 |
| 31 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Active Assets | 5089 |
| 32 | Oroville Hospital | Morgan Stanley | Morgan Stanley-Active Assets | 2089 |

8. The Debtors' Cash Management System facilitates timely and efficient receipt and disbursement of funds, including payments to physicians, employees, vendors, utility and other service providers, governmental units, and any other disbursements required for the Debtors' operations.

9. Based on my review of the Debtors' financial information, I estimate that deposits into the Cash Management System average approximately $32 million per month (net of intercompany

transfers and transfers among the Bank Accounts), which consists primarily of payments from Medi-Cal and Medicare, private payor insurance plans, patients, and the Hospital Quality Assurance Fees ("HQAF") program and other supplemental funding programs. While the Cash Management System's efficiency in receiving, managing, and disbursing funds results in a net benefit to the estates, the Debtors incur certain expenses in maintaining the Cash Management System, as summarized in the following table and detailed below (the "Cash Management Expenses"):

| Bank Fee | Monthly Average (last 12 months) | Estimated Amount Accrued as of Petition Date (Final Amount) | Estimated Amount Owed Within 21 Days (Interim Amount) |
|---|---|---|---|
| Mechanics Bank Fees | $7,300 | $2,650 | $1,200 |
| Comerica Bank Fees | $380 | $480 | $380 |
| First Citizens Bank Fees | $310 | $85 | $0 |
| Tri-Counties Bank Fees | $240 | $300 | $240 |
| **Total** | **$8,230** | **$3,515** | **$1,820** |

10. Because of the nature of the Debtors' operations and the disruption to the business that would result from closure of the Bank Accounts, I believe that the Debtors' continued use of the Cash Management System is critical to the Debtors' ongoing operations.

B. **Flow of Funds**

11. Specialized receipt accounts collect inflows from distinct payors and channels, which are then periodically swept into the General Checking Account. Disbursements for vendors, payroll, payroll taxes, benefits, and program obligations originate either directly from the General Checking Account or from designated disbursement accounts that are funded by transfers from the General Checking Account.

1. **Receipts**

12. **Primary Receipt Concentration**: Receipts from Medicare payments, private payor insurance plans, and HQAF and other supplemental funding programs are deposited directly into the General Checking Account. Nearly all other revenue is paid into specialized receipts-only accounts that exist solely to receive funds from specific sources and are not used for disbursements. With one exception identified below, funds deposited into these receipt-only accounts are swept into the

General Checking Account on a daily basis via a manually-initiated transfer. These receipt-only Bank Accounts include:

    a. **Credit Card Receipt Accounts**: Credit card payments are received into one of two receipt-only accounts. Credit card payments that patients initiate through the Debtors' online portal are deposited initially into the Mechanics Bank account ending in 1245. Credit card payments that patients make in-person at the Hospital are deposited into the Comerica Bank account ending in 1398. Unlike all other receipt-only accounts, credit card receipts processed by Comerica Bank are initially routed to a Comerica money market account ending in 4677 before being swept into the General Checking Account on an as-needed basis.

    b. **Skilled Nursing Facility**: The Debtors operate a skilled nursing facility (the "SNF"). Payments made to the Debtors for services provided at the SNF are deposited into the Mechanics Bank account ending in 5005.

    c. **Pharmacy**: The Debtors operate a retail pharmacy open to the public and located near the Hospital (the "Retail Pharmacy"). Funds received for purchases made at the Retail Pharmacy are deposited into the Mechanics Bank account ending in 8727.

    d. **SWIFT Account**: International receipts, which are limited in volume, are received into the Mechanics Bank account ending in 4940.

    e. **EFT-designated accounts**: The Debtors receive electronic fund transfers from certain payors into designated accounts held at Mechanics Bank with account numbers ending in 4561 ("Medi-Cal EFT Account"), 3554 ("OPG ACH Account"), and 3547 ("Comp Management EFT Account").

        i. *Medi-Cal*. Electronic payments from Medi-Cal, aside from payments related to physicians' services and the retail pharmacy, as discussed below, are paid into the Medi-Cal EFT Account via electronic fund transfers.

