**21**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:     (310) 598-4150
Facsimile:     (310) 556-9828

*Proposed Counsel to Oroville Hospital, et al.,
the Debtors and Debtors-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Lead Case No. 25-26876 |
| OROVILLE HOSPITAL, *et al.*,[1] | Jointly Administered With: Case No. 25-26877 |
|       Debtors and Debtors in Possession. | **DCN KCO-7** |
| | Chapter 11 |
| | Hon. Christopher D. Jamie |
| ☒ Affects All Debtors | |
| ☐ Affects Oroville Hospital ☐ Affects OroHealth Corporation: A Nonprofit Healthcare System | **Hearing Information** |
| | Hearing Date:  December 11, 2025 |
| | Hearing Time:  11:00 a.m. |
| | Location:     Courtroom 32 |
|       Debtors and Debtors in Possession. |            501 I Street, Sixth Floor |
| |            Sacramento, California 95814 |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS TO PHYSICIANS AS CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

# TABLE OF CONTENTS

**Page**

I. JURISDICTION AND VENUE ................................................................................... 6

II. FACTUAL BACKGROUND ................................................................................... 7

    A.     General Background ................................................................................... 7

    B.     The Physicians are Independent Contractors ........................................... 8

    C.     The Physicians are Critical Vendors ....................................................... 9

            1.     The Physicians are Essential to Patient Care and Maintenance of the Debtor's Business During the Pendency of the Chapter 11 Cases .............. 9

            2.     The Physicians are not Easily Replaced, and Recruiting new Physicians Would be Time Consuming and Prohibitively Expensive ....................... 10

            3.     The Physicians may decide to seek alternative employment if not compensated for unpaid prepetition services ........................................... 11

            4.     The Debtors will suffer immediate and irreparable harm if the Physicians are not specially incentivized to continue providing essential services ................................................................................... 12

III. RELIEF REQUESTED ........................................................................................ 12

IV. BASIS FOR RELIEF ........................................................................................... 14

    A.     The Court Should Authorize the Payment of the Physicians as Critical Vendors Claims Pursuant to 11 U.S.C. §§ 363(b) and 105(a) .............................................. 14

    B.     Payment of the Physicians as Critical Vendors is in Furtherance of the Debtors' Fiduciary Duties Under 11 U.S.C. §§ 1107(a) and 1108 ...................................... 18

V. PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS .......................... 19

VI. EMERGENCY CONSIDERATION ....................................................................... 19

VII. RESERVATION OF RIGHTS .............................................................................. 20

VIII. WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H) ......................................... 20

IX. NOTICE ........................................................................................................... 21

X. CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Suzuki Motor Corporation*, No. 8:12-bk-22808-SC (Bankr C.D. Cal.
Nov. 7, 2012) ......................................................................................................... 16

*In re B & W Enterprises, Inc.*,
713 F.2d 534 (9th Cir. 1983) ................................................................................. 15

*Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*,
526 U.S. 434 (1999) ............................................................................................... 16

*Burchinol v. Cent. Wash. Bank (In re Adam's Apple, Inc.)*,
829 F.2d 1484 (9th Cir, 1987) ............................................................................... 15

*California Coastal Communities, Inc.*,
No. 8:09-bk-21712-TA (Bankr. C.D. Cal. Dec. 9, 2009) ...................................... 16

*In re Chassix Holdings, Inc.*,
No. 15-10578 (Bankr. S.D.N.Y. 2015) .................................................................. 17

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ................................................................................ 14

*In re CoServ*,
273 B.R. 487 (Bankr. N.D. Tex. 2002) ..................................................... 14, 16, 18

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) ............................................................................................ 15

*In re Evergreen Oil, Inc.*,
No. 8:13-bk-13163 (Bankr. C.D. Cal. Apr. 10, 2013) ........................................... 16

*In re Gulf Air*,
112 B.R. 152 (Bankr. W.D. La. 1989) ................................................................... 15

*In re HDOS Enterprises*,
No. 2:14-BK-12028-NB (Bankr. C.D. Cal. Feb. 6, 2014) [Docket No. 66] ........... 16

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ..................................................................... 15

*In re Just for Feet, Inc.*,
242 B.R. 821 (D. Del. 1999) ....................................................................... 14, 15

*In re Lehigh & New Eng. Ry.*,
657 F.2d 570 (3d Cir. 1981) .................................................................................. 14

*In re Montgomery Ward Holding Corp.*,
242 B.R. 147 (D. Del. 1999) ................................................................................. 14

*In re Old HB, Inc. (f/k/a Hostess Brands, Inc.)*,
No. 7:2012-bk-22052 (Bankr. S.D.N.Y Jan. 13, 2012) [Docket No. 76] ............................. 17

*In re The Great Atlantic & Pacific Tea Co., et al.*
(Bankr. S.D.N.Y. 2010) [Docket No. 55] ............................................................... 17

*In re The Readers Digest Ass'n, Inc.*,
No. 09-23529 (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No. 91] ........................................ 17

*In re Verity Health System of California, Inc.*,
No. 2:18-bk-20151-ER (Bankr. C.D. Cal. Sept. 7, 2018) [Docket No. 134]........................ 16

*In re Victor Valley Community Hospital*,
No. 6:10- bk-39537-CB (Bankr. C.D. Cal. Sept. 17, 2010) [Docket No. 34].................... 6, 16

**Statutes**

11 U.S.C § 105(a) ................................................................................................ *passim*

11 U.S.C. § 107(b) ........................................................................................................ 6, 7

11 U.S.C. § 363 ............................................................................................................. 6, 7

11 U.S.C § 363(b) ....................................................................................................... 12, 14

11 U.S.C. § 363(b)(1) ...................................................................................................... 14

11 U.S.C. § 363(c)(1) ....................................................................................................... 14

11 U.S.C. § 364(d) ........................................................................................................... 15

11 U.S.C. § 365 ................................................................................................................ 20

11 U.S.C. § 510 ............................................................................................................... 15

11 U.S.C. § 549 ............................................................................................................... 13

11 U.S.C. § 1101, *et seq.*............................................................................................ *passim*

11 U.S.C. § 1107(a) ............................................................................................ 6, 7, 18, 19

11 U.S.C. § 1108 ................................................................................................ 6, 7, 18, 19

26 U.S.C. § 501(c)(3) ......................................................................................................... 7

28 U.S.C. § 157 .................................................................................................................. 6

28 U.S.C. § 157(b)(2) ......................................................................................................... 7

28 U.S.C. § 1334 ................................................................................................................ 6

28 U.S.C. § 1408 ................................................................................................................ 7

28 U.S.C. § 1409 ................................................................................................................ 7

22 Cal. Code Regs. § 51207 ...................................................................................... 10

22 Cal. Code Regs. §§ 70001 *et seq.* .................................................................... 10

Cal. Bus. & Prof. Code §§ 1200 *et seq.* ............................................................... 10

Cal. Bus. & Prof. Code §§ 4000 *et seq.* ............................................................... 10

Cal. Code Regs. Tit. 22 .......................................................................................... 10

Cal. Health & Safety Code §§ 1250 *et seq.*......................................................... 10

Cal. Health & Safety Code §§ 11000 *et seq.* ....................................................... 10

U.S. Code Title 42 .................................................................................................. 10

**Other Authorities**

42 C.F.R. §§ 482 *et seq.* ......................................................................................... 10

Fed. R. Bankr. P. 1007(d) ...................................................................................... 21

Fed. R. Bankr. P. 2002(i) ....................................................................................... 21

Fed. R. Bankr. P. 6003 ................................................................................ 6, 7, 12, 19

Fed. R. Bankr. P. 6004 .................................................................................... 6, 7, 12

Fed. R. Bankr. P. 6004(a) ...................................................................................... 20

Fed. R. Bankr. P. 6004(h) ...................................................................................... 20

Fed. R. Bankr. P. 7008 ............................................................................................ 6

Fed. R. Bankr. P. 9018 ......................................................................................... 6, 7

Fed. R. Bankr. P. 9037 ......................................................................................... 6, 7

Healthcare Access & Info., *Physician Supply & Preventable Hospitalizations by County* (2023), https://hcai.ca.gov/visualizations/physician-supply-and-preventable-hospitalizations-by-county/ (last visited Nov. 20, 2025) ................... 10

LBR 9018-1 ............................................................................................................ 6, 7

LBR 9037-1 ............................................................................................................ 6, 7

U.S. Const. art. III .................................................................................................. 6

Oroville Hospital (the "<u>Hospital</u>") and OroHealth corporation ("<u>OroHealth</u>), debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned bankruptcy cases (the "<u>Bankruptcy Cases</u>") filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),[2] hereby submit this Memorandum of Points and Authorities in support of their motion (the "<u>Motion</u>") for entry of interim and final orders, substantially in the forms attached to the List of Exhibits (the "<u>Exhibits List</u>") as **Exhibit A** and **Exhibit B** (the "<u>Interim Order</u>" and the "<u>Final Order</u>" respectively) filed concurrently herewith, pursuant to §§ 105(a), 107(b), 363, 1107(a), and 1108 of the Bankruptcy Code, Rules 6003, 6004, 9018, and 9037 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 9018-1 and 9037-1 of the Local Rules of Practice (the "<u>LBR</u>"): (i) authorizing the Debtors to honor prepetition obligations to its Physicians as Critical Vendors (defined below); and (ii) granting related relief. The Physicians are the lifeblood of Oroville Hospital, and they are essential and indispensable to the viability of these Bankruptcy Cases. In support of the Motion, the Debtors refer to the *Declaration of Robert J. Wentz in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>") and *Declaration of Robert J. Wentz in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders: (i) Authorizing the Debtors to Honor Prepetition Obligations to its Physician as Critical Vendors; and (ii) Granting Related Relief* (the "<u>Wentz Declaration</u>") filed concurrently herewith, and respectfully state as follows:

**I.**

**<u>JURISDICTION AND VENUE</u>**

The United States Bankruptcy Court for the Eastern District of California (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and General Orders 182 and 223 of the United States District Court for the Eastern District of California. The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article

---

[2] Unless otherwise defined herein, all references to "Section" and "§" refer to a section of the Bankruptcy Code.

III of the United States Constitution.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are §§ 105(a), 107(b), 363, 1107(a), and 1108, Bankruptcy Rules 6003, 6004, 9018, and 9037, and Rules 9018-1 and 9037-1 of the Local Rules of Practice.

**II.**

**FACTUAL BACKGROUND**

**A.**  **General Background**

On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which initiated the Chapter 11 Cases. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. The Debtors also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, the Debtors recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986. A more detailed description of the Debtors, including their current and historical business operations and the events precipitating the Chapter 11 Cases, are set forth in the First Day Declaration.

**B.     The Physicians are Independent Contractors**

The Debtors are served by approximately 150 physicians, surgeons, and physician medical directors (the "Physicians"). Due to California's ban on the Corporate Practice of Medicine, the Physicians are all independent contractors or employees of physician groups that contract with the Debtors. The Physicians provide a broad range of life-saving medical care and treatment for patients of the Hospital, including, but not limited to: (a) care for critically ill patients suffering from illnesses including acute heart disease, stroke, traumatic injuries, and other life-threatening disorders; (b) pediatric care essential for a child's physical and mental well-being; and (3) radiation therapy for cancer patients. Additionally, because the Hospital provides the only emergency services[3] in Oroville and the surrounding area, the Hospital and its Physician caregivers impact a large geographic area. The Physicians are also the primary driver of the Hospital's revenue. Fees generated by the Physicians and the services they provide are the primary source of revenue for the Hospital. As such, from both a patient care and a revenue perspective, the Physicians truly are the Hospital's lifeblood.

The Debtors have entered into agreements with the Physicians for a broad range of specialties as further detailed in the table below. As of the Petition Date, the Debtors owe the Physicians approximately $8.4 million in prepetition normal course compensation for the month of November 2025 and the first eight days of December (the "Physician Claims").

| | | |
|---|---|---|
| 1. Aesthetic Medicine | 18. Endocrinology | 35. Podiatry |
| 2. Allergy and Immunology | 19. Endoscopy | 36. Primary Care |
| 3. Ambulatory Care | 20. Gastroenterology | 37. Psychiatry |
| 4. Anesthesia Services | 21. Hospitalist Services | 38. Pulmonary |
| 5. Anticoagulation Services | 22. Intensive Care Unit | 39. Pulmonary Functioning |
| 6. Bariatric Surgery | 23. Laboratory Services | 40. Radiology |
| 7. Breast Cancer Services | 24. Nephrology | 41. Respiratory Care |
| 8. Cardiac Catheterization | 25. Neurodiagnostics | 42. Robotic Surgery |
| 9. Cardiology | 26. Neurology | 43. Sleep Disorder Testing |
| 10. Cardiovascular Testing | 27. Nutrition Therapy | 44. Stroke Program |
| 11. Childbirth Services | 28. Obstetrics / Gynecology | 45. Surgical Services |
| 12. Chiropractic Services | 29. Ophthalmology | 46. Telemedicine |
| 13. Colorectal Surgery | 30. Orthopedic Surgery | 47. Urology |

---

[3] The nearest 24-hour full-service emergency room to Oroville Hospital is a 35-to-45-minute drive away.

| 14. Dermatology | 31. Pain Management | 48. Valley Medical Imaging |
| 15. Dentistry | 32. Palliative Care Program | 49. Vascular Surgery |
| 16. Ear, Nose and Throat | 33. Pediatric Services | 50. Women's Imaging |
| 17. Emergency Care | 34. Pharmacy | |

**C.      The Physicians are Critical Vendors**

The Debtors, in consultation with their advisors, have determined that the Physicians are critical because: **(a)** they are essential to (i) patient care, (ii) maintaining the Debtors' business in full compliance with California's requirements for operating general acute care hospitals, and (iii) continuing to provide needed patient care and services postpetition; **(b)** they are not easily replaced, and any such effort would be time consuming and prohibitively expensive; **(c)** they may decide to seek alternative employment if not paid in full for prepetition services; and **(d)** the Debtors will suffer immediate and irreparable harm if the Physicians are not specially incentivized to continue providing essential services.

**1.      The Physicians are Essential to Patient Care and Maintenance of the Debtors' Business During the Pendency of the Chapter 11 Cases.**

The Debtors and the communities they serve are in an extremely vulnerable position. Maintaining its obligations to the Oroville community and staying in compliance with extensive state and federal regulations and requirements necessitates the Physician's continued services. Any disruption in Physician staffing may jeopardize the Hospital's ability to provide life-saving care and compromise the Debtors' ability to maintain their high standards of patient care and safety. This would irreparably harm the Debtors, and by extension, the Debtors' patients and the communities in which the Debtors serve. Any disruption in Physician staffing could also have a negative impact on maintaining the going-concern value of the Debtors' business and assets and threaten the sale process contemplated by the Debtors. Thus, in order to ensure the timely and proper care of the Debtors' patients and maintain ongoing business operations, it is imperative the Debtors are able to rely on the services of their Physicians, which are critical to patient care and the Debtors' uninterrupted business operations during the pendency of the Bankruptcy Cases, which will preserve the value of the Debtors' businesses and assets for the benefit of all stakeholders while serving the communities in which the Debtors operate.

Moreover, as the operator of a hospital licensed under California law and certified to participate in the Medicare and Medi-Cal programs, local, state, and federal laws and regulations place certain compliance requirements on the Debtors. The Debtors must comply with all hospital licensing and certification requirements under California law. Including the California Health and Safety Code (Cal. Health & Safety Code §§ 1250 *et seq.*) and Title 22 of the California Code of Regulations (22 Cal. Code Regs. §§ 70001 *et seq.*; 22 Cal. Code Regs. § 51207). As a certified Medicare and Medi-Cal reimbursement programs participant, the Debtors must remain compliant with certain requirements and conditions to participation set forth in Title 42 of the U.S. Code of Federal Regulations. 42 C.F.R. §§ 482 *et seq.* The Debtors must also monitor and comply with all other licensing and operational requirements applicable to the Hospital's programs and service lines, including those applicable to hospital pharmacies and laboratories. *See, e.g.,* Cal. Bus. & Prof. Code §§ 1200 *et seq.*; Cal. Bus. & Prof. Code §§ 4000 *et seq.*; *see also* Cal. Health & Safety Code §§ 11000 *et seq.* (establishing compliance requirements for distribution of controlled substances under the California Controlled Substances Act) These regulations and requirements can only be fulfilled through the continued services of the Physicians.

**2.      The Physicians are not Easily Replaced, and Recruiting new Physicians Would be Time Consuming and Prohibitively Expensive.**

Oroville Hospital's primary and secondary service areas have been designated by the State of California as "Health Professional Shortage Areas," and the California Department of Healthcare Access and Information ("HCAI") has identified Butte County as having a low physician supply.[4] This shortage of physicians reflects a national shortage of doctors in rural communities, and the unique challenges rural hospitals face when trying to recruit new doctors. Limited local training opportunities, geographic isolation from larger medical communities, and limited employment opportunities for spouses are all common recruiting hurdles, and Oroville Hospital has had to combat these, and other challenges, when recruiting physicians. These factors not only make it

---

[4] *See* Cal. Dept. of Healthcare Access & Info., *Physician Supply & Preventable Hospitalizations by County* (2023), https://hcai.ca.gov/visualizations/physician-supply-and-preventable-hospitalizations-by-county/ (last visited Nov. 20, 2025).

harder for the Hospital to recruit physicians but also extend the time it takes to recruit physicians to fill open positions as well as the attendant cost. It can take from several months to more than a year to recruit a new physician for certain specialties, and there are significant costs associated with recruiting. For example, professional recruiters typically charge a fee based on the specific physician's annual salary. That fee can be as high as thirty percent (30%) and equate to many thousands of dollars. Additional recruiting costs include signing bonuses, reimbursement for moving expenses, recruitment loans, and loan forgiveness in certain situations.

As such, if even a small number of Physicians were to leave the Hospital to pursue other opportunities, the time and expense associated with recruiting would place a significant burden on the Debtors' estates. This would lead to a decline in revenue and the availability of medical services at the Hospital, potentially leaving gaps in care that would have a negative impact on the communities served by the Hospital. While some positions could potentially be filled by locum tenens physicians, this temporary fix is on average fifty percent (50%) more expensive than physicians employed through the Hospital's standard practices, and they are less common for certain specialties such as obstetrics/gynecology, which play a critical role in community health and wellbeing.

3. **The Physicians may decide to seek alternative employment if not compensated for unpaid prepetition services.**

Due to the national shortage of physicians, including both primary care and specialist physicians, the job market is highly competitive, and opportunities for physicians are plentiful. Accordingly, without the ability to pay the Physicians for prepetition services, the Debtors strongly believe that this demoralizing disruption in compensation will cause many to pursue alternative opportunities. Thirty percent (30%) to forty percent (40%) of the Physicians live outside of Oroville, largely in the communities Sacramento, Roseville, Rocklin, and Lincoln. As such, it would be easier for these Physicians to seek alternative opportunities in their hometown communities. As previously noted, this would have a devastating impact on the communities served by the Hospital and result in irreparable harm to the Debtors postpetition operation, the smooth

transition into chapter 11, and the preservation and maximization of value for the benefit of the Debtors' creditors.

Further, the Physicians are "clinically dependent" in that they rely on each other to provide services to their patients. For example, a surgeon cannot perform an operation without an anesthesiologist, and a surgeon typically relies on a pathologist to direct and inform the surgical procedure. Similarly, an interventional radiologist requires the services of a vascular surgeon, and an oncologist relies on a radiologist to guide cancer therapies. The Physicians also provide mandated supervision for mid-level caregivers including physician assistants and nurse practitioners. The departure of a supervising physician would mean that a reporting physician assistant or nurse practitioner, many of whom provide frontline primary care, could no longer provide healthcare services unless reassigned to a new supervising physician. Accordingly, the departure of one physician can have ripple effects beyond his or her own individual practice, and that ripple could turn into a wave if multiple physicians were to leave the Hospital.

**4.　　The Debtors will suffer immediate and irreparable harm if the Physicians are not specially incentivized to continue providing essential services.**

For all the reasons stated above, the risk of an exodus of Physicians following the Petition Date would result in immediate and irreparable harm to the Debtors' ability to: (1) provide critical medical care to their community; (2) fund the Chapter 11 Cases; and (3) conduct a successful sale through this bankruptcy proceeding to maximize the value of the Debtors' businesses and assets for the benefit of all stakeholders. Simply put, Physician defection could jeopardize the Debtors' efforts from the beginning.

**III.**

**RELIEF REQUESTED**

The Debtors respectfully request entry of the Interim and Final Orders, substantially in the forms attached as **Exhibit A** and **Exhibit B** to the Exhibits List, respectively, pursuant to §§ 105(a), 363(b) and Bankruptcy Rules 6003 and 6004. The Debtors seek authority to pay, in their discretion, all or part of the Physician Claims, subject to certain conditions and procedures described below, up to $8.4 million (the "Critical Vendor Cap"), with (i) an interim amount of up to $6.75 million

as needed to avoid immediate and irreparable harm; and (ii) an additional amount of $1.65 million on a final basis.

Debtors propose to make full or partial payment to the Physicians pursuant to this Motion in the exercise of their business judgment, only to the extent deemed necessary, to ensure that the Debtors can continue to operate without an unacceptable risk of disruption and to avoid the severe negative consequences Debtors may suffer on account of unpaid Physicians.

The payment of any Physician Claim will be conditioned on an express agreement (the "Critical Vendor Agreement") in form and substance substantially similar to the form Critical Vendor Agreement attached as **Exhibit C** to the List of Exhibits filed concurrently herewith between the Physician and the Debtors which will include, without limitation, the following information and terms:

- The amount of the Physician's estimated prepetition claim, accounting for any setoffs, other credits, or discounts thereto, which would be mutually determined in good faith by the Physician and Debtors (but such amount would be used only for the purposes of determining the Physician Claim under the Critical Vendor Order and would not be deemed a claim allowed by the Court for any other purpose in the Bankruptcy Cases, and the rights of all interested persons to object to such claims would be fully preserved until further order of the Court);

- The Physician's agreement to continue providing services consistent with and as required under their current agreement with the Debtors;

- The Physician's acknowledgement that they have reviewed the terms and provisions of the Critical Vendor Order, and consents to be bound thereby;

- If a Physician fails to comply with the applicable Critical Vendor Agreement, including, but not limited to, a failure to continue providing services consistent with their current agreement with the Debtors for a period of not less than one hundred twenty (120) days following execution of the Critical Vendor Agreement: (a) any payment made to that Physician may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request pursuant to § 549; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

The Debtors submit that the relief requested herein is essential, appropriate and in the best interests of the Debtors, their creditors, and all parties in interest.

## IV.

### BASIS FOR RELIEF

**A.     The Court Should Authorize the Payment of the Physicians as Critical Vendors Pursuant to 11 U.S.C. §§ 363(b) and 105(a).**

Authorizing payment of the Physicians as Critical Vendors is an appropriate exercise of the Court's discretion under §§ 363(b) and 105(a). Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b)(1). Section 363(c)(1) allows the Debtors to use property of the estate in the ordinary course of business without court approval. Further, bankruptcy courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property under § 363(b)(1). *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)). Courts recognize that a debtor in possession has a fiduciary duty to, among other things, protect and preserve the bankruptcy estate. *See In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

Section 105(a) provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. Pursuant to § 105(a), courts have invoked the *"necessity of payment" doctrine* to authorize the immediate payment of certain pre-petition obligations to unsecured creditors before plan confirmation when such payment is essential to the continued operation of the debtor in a chapter 11 reorganization. *See, e.g.*, *In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims").

The U.S. Supreme Court, in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017), recognized that the payment of critical vendors may be a legitimate exception to the Bankruptcy

Code's priority scheme if, among other things, such treatment helps to: (i) "preserve[s] the debtor as a going concern"; (ii) makes "the disfavored creditors better off"' (iii) "promote[s] the possibility of a confirmable plan"; (iv) "restore[s] the status quo ante"; and (v) "protect[s] reliance interests." *Id.* at 985-86.

The Ninth Circuit has also recognized the "necessity of payment" doctrine. For example, in *Burchinol v. Cent. Wash. Bank (In re Adam's Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir, 1987), the Ninth Circuit discussed the existence of two competing "fundamental tenets" of bankruptcy: (1) equality in the treatment of all creditors; and (2) the rehabilitation of a debtor. The *Adam's Apple* court stated that the rehabilitation of a debtor "may supersede the policy of equal treatment" of creditors and went on to describe such situations. *Id.* ("Cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts."). The court recognized that section 364(d), for example, "illustrates a Congressional willingness to subordinate the interests of pre-petition creditors to the goal of rehabilitation." *Id.*[5]

Bankruptcy courts in the Ninth Circuit have approved payment of pre-petition claims for critical vendors pursuant to § 105(a). *See, e.g., In re Verity Health System of California, Inc.*, No.

---

[5] In its discussion, the *Adam's Apple* court did not mention an earlier Ninth Circuit case, *In re B & W Enterprises, Inc.*, 713 F.2d 534 (9th Cir. 1983), which questioned whether the "necessity of payment" doctrine survived the 1978 changes to the Bankruptcy Code, and stated that, if it did, the court would apply the doctrine only to railroad cases "absent compelling reasons." *Id.* at 537. Ultimately, the court in that case declined to apply the doctrine because the appellants had not presented "sufficient justification" for extending the doctrine to the (non-railroad) debtor. *Id.* Some courts have misconstrued the Ninth Circuit's holding in *B & W Enterprises* as prohibiting critical vendors motions. This is contrary to the Supreme Court's analysis in *Jevic, supra*. The Debtors submit that *B&W Enterprises*, which concluded that 11 U.S.C. § 510 could not be used to subvert the Bankruptcy Code's priority scheme without evidence of misconduct by the creditor not receiving payment on prepetition expenses, *id.* at 537, should be narrowly construed. However, numerous courts have held that the doctrine survives the 1978 Bankruptcy Code changes and can apply to non-railroad debtors. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989); *In re Just for Feet, Inc.*, 242 B.R. 821 (Bankr. D. Del. 1999); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989). Moreover, the Ninth Circuit in *Adam's Apple* suggested that the doctrine was not limited to railroad cases.

2:18-bk-20151-ER (Bankr. C.D. Cal. Sept. 7, 2018) [Docket No. 134]; *In re Victor Valley Community Hospital*, No. 6:10- bk-39537-CB (Bankr. C.D. Cal. Sept. 17, 2010) [Docket No. 34]; *In re HDOS Enterprises*, No. 2:14-BK-12028-NB (Bankr. C.D. Cal. Feb. 6, 2014) [Docket No. 66] (granting critical vendors motion); *In re Evergreen Oil, Inc.*, No. 8:13-bk-13163 (Bankr. C.D. Cal. Apr. 10, 2013) [Docket No. 32] (granting critical vendors motion); *American Suzuki Motor Corporation*, No. 8:12-bk-22808-SC (Bankr C.D. Cal. Nov. 7, 2012) [Docket No. 69] ("The Debtor is authorized, but not directed, to pay in its sole discretion the prepetition claims of Critical Vendors in the ordinary course of the Debtor's business relating to undisputed prepetition claims that the Debtor, in its business judgment, determines is necessary and appropriate for the operation of its business"); *California Coastal Communities, Inc.*, No. 8:09-bk-21712-TA (Bankr. C.D. Cal. Dec. 9, 2009) [Docket No. 87] (granting "critical vendor" motion and authorizing vendors "to continue supplying goods and services to the Debtors on the same trade terms given to them prior to the Petition Date or upon such other agreed trade terms as the Debtor may recommend").

Allowing the Debtors to pay the prepetition Physician Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtor's business and maximizing the value of property available to satisfy creditors. *See, e.g., Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 ... preserving going concerns and maximizing property available to satisfy creditors"). Reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a Debtor's ability to preserve going-concern value and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this motion. *See In re CoServ, L.L.C.,* 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

The Debtors have determined, in the exercise of their business judgment, that honoring prepetition obligations to the Physicians (up to the Critical Vendor Cap), in the Debtors' discretion,

is in the overwhelming best interests of the Debtors and their estates. The Debtors require the continued services of their Physicians to maintain operational stability. Without the Physicians' services, the Debtors could be forced to significantly curtail or potentially halt operations immediately in some practice areas. While such a result may be reasonable for certain businesses, it would be reckless for the Debtors and put patient care and their license at risk. Granting the Debtors authority to honor such prepetition claims (up to the Critical Vendor Cap) greatly benefits the Debtors' estates by preserving the Debtors' relationships with their Physicians, without whom the Debtors cannot adequately provide medical services or comply with statutory requirements necessary for certification, and by maintaining the value of the Hospital, so that the Debtors can continue business operations while they run a sales process with the goal of an affiliation or sale of the Debtors' assets to ensure that (i) the Hospital and related operations continue uninterrupted, (ii) patients in the City of Oroville, the greater Butte County and surrounding areas continue to have access to quality healthcare, and (iii) the Debtors' business and the going-concern value of their assets are preserved for the benefit of all stakeholders.

Moreover, in other cases of similar magnitude but with much less at stake than the lives of patients, courts have authorized payment of significantly higher amounts in critical vendor claims. *See, e.g.*, *In re The Great Atlantic & Pacific Tea Co., et al.*, (Bankr. S.D.N.Y. 2010) [Docket No. 55] (authorizing payment of up to $62 million in critical vendor claims); *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. 2015) [Docket Nos. 85, 275] (authorizing payment of critical vendor claims up to $5 million on an interim basis and $40 million on a final basis); *In re Old HB, Inc. (f/k/a Hostess Brands, Inc.)*, No. 7:2012-bk-22052 (Bankr. S.D.N.Y Jan. 13, 2012) [Docket No. 76] (authorizing payment of up to $14 in critical vendor claims); *In re The Readers Digest Ass'n, Inc.*, No. 09-23529 (Bankr. S.D.N.Y. Sept. 17, 2009) [Docket No. 91] (authorizing payment of up to $25 million to critical vendors).

Accordingly, the Debtors seek authority, but not direction, to pay prepetition Physician Claims in the ordinary course of business.

**B.** **Payment of the Physicians as Critical Vendors is in Furtherance of the Debtors' Fiduciary Duties Under 11 U.S.C. §§ 1107(a) and 1108.**

The Debtors, operating their business as debtors in possession under §§ 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The *CoServ* court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

Payment of the Physicians meets each element of the *CoServ* court's standard. As described above, the failure to timely pay the Physicians could jeopardize patient well-being and diminish the value of the Debtors' estates and their ability to continue to serve the needs of the communities in which they operate and to maximize value for all stakeholders. The harm and economic disruption that would stem from the failure to timely pay the Physicians is grossly disproportionate to the amount of the prepetition claims that would have to be paid. Finally, with respect to each of the Physicians, the Debtors have determined that no practical or legal alternative exists, and that the continued partnership with the Physicians is necessary to avoid significant diminution in value of

the Debtors' estates. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under §§ 1107(a) and 1108 through payment of the Physicians.

## V.

## PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS

The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to an authorized payment in respect of the Insurance Policies. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## VI.

## EMERGENCY CONSIDERATION

Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the petition date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The relief requested herein integral to the Debtors' ability to transition their operations into these Chapter 11 Cases. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. The relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## VII.

## **RESERVATION OF RIGHTS**

Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights, objections, or remedies as to any party or claim. The Debtor hereby reserves the right to seek to modify the relief requested herein as may be necessary to facilitate these Bankruptcy Cases and the Debtor's operations, or as may otherwise be necessary to comply with the requirements of any order entered in these Bankruptcy Cases. Moreover, nothing contained herein, or any actions taken pursuant to such relief requested is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under § 365 (or otherwise affect the Debtor's rights under § 365 to assume or reject any executory contract with any party). Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. Finally, the relief requested herein shall not oblige the Debtor to accept any services.

## VIII.

## **WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### IX.

### NOTICE

The Debtors will provide notice of the Motion via first class mail, facsimile or email (where available) to: (a) the Office of the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis) filed in accordance with Bankruptcy Rule 1007(d); (c) the DIP lender; (d) creditors that assert a security interest in the Debtor's real property or cash collateral; (e) the State of California through the Attorney General for the State of California; (f) the United States of America through the United States Attorney for the Eastern District of California; and (g) parties that file with the Court and serve upon the Debtor requests for notice of all maters in accordance with Bankruptcy Rule 2002(i) (collectively, the "Notice Parties").  If the Court grants the relief requested by the Motion, the Debtor shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtor submits that such notice is sufficient and that no other or further notice be given.

No prior request for the relief sought herein has been made by the Debtor to any other court.

### X.

### CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court grant this Motion and enter interim and final orders in the forms attached respectively as **Exhibit A** and **Exhibit B** to the List of Exhibits filed concurrently herewith, and grant such other relief as is just and proper.

Dated: December 8, 2025                    **FOX ROTHSCHILD LLP**


                                           _/s/ Keith C. Owens_____
                                           Keith C. Owens
                                           Nicholas A. Koffroth

                                           _Proposed Counsel to Oroville Hospital, et al.,_
                                           _the Debtors and Debtors-in-Possession_