GREENBERG TRAURIG, LLP

CARSON HENINGER (SBN CA 327130)
222 SOUTH MAIN STREET, SUITE 1730
SALT LAKE CITY, UTAH 84101
TELEPHONE: 801.478.6914
CARSON.HENINGER@GTLAW.COM

KEVIN J. WALSH (admitted *pro hac vice*)
COLLEEN A. MURPHY (admitted *pro hac vice*)
CHRISTOPHER MARKS (admitted *pro hac vice*)
One International Place, Suite 2000
Boston, Massachusetts 02110
Telephone: (617) 310-6000
Email:    Kevin.Walsh@gtlaw.com
          Colleen.Murphy@gtlaw.com
          Chris.Marks@gtlaw.com

Counsel to UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA SACRAMENTO DIVISION

| | |
|---|---|
| In re: <br><br> OROVILLE HOSPITAL, *et al.*,[1] <br><br> Debtors and Debtors in Possession <br><br> ☒ Affects all Debtors <br> ☐ Affects Oroville Hospital <br> ☐ Affects OroHealth Corporation: A Nonprofit Healthcare System <br><br> Debtors and Debtors in Possession | Lead Case No. 25-26876 <br><br> Jointly Administered With: Case No. 25-26877 <br><br> **DCN NAK-7** <br><br> Chapter 11 <br> Hon. Christopher D. Jaime <br><br> <u>Hearing Date</u>: December 11, 2025 <br> <u>Hearing Time</u>: 11:00 a.m. <br> <u>Location</u>: Courtroom 32 <br> 501 I Street, Suite 3-200 <br> Sacramento, California 95814 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

-1-

ACTIVE 717261364v2

**UMB BANK, N.A., AS TRUSTEE'S PRELIMINARY OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee (the "Trustee"), the senior secured creditor of Oroville Hospital (the "Debtor" or "Hospital"), by and through undersigned counsel hereby objects, on a preliminary basis, to the Debtor's *Emergency Motion For Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Senior Secured Postpetition Financing, (B) Use Cash Collateral, And (C) Grant Liens And Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection To Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; (IV) Scheduling A Final Hearing; And (V) Granting Related Relief* (the "Motion") [Docket No. 58].[2]

It is no coincidence that the Debtor's professionals have dubbed this case "Operation Gold Rush." That term aptly describes how those professionals have approached this case, by rejecting the Trustee's proposed debtor in possession loan in favor of one which maximizes and protects their own fees and which funnels money from the Hospital's operations to those professionals and affiliates and insiders of the Debtor.[3] The Trustee has, for weeks, attempted to negotiate with the Debtor in good faith to get it to reduce the outsized professional fees it proposes to pay its professionals, to no avail. That is, likely in no small part, because those negotiations have been

---

[2] The Trustee reserves and preserves all of its rights and objections to the Motion and/or any other motion that has been filed in this case by the Debtor on an interim basis, and explicitly does not waive any arguments with respect thereto by filing this preliminary objection.

[3] As but one example of how the Debtor's professionals are using this process for their own gain, Cain Brothers will earn a fee of $380,000 if the proposed DIP Facility is authorized. In contrast, had the Debtor accepted the Trustee's proposed post-petition loan, Cain Brothers, by the terms of its engagement agreement, would have earned no fee. This obvious conflict of interest is telling of the motives behind the Debtor's rejection of the Trustee's proposed loan.

-2-

ACTIVE 717261364v2

conducted with the very professionals who would benefit from those outsized fees. Rather than engage in serious negotiations on the amount and timing of payment of their fees, those professionals have chosen instead to engage in a priming fight with the Trustee on the first days of this case. This is an unfortunate way to begin a case that should see the professionals focused on maintaining the Hospital's operations for the good of the community that it serves, not solely on the payment of their own fees. The Debtor has already spent millions of dollars in the weeks leading up to the filing of this case on payments to its professionals, including, as the Trustee understands, making hundreds of thousands of dollars of preference payments to certain of its professionals. The Trustee believes that every dollar that the Debtor has left after making those payments should be used solely to support the Hospital's operations until the Debtor's proposed sale can be consummated. It is this difference of opinion that led to the Trustee's inability to strike a deal with the Debtor for post-petition financing.

Through the Motion, the Debtor requests authority to prime *all* of the Trustee's collateral with a $38[4] million loan facility, $16 million of which will be disbursed on an interim basis. Shockingly, while buried in the DIP Budget and not appropriately briefed or called out in the Motion, the Debtor is really trying to ringfence nearly $8.3 million, i.e., over 50% of the proposed interim draw, for professional fees alone. *See* Exhibit B to Motion. Another $1.7 million is proposed to be paid to the Debtor's affiliates and insiders, some of whom are, according to the Debtor, owned by members of its board of trustees, their family members, physicians at the Hospital and current and former officers and directors of the Debtor. These proposed payments should be thoroughly investigated before they are paid by the estate.

---

[4] The Debtor asserts that this collateral is worth over $300 million (which the Trustee reserves all rights to contest as discussed herein). Assuming, *arguendo*, that the Debtor is correct, there is simply no need for the DIP Lender to take a security interest in all of the Trustee's collateral, which would provide a nearly 1000% equity cushion. That excessive level of security is not necessary, reasonable or appropriate under any circumstance.

-3-

ACTIVE 717261364v2

The Debtor seeks to prime the Trustee's collateral based on "evidence" of an equity cushion that was produced to the Trustee *less than 48 hours before* the First Day Hearing.[5] This gamesmanship is particularly troubling in light of the fact that during the Trustee's over two years of working with the Debtor, it has rarely, if ever, produced accurate, reliable or timely financial projections or information. As a matter of fundamental due process, the Trustee, and all other parties in interest, must be afforded the right to test and thoroughly vet the valuation of the Debtor's assets that is being offered to support the Debtor's specious priming request.

However, the Court need not even reach the Debtor's adequate protection argument at this interim stage. The Trustee is fully committed to supporting the Hospital's continued operations for the benefit of the community and patients that it serves, and is therefore willing to consent to the use of its cash collateral to fund the Hospital's *operations* (i.e., the amounts listed above the line "Cash Flow from Operations" in the DIP Budget), with the sole exception of payments to "Affiliates" discussed above.[6] The Court need not address the professional fee portion of the DIP Budget, discussed below, at this time as those parties have their rights under the Bankruptcy Code to be paid from whatever equity there is in these estates (which, according to them, is massive), or if they successfully surcharge the Trustee's collateral under Section 506(c) of the Bankruptcy Code. The Court therefore need not even delve into the Debtor's specious adequate protection arguments for the purpose of allowing the use of the Trustee's cash collateral on an interim basis to fund the Debtor's operating costs.

With respect to the Debtor's proposed DIP Facility, the Debtor cannot meet its heavy burden under 11 U.S.C. §364(d)(1) to prime the Trustee's liens because the Trustee is willing to provide a

---

[5] Counsel for the Debtor provided a "courtesy" copy of the Motion and supporting documents at 4:25 p.m. PT on December 9, 2025 (merely 35 minutes before this Court's deadline to produce those documents).

[6] For the avoidance of doubt, the Trustee is explicitly not consenting to a surcharge of its collateral pursuant to Section 506(c) of the Bankruptcy Code, and reserves all of its rights and objections with respect to the estate's ability to obtain such a surcharge against the Trustee's collateral.

-4-

ACTIVE 717261364v2

financing facility that is larger and has better economic terms than the DIP Facility. Section 364(d)(1) of the Bankruptcy provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. §364(d)(1). The "approval of a priming, post-petition loan must be guided by the express terms of the governing statute, together with the judicial interpretation of §364(d)(1) as being appropriate in bankruptcy proceedings as a matter of 'last resort.'" *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 693 (E.D.N.C. 2009) (quoting) (*In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001)); *In re Seth Co.*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("The ability to prime an existing lien is extraordinary"). "The first prong of § 364(d)(1) requires the debtor affirmatively to demonstrate, not merely assume, that less onerous post-petition financing was unavailable." *Suntrust Bank*, 406 B.R. at 693 (quoting *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992)) ("Because super priority financing displaces liens on which creditors have relied in extending credit, the debtor must demonstrate to the court that it cannot obtain financing by other means.") (internal quotation marks omitted).

The Debtor cannot meet its burden under Section 364(d)(1), nor does it even attempt to in the Motion. The details of the Trustee's proposed facility are set forth more fully in the term sheet attached hereto as <u>Exhibit A</u>, and summarized below with a comparison to the DIP Facility being advanced by the Debtor: [7]

---

[7] To the extent that any terms in this summary chart conflict with those in the term sheet, the term sheet shall govern.

-5-

ACTIVE 717261364v2

|  | **Trustee's Facility** | **DIP Lender's Facility** |
|---|---|---|
| Interim Facility Size | $16 million | $16 Million |
| Final Facility Size | $40 million | $38 million |
| Standard Interest Rate | 10.75% (Capitalized and paid at maturity) | 11% current pay but may be capitalized |
| Commitment Fee | n/a | 2% earned upon entry of interim order |
| Exit Fee | 3% earned upon entry of a final order | 1% earned upon entry of interim order |
| Legal Fees of Lender | Paid at maturity | Paid Current |
| Working Fee | None | $75,000 |

The Trustee's proposed facility is cheaper, larger and provides more operating liquidity for the Hospital to pay vendors, staff, physicians, and nurses and generally maintain patient care. And it has the added advantage of allowing the Court and the parties to avoid an expensive and time-consuming priming fight. Because the Trustee is willing and able to immediately lend the needed cash to keep the Hospital operating and to do so on better terms than the DIP Lender is proposing, the Debtor has not and cannot meet its burden under Section 364(d)(1) of the Bankruptcy Code, and the Court should deny the Motion.[8]

A key difference between the Trustee's proposed facility and the DIP Facility is that the Trustee does not consent to the payment of the more than $8 million of professional fees sought on the first day of the bankruptcy case by the Debtor during the initial 13-week period, whether from cash collateral or from any DIP financing that is approved by the Court. In addition to the sheer size and priority skipping nature of the professional fee payment request made by the Debtor, which the Debtor has not briefed in the Motion, the Hospital should not be using its much-needed liquidity to pay professional fees at this time. There is no telling how long it will take the Hospital to complete

---

[8] A representative of the Trustee will be available at the December 11, 2025 hearing to testify regarding its proposed financing facility.

-6-

a sale in this case, or how large its operating shortfalls will be until that sale is finalized. As mentioned above, the Debtor's projections in the years during which the Trustee has been involved in this matter have been anything but accurate. It is simply not appropriate to divert millions of dollars of cash at this time from the Hospital's operations to pay professionals, particularly without the consent of the secured creditor who is being primed by these fees. Moreover, any complaints of administrative insolvency are clearly belied by the Debtor's proffered valuation of its assets and the Trustee's supposed 45% equity cushion in its collateral. Based on the Debtor's own valuations (which the Trustee does not agree with at this time), there will be more than sufficient equity to pay all of its allowed professional fees at the end of this case, as is typical and required under the Bankruptcy Code. If the Debtor and its professionals are not willing to stand behind their valuation and take the risk that a sale of the Debtor's assets achieves the results that they are promising (i.e., that there will be more than enough assets to pay the Trustee's claim in full with tens of millions of dollars to spare), then they cannot legitimately argue that the Trustee is adequately protected by that very same equity cushion that they themselves are not willing to rely on to pay their junior administrative claims.

Moreover, the supposed "carve-out" embedded in the Motion, but which is not fully briefed or disclosed, because the Trustee was not timely provided a copy of the proposed order,[9] that defines the "carve-out," is illusory. Unless the DIP Lender is agreeing to reduce its claim and recovery from the Estate by the size of the carve-out, there is no "carve-out" from the DIP collateral. Against the backdrop of the Debtor claiming that its assets are worth over $300 million there is little likelihood that the $38 million DIP Facility will not be repaid in full. What is in question is whether the Trustee's claim will be paid in full if junior creditors such as the Debtor's professionals are paid

---

[9] The Trustee's counsel was provided a copy of the proposed order at 5:45 p.m. PT on December 10, 2025, i.e., less than 24 hours before the First Day Hearing. The Trustee reserves and preserves all rights and objections related to the contents of the Debtor's proposed interim order.

-7-

ACTIVE 717261364v2

with its collateral. If the Debtor's professionals are allowed to be paid without the Trustee's consent, and the Trustee is not ultimately paid in full, the result would be that the "carve-out" would impair the Trustee's claim without its consent. But a carve-out is a product of negotiation and agreement and cannot be foisted upon the Trustee without its consent. At a minimum, the Court should strike any references to "carve-outs" in the DIP Facility that are designed to insulate professional fees and elevate the payment of those fees over secured creditors and over all other administrative claims. There is simply no basis in the Bankruptcy Code (and it would be contrary to Supreme Court jurisprudence) for this nonconsensual priority skipping provision of the Motion. This is particularly evident here where the Debtor has not even briefed the issue, but has instead tried to sneak this provision past the parties and the Court by burying it in a proposed order that was circulated just hours before the hearing on the Motion.

In the Motion and its supporting declarations, the Debtor refers to the events precipitating the filing of this case, and in particular tries to shift the blame for its massive operating losses over the last few years and the filing of this case onto the Trustee. Nothing could be further from the truth. While the Debtor focuses its attentions on the Trustee withholding consent to its sale of the lab outreach business and the Trustee accelerating its debt and foreclosing upon the cash collateral that the Trustee was holding (both of which are discussed briefly below), the Debtor omits to mention the over $10 million settlement that it entered into just last year with the Department of Justice stemming from alleged violations of federal anti-kickback laws and the class action lawsuit that the Debtor settled for over $3 million related to alleged inappropriate wage withholding. The Debtor also conveniently fails to identify the fact that it did not pay over $30 million to the Department of Healthcare Services ("DHCS") that came due in and around 2024, which resulted in a settlement with DHCS that required the Debtor to make $400,000 per month payments to DHCS over the last year or that the Debtor has paid, as the Trustee understands it, millions of dollars over

ACTIVE 717261364v2

the last few years to its financial advisor, which payments resulted in seemingly no benefit to the Hospital, or any party in interest, at all. These facts, along with other examples of mismanagement that will undoubtedly be discussed throughout this case, are what drove the Debtor to this Court, not any action or alleged failure to act, of the Trustee.

Likewise, the Debtor's complaints that the Trustee did not consent to its sale of the lab outreach business are misplaced and intentionally misleading. The Debtor asked the Trustee, nearly a year ago, to consent to a sale of a service line without providing any information about the sale whatsoever, including the price, the sale terms, the buyer's identity, the effect that the sale would have on the Debtor's future operations or even, for some period of time, what service line the Debtor proposed to sell. Most troubling was that the Debtor did not even run a competitive marketing process for this asset, and it was not until the Debtor finally provided access and information to the Trustee's advisors, just a few months ago, that the Trustee learned that the proposed sale price for the lab outreach business was possibly tens of millions of dollars below market value. When the Trustee asked for an opinion on the fair market value of the lab business, the Trustee was informed, and shocked to find out, that the proposed buyer was an institutional client of the Debtor's financial advisor, FTI Consulting, *the very entity that advised the Debtor on the reasonableness of the sale price.* In other words, FTI was advising the Debtor that the price being offered by FTI's other (larger) client was reasonable without having done any market testing to confirm that fact. Moreover, the Trustee was never provided any opinion from FTI, or anyone else, to confirm FTI's claim that the proposed sale was for fair market value. These facts, along with the fact that the Debtor provided the Trustee with no plan to stabilize its operations or assessment of how the proposed sale would impact revenues and the fact that the Debtor was hemorrhaging cash were the reasons the Trustee could not consent to the proposed sale. It is shocking that the Debtor is

-9-

attempting to blame the Trustee for not consenting to a short sale of a service line when faced with the Debtor's conflicts of interest and refusal to provide basic information regarding the sale.

Ultimately, when the Debtor did not make its scheduled interest payment on September 30, 2025, the Trustee accelerated the debt due to it and foreclosed on its lien in the money that it was holding as collateral for the Series 2019 Bonds. The notion that this was a "manufactured" default is preposterous, particularly given that the Debtor, by its own admission, has been in default under the Bond Documents since at least April 2023 and it never executed a forbearance agreement with the Trustee during its years of being in default, despite the fact that the Trustee provided the Debtor with many versions of a forbearance agreement and repeatedly requested that the Debtor execute one. The Trustee could have accelerated the debt at any time since then. There is nothing inappropriate about a lender exercising its remedies when faced with a borrower who admitted to being unable to pay its debts as they became due, informed the lender that it was on the brink of running out of cash (with or without the requested advances from the Project Fund) and refused to provide a plan to stabilize its operations. The Debtor's attempts to victim blame are specious at best.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee, respectfully requests that the Court DENY the Motion, APPROVE the post-petition financing proposed in the Trustee's term sheet attached hereto, and GRANT any other or further relief as the Court deems appropriate under the circumstances.

ACTIVE 717261364v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully Submitted,

GREENBERG TRAURIG, LLP


By /s/  *Carson Heninger*
Carson Heninger (SBN CA 327130)
Kevin J. Walsh (admitted *pro hac vice*)
Colleen A. Murphy (admitted *pro hac vice*)
Christopher Marks (admitted *pro hac vice*)

Counsel to UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee

-11-

ACTIVE 717261364v2