        ii. *ACH Payments for Physicians' Services*. Although physicians work for the Debtors full-time, they are not employed directly by the Debtors due to California's prohibition of nonprofessional entities such as hospitals from practicing medicine. As a result, hospitals generally cannot directly hire doctors. Instead, the Debtors contract with medical practice

groups, professional corporations, and individual doctors (collectively, the "Physicians") to provide physician services as independent contractors. The Debtors have arrangements in place with certain payors to pay for Physicians' services by making EFT payments through automated clearing house systems. For payors that make payments through this system, and for whom collections are not managed by Comprehensive Management (defined below), ACH payments are received into the OPG ACH Account.

                iii.      **ACH Payments from Billing and Collection Services**. The Debtors operate several health clinics (the "Rural Health Clinics"). Comprehensive Management Inc. ("Comprehensive Management") provides certain billing and collections services to the Debtors for services provided by Physicians in the Rural Health Clinics. Electronic payments made on account of billings processed by Comprehensive Management are deposited into the Comp Management EFT Account.

        **2.     Internal Funds Movement, Liquidity Management, and Restricted Accounts**

13. Operational liquidity is centralized in the General Checking Account following periodic transfers from receipt accounts and interest-bearing accounts. Funds are swept from receipt-only accounts into the General Checking Account on a daily basis. Funds are transferred from savings accounts to the General Checking Account on an as-needed basis to meet operational needs.

14. As explained below, some obligations are paid directly from the General Checking Account while others are paid from specific disbursement accounts. Cash is transferred from the General Checking Account into the disbursement accounts both regularly and on an as-needed basis depending on the type of obligation.

15. Cash that is not needed immediately is occasionally transferred from the General Checking Account to a Mechanics Bank savings account ending in 0980 (the "Savings Account") to optimize interest returns while maintaining access to the funds when needed. For example, the Debtors receive large HQAF program payments that support operations for extended periods. These funds are initially received into the General Checking Account and wholly or partially transferred into the Savings Account while remaining available for transfer back into the General Checking

Account as needed. As of the Petition Date, the Savings Account balance is approximately $978,000.

16.　　The Hospital receives social security benefits on behalf of inpatients receiving care at the SNF. A designated trust account at Mechanics Bank ending in 8955 (the "SNF Resident Trust Account") receives these funds via ACH and checks from the Social Security Administration at the beginning of each month. Funds received into this account are not commingled with other funds in the Cash Management System. The Hospital issues checks to SNF residents as and when such residents are entitled to receive social security benefits. As of the Petition Date, the SNF Resident Trust Account holds approximately $74,000.

17.　　As explained below, the Debtors use credit cards issued by Commerce Bank to pay certain expenses. The Debtors maintain a restricted account at Commerce Bank ending in 9608 that holds approximately $414,000 as collateral to secure credit card obligations. Aside from interest earned on the balance, this account is inactive as funds are neither deposited nor withdrawn from this account, though the restricted account must be maintained per the Debtors' agreement with Commerce Bank.

18.　　I am informed that, in 2018, the Debtors issued bonds to finance expansions of the Hospital's pharmacy[3] and cafeteria. As trustee for the bonds, the Bank of New York Mellon Trust Company, N.A. ("BNY") maintains accounts ending in 2353 and 2358 with an aggregate balance of approximately $9.2 million. Though these funds are held by BNY, the accounts are held under the Hospital's employer identification number. Because these funds are restricted, the Debtors do not anticipate having the ability to draw from these accounts during the pendency of the Bankruptcy Cases.

### 3. Outflow Channels

19.　　**Vendors**: Vendors are paid through three channels: (1) directly from the General Checking Account; (2) from a dedicated checking account for vendor payments; and (3) by credit card. Certain vendors are paid via electronic fund transfers, which are wired to these vendors from

---

[3] Unlike the Retail Pharmacy described above, this pharmacy is located in the Hospital for use within the Hospital.

the General Checking Account. The Debtors wire payments to vendors from the General Checking Account on an as-needed basis. Most of the Debtors' vendors are paid by checks from the Tri-Counties Bank account ending in 7795. The Debtors transfer funds from the General Checking Account into the Tri-Counties Bank account on a daily basis to cover these checks. A minority of vendors have elected to be paid by credit card. When a credit card payment is initiated, the vendor receives payment from the card issuer, Commerce Bank, which then draws funds from the Tri-Counties Bank account ending in 7795 to cover the card transaction.

20. **Payroll**: The Debtors' employees are paid bi-weekly, primarily via direct deposit with some employees electing to be paid by check. The bulk of the Debtors' employees are employed directly by the Hospital, with only a handful of employees having general corporate and management responsibilities employed by OroHealth. As of the Petition Date, the Hospital employs approximately 2,122 employees and OroHealth employs approximately eight employees.

21. For Hospital employees, the Debtors transfer approximately $4 million bi-weekly from the General Checking Account into the Mechanics Bank account ending in 0082 (the "Hospital Payroll Account") to pay the Hospital employees' wages (payroll taxes and employee benefits are paid from different accounts as described below). For employees of OroHealth, the Debtors transfer approximately $150,000 bi-weekly into the Mechanics Bank account ending in 3267 (the "OroHealth Payroll Account," and together with the Hospital Payroll Account, the "Payroll Accounts") to satisfy OroHealth's employee wage and payroll tax obligations.

22. Payroll taxes for the Hospital's employees' wages are not deposited into the Payroll Accounts and instead are paid directly from the General Checking Account to the applicable governmental units.

23. Though the Hospital is self-insured, it uses a third-party administrator, Advantek Benefit Administrators ("Advantek"), to determine insurance benefits. Health, dental, and vision insurance benefits paid to or on behalf of Hospital employees, after being determined by Advantek, are paid from the Mechanics Bank account ending in 9611, which is funded on an as-needed basis from the General Checking Account.

24.　　OroHealth offers a flexible spending plan to its employees, allowing its employees to elect to contribute a portion of their pre-tax Wages to flexible spending accounts. The flexible spending plan is administered by Navia Benefits, which provides various means for employees to use their flexible spending accounts. To disburse funds under the flexible spending plan, Navia Benefits draws funds from the Mechanics Bank account ending in 3811 (the "FSA Account") and pays them to the applicable recipient. The Debtors transfer funds from the General Checking Account to the FSA account as needed to maintain a balance in the FSA Account sufficient to cover amounts drawn by Navia Benefits.

25.　　**Physicians**: As explained above, the Physicians are not employees of the Debtors and instead provide services as independent contractors. The Physicians are paid from the First Citizens Bank account ending in 7407, which is funded by transfers from the General Checking Account. The majority of Physicians are paid monthly (mid-month for the previous month's services).

26.　　**HQAF**: As stated above, the Hospital participates in HQAF program administered by the California Department of Healthcare Services ("DHCS"). The HQAF program is intended to maximize federal funds available to California hospitals through Medi-Cal. *See* Cal. Welf. & Inst. Code § 14169.50. The Hospital pays fees to the HQAF program based on volumes and program criteria on a schedule determined by DHCS. The Hospital then receives payments from the HQAF program based on similar criteria pursuant to DHCS's payment schedule. Like virtually all California hospitals with a large Medi-Cal population, net receipts from this program exceed payments on an annual basis and are critical to the Debtors' liquidity.

27.　　Aside from electronic payments that are paid into the Medi-Cal EFT Account (discussed above), payments to and from the HQAF program are paid from and received into the General Checking Account. As discussed above, when the Hospital receives large HQAF payments that must support operations for extended periods, portions of such payments are transferred into a savings account with a higher yield rate than the General Checking Account.

28.　　**Patient Refunds**: Refunds to patients (the "Patient Refunds") are paid from the General Checking Account and may result from (1) duplicate payments, (2) adjustments to a patient's out-of-pocket obligations following receipt of payment from a third party, such as insurance, (3)

billing corrections, or (4) changes to patients' insurance coverage, including on account of secondary insurance coverage. When these events occur, a "credit balance" accrues on the patient's account if the total payments from all sources exceed the charges for services rendered to the patient after any adjustments or corrections. When the Debtors receive notice that a patient may be entitled to a Patient Refund, the Debtors review the patient's account to identify and validate any credit balance. Once the credit balance is validated, the patient is entitled to a refund.

29. The Debtors estimate that approximately $180,000 in Patient Refunds have accrued and are unpaid as of the Petition Date.

**C.  Intercompany Transactions**

30. Before the Petition Date, in the ordinary course of business, the Debtors engaged in transactions with each other (collectively, the "Intercompany Transactions") related to OroHealth's employees. In the ordinary course of business, OroHealth provides management services to the Hospital and in exchange, as explained above, the Hospital pays OroHealth's employees by transferring funds into the OroHealth Payroll Account.

**D.  Corporate Card Program**

31. As part of the Cash Management System, the Debtors have three corporate credit cards issued by Commerce Bank (the "Corporate Cards") to be utilized for approved purchases and business expenses as authorized by the Debtors' CFO, Purchasing Director, or Director of Plan Operations. In addition, the Debtors utilize a program offered by Commerce Bank that functions much like a corporate credit card but without a physical card (the "Purchase Card Program," and collectively with Corporate Cards, the "Corporate Card Program"). Under the Purchase Card Program, the Debtors provide account information to certain vendors that use the information to charge the Debtors' Commerce Bank credit account. Charges to the Corporate Cards and Purchase Card Program are paid initially by Commerce Bank, which then withdraws funds from the Tri-Counties Bank account ending in 7795 to cover the expenses. In the twelve months before the Petition Date, the average monthly amount spent by the Debtors using the Corporate Cards was approximately $383,000.00. As of the Petition Date the Debtors owe a balance of approximately $1,070 on account of the Corporate Card

Program. The Debtors' obligations to Commerce Bank under the Corporate Card Program are secured by cash held in the Bank Account ending in 9608.

### E. Bank Fees

32.　The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees"). In the twelve (12) months before the Petition Date, the average Bank Fees were approximately $8,200 per month. As of the Petition Date, the Debtors owe approximately $3,500 in Bank Fees, approximately $1,800 of which will come due within the first twenty-one days of the Bankruptcy Cases.

### F. Business Forms

33.　As part of the Cash Management System, the Debtors utilize business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and checks (the "Business Forms"). The United States Trustee Guidelines require that the Cash Management Banks print "Debtor-in-Possession" and the bankruptcy case number on checks issued after the Petition Date. The Debtors do not use pre-printed checks. Instead, checks are printed when they are issued.

34.　To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Bankruptcy Cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. The Debtors are in the process of re-configuring their check printing system such that checks printed after the Petition Date will bear the designation "Debtor-in-Possession" and the corresponding bankruptcy case number. The Debtors anticipate that the reconfiguration will be completed before the first day hearing on the Motion.

### G. Compliance with the U.S. Trustee Guidelines and the Bankruptcy Code

#### 1. U.S. Trustee Authorized Depositories

35.　I understand that six of the eight Cash Management Banks, are not included on the Office of the United States Trustee (the "U.S. Trustee") authorized depositories list, including the Debtors' primary bank, Mechanics Bank. The remaining two Cash Management Banks (US Bank and Comerica Bank) are on the authorized depositories list. With the exception of investment

accounts held with Morgan Stanley, which hold an aggregate of only approximately $66,000, all of the Bank Accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"); however, the balances in certain of the Bank Accounts may exceed the insured threshold amounts.

36. Notwithstanding their absence from the authorized depositories list, I believe that any funds deposited in the Bank Accounts are secure because the Cash Management Banks are well-capitalized, reputable financial institutions. I believe that any risks associated with receiving and holding funds with the Cash Management Banks is negligible and is far outweighed by the immediate irreparable damage that would be caused by shutting down the Cash Management System to open new debtor-in-possession accounts.

### 2. Section 345(b) of the Bankruptcy Code

37. Except for investment accounts held at Morgan Stanley, each Bank Account is insured by the FDIC and, therefore, complies with § 345.

38. I am informed and believe that the Cash Management Banks are well-capitalized and financially stable institutions.

39. I believe that the Corporate Card Program is critical to the Debtors' ability to maintain ordinary course operations for the reasons set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 8th day of December, 2025, in New York, New York.

_____
Sean A. Gumbs

-14-