1  GREENBERG TRAURIG, LLP

2  CARSON HENINGER (SBN CA 327130)
   222 South Main Street, Suite 1730
3  Salt Lake City, Utah 84101
   Telephone: 801.478.6914
4  Carson.Heninger@gtlaw.com

5  KEVIN J. WALSH (admitted *pro hac vice*)
   COLLEEN A. MURPHY (admitted *pro hac vice*)
6  CHRISTOPHER MARKS (admitted *pro hac vice*)
   One International Place, Suite 2000
7  Boston, Massachusetts 02110
   Telephone: (617) 310-6000
8  Email:    Kevin.Walsh@gtlaw.com
             Colleen.Murphy@gtlaw.com
9             Chris.Marks@gtlaw.com

10 Counsel to UMB Bank, N.A., as Master Trustee and
   Series 2019 Bond Trustee

11                 UNITED STATES BANKRUPTCY COURT
12        EASTERN DISTRICT OF CALIFORNIA SACRAMENTO DIVISION

13 | In re:                                    | Lead Case No. 25-26876
14 | OROVILLE HOSPITAL, *et al.*,[1]           | Jointly Administered With: Case No. 25-26877
15 |     Debtors and Debtors in Possession     | **DCN NAK-7**
16 |                                           | Chapter 11
17 | ☒ Affects all Debtors                     | Hon. Christopher D. Jaime
18 | ☐ Affects Oroville Hospital               | Hearing Date: December 11, 2025
19 | ☐ Affects OroHealth Corporation: A        | Hearing Time: 11:00 a.m.
        Nonprofit Healthcare System
20 |     Debtors and Debtors in Possession     | Location: Courtroom 32
21 |                                           |           501 I Street, Suite 3-200
                                                          Sacramento, California 95814

22

23

24

25

26

27 _____
   [1]      The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification
28 number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing
   address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

                                      -1-

**EXHIBITS IN SUPPORT OF UMB BANK, N.A., AS TRUSTEE'S PRELIMINARY OBJECTION TO THE DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee (the "<u>Trustee</u>"), the senior secured creditor of Oroville Hospital (the "<u>Debtor</u>" or "<u>Hospital</u>"), by and through undersigned counsel hereby submits the following exhibit in support of *UMB Bank, N.A., as Trustee's Preliminary Objection to the Debtor's Emergency Motion For Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Senior Secured Postpetition Financing, (B) Use Cash Collateral, And (C) Grant Liens And Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection To Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; (IV) Scheduling A Final Hearing; And (V) Granting Related Relief.*

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | UMB Bank DIP Financing Term Sheet | 4-38 |

Dated: December 11, 2025                    GREENBERG TRAURIG, LLP


By /s/  *Carson Heninger*
Carson Heninger (SBN CA 327130)
Kevin J. Walsh (admitted *pro hac vice*)
Colleen A. Murphy (admitted *pro hac vice*)
Christopher Marks (admitted *pro hac vice*)

Counsel to UMB Bank, N.A., as Master Trustee and Series 2019 Bond Trustee

ACTIVE 717261364v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**
(UMB Bank DIP Financing Term Sheet)

**OROVILLE HOSPITAL, ET AL.**

**Secured Superpriority Debtor in Possession Financing
Summary of Terms and Conditions**

**December 10, 2025**

The following is a summary of proposed terms and conditions by the DIP Lender for the establishment of a senior secured term loan facility in favor of Oroville Hospital, and its sole corporate member, OroHealth Corporation, each in its capacity as debtor-in-possession (collectively, the "**Debtors**" or the "**Borrowers**") in the chapter 11 cases (the "**Cases**") to be commenced in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "**Bankruptcy Court**") on or before December 8, 2025 (the "**Petition Date**").

This term sheet (together with the exhibits hereto, the "**Term Sheet**") shall be a binding agreement upon execution, subject to, the entry of the Interim DIP Order with respect to the DIP Facility Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim DIP Order or the Final DIP Order (as defined below), the terms of the Interim DIP Order or the Final DIP Order (as applicable) shall govern.

| | |
|---|---|
| Borrowers | Oroville Hospital and OroHealth Corporation |
| Joint and Several Liability | The liability of the Debtors for the obligations, indebtedness and liabilities created under or pursuant to this Term Sheet, the Interim DIP Order, the agreements, documents, notes and instruments executed and delivered to evidence the post-petition financing contemplated by this term sheet (collectively, the "**DIP Documents**") and together with this Term Sheet, the Interim DIP Order and the Final DIP Order (collectively, the "**DIP Financing Documents**") shall be joint and several. |
| DIP Lender | UMB Bank, N.A., as successor Series 2019 Bond Trustee as described in Schedule I attached hereto; and one or |

| | |
|---|---|
| | more holders of the Bonds to the extent necessary as identified in the DIP Orders (collectively, the "**DIP Lender**"). |
| Directing Bondholders; Bondholders | The "**Directing Bondholders**" with respect to the DIP Lender are the beneficial owners of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds, as those terms are described and defined in |

| | |
|---|---|
| | Schedule I attached hereto. The Directing Bondholders with respect to the Master Trustee (defined in Schedule I hereto) are the beneficial owners of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds and the Series 2018 Bonds, as those terms are described and defined in Schedule I attached hereto. The "**Bondholders**" are the beneficial owners of the outstanding Series 2019 Bonds and Series 2018 Bonds. |
| Facility | The DIP Lender will provide to the Borrowers a priming, senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") consisting of a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of up to $40 million (the "**DIP Commitment**" and each portion thereof drawn by the Debtor, the "**DIP Loan(s)**"). The DIP Commitment is sourced $24 million from funds held by the DIP Lender under the Bond Indentures and $16 million from funds to be advanced to the DIP Lender from the Funding Bondholders (defined below). |
| | The DIP Facility will be made available to the Debtors through an initial maximum aggregate amount of up to $16 million in accordance with an Approved Budget (the "**Interim Advance**") following the entry of the Interim DIP Order (defined below). Following entry of the Final DIP Order, additional draws under the DIP Facility will be made available, including [TBD – Gibbins and FTI to coordinate] in accordance with an Approved Budget in the aggregate amount not to exceed $24 million. |
| | The $16 million of the DIP Commitment will be provided by one or more Bondholders (the "**Funding Bondholders**") to the DIP Lender to be used as necessary to support the operations of the Debtors in accordance with an Approved Budget. These additional funds would be advanced to the Debtors on the same terms and conditions as the $24 million portion of the DIP Facility. |
| | Pending the entry of the Final DIP Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Order. |

ACTIVE 716554869v11

| | |
|---|---|
| Purpose | The DIP Loans shall be available to fund in accordance with the Approved Budget and the applicable DIP Financing Order: (i) working capital and maintenance capital expenditure requirements of the Debtors, (ii) operating expenses of the Debtors, (iii) fees and expenses of the DIP Lender and its professionals; provided, however, that the fees and expenses payable to the DIP Lender shall be payable in kind and added to the principal balance of the DIP Facility, and (iv) other line items in accordance with the terms of the Approved Budget. |
| | Neither the proceeds of the DIP Loans nor the Master Trustee's cash collateral shall be transferred to or used by any entity other than a Debtor, except as permitted by the DIP Lender or as set forth in the Approved Budget. |
| | No portion of the DIP Loans, the Carve-Out (as defined below) or any cash collateral of the Master Trustee or the DIP Lender shall be used to assert any claim or cause of action or make any objection against the DIP Lender, the Master Trustee, the Bondholders, or their advisors, agents and subagents, and/or challenging any claim or lien of the Master Trustee or the validity or enforceability of the Bond Documents (as defined in Schedule I hereto), and/or challenging any pre-petition payment or transfer to the Master Trustee; provided that any DIP Loans used to pay any counsel of and financial advisor to the Committee, if any is formed, to investigate any of the foregoing shall not exceed $25,000.00 in the aggregate. |
| Interest Rate; Fees | The DIP Loans shall accrue interest at 10.75%, with a default interest rate of an additional 2.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility. |
| | The DIP Facility shall provide for an exit fee of 3.0% percent of the DIP Commitment (the "**Exit Fee**") fully earned and non-refundable upon entry of the Final DIP Order and payable on the DIP Termination Date (as defined below). |

| | |
|---|---|
| Priority and Security | Subject to the Carve-Out (as defined below), all obligations of the Debtors under the DIP Facility (the "**DIP Obligations**") shall be:<br><br>i.   entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, subject only to the Carve-Out (as defined below) (the "**DIP Superpriority Claims**"). The DIP Superpriority Claims may be repaid from any cash of the Debtor, including without limitation, cash collateral, <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall not be payable from the proceeds of any of the estate's causes of action under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and property received or recovered thereby (the "**Avoidance Action Proceeds**");<br><br>ii.   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including without limitation the real property listed on Schedule II attached hereto, but excluding Avoidance Action Proceeds (such liens, subject only to the Carve-Out);<br><br>iii.   secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in |

| | existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"),[1] which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out; |
| | iv.  secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, including without limitation (a) each Debtor's equity interests in affiliated entities, including, without limitation, Oroville Medical Complex, LLC, 1000 Executive Parkway, LLC, Oroville Medical Partners, LLC, OHPAC Partners, LLC, and Oroville Solar Partners, LLC, and (b) the real property listed on Schedule II attached hereto, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising – such lien, together with the liens described in clauses (i) through (iii) above, the "**DIP Liens**" and the collateral described in clauses (i) through (iv) above, collectively, the "**DIP Collateral**"), which liens shall be subject to the Carve-Out. |
| | The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral. |
| | The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor. |

---

[1]  The DIP Documents shall include a schedule of Permitted Prior Liens.

ACTIVE 716554869v11

| | The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Bond Documents, and any other Permitted Prior Liens, if any. |
| | The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim DIP Order without the requirement of any further action by the DIP Lender; <u>provided</u> that if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| Adequate Protection | The Master Trustee will consent to the use of its cash collateral pursuant to a cash collateral order (which may be subsumed within the Interim DIP Order and the Final DIP Order) consistent with this Term Sheet and in accordance with the Approved Budget. The Borrowers' use of cash collateral shall terminate from and after the Termination Date or, at the direction of the Master Trustee, on the first business day after the date of any Event of Default under the DIP Facility. |
| | As adequate protection to the Master Trustee for any diminution in the value of the Master Trustee's interests in the collateral granted under the Bond Documents (as defined in Schedule I) (the "**Pre-Petition Bond Collateral**") resulting from (i) the priming of the Master Trustee's liens by the Liens in favor of the DIP Lender granted pursuant to the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use of the cash collateral pursuant to section 363(c) of the Bankruptcy Code, (iii) the use, sale or lease of the Pre-Petition Bond Collateral (other than the cash collateral) pursuant to section 363(c) of the Bankruptcy Code, and/or (iv) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Master Trustee shall: |

|  | i. | be granted replacement liens on, and security interests in, the Pre-Petition Bond Collateral subject only to (1) the liens on, and security interests in, the Pre-Petition Bond Collateral granted to the DIP Lender pursuant to the DIP Facility, the Interim DIP Order and the Final DIP Order, as the case may be, (2) valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, and (3) the Carve-Out; |
|  | ii. | be granted a valid, enforceable, fully perfected security interests in and liens upon all of the Debtor's rights in property of the Debtor's estate as of the Petition Date, and all of the Debtor's rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, subject only to (1) the liens and security interests granted to the DIP Lender pursuant to the DIP Facility, the Interim DIP Order and the Final DIP Order, as the case may be, (2) valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, and (3) the Carve-Out; |
|  | iii. | be granted an allowed superpriority administrative expense claim which shall have priority (except with respect to the liens and superpriority claims granted to the DIP Lender in connection with the DIP Facility, the replacement liens granted pursuant to clause (a), above, and the Carve Out), in any of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered |

|  | pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final DIP Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code; provided, however, that the Superpriority Claims shall not be payable from the Avoidance Action Proceeds. |
|  | iv. receive a reaffirmation from the Debtors that they will, during the pendency of the Cases, comply with certain covenants in the Bond Documents, including those relating to prohibited uses, tax covenants, continuing disclosure, special services, compliance with certain Master and Bond Indenture terms, insurance and tax-exempt status; |
|  | v. receive the proceeds from the closing of the sale of the Hospital, after satisfaction of the DIP Loan, and payment of and/or reserve for the Carve-Out; |
|  | vi. receive good faith cooperation of the Debtors and appropriate access to real property in the event the Master Trustee wants to commission an appraisal of any real property that is DIP Collateral or Pre-Petition Bond Collateral; and |
|  | vii. be provided the same access to Debtors' personnel and professionals and to financial and other reporting to the DIP Lender as required under the DIP Facility. |
| Closing Date | The first business date on which the DIP Conditions Precedent below shall have been satisfied and the making of the Interim Advance shall have occurred (the "**Closing Date**"), which is expected to be within one (1) business day of entry of the Interim DIP Order. |
| DIP Conditions Precedent | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this Term Sheet deemed necessary or appropriate by the DIP Lender, including but not limited to:<br><br>i. a Chief Restructuring Officer acceptable to the DIP Lender and the Directing Bondholders shall have been retained by the Debtors (the "**CRO**");[1] |

---

[1] Michael Lane as CRO is acceptable to the DIP Lender and the Directing Bondholders.

ACTIVE 716554869v11

<table>
<tr><td></td><td></td><td>in form and substance reasonably acceptable to the DIP Lender;</td></tr>
<tr><td></td><td>ii.</td><td>no later than two (2) days prior to the filing of the DIP Motion (as defined below), the DIP Lender shall have received a cash forecast for the period from the filing of the DIP Motion through the following 13-weeks setting forth projected cash flows and disbursements that is acceptable to the DIP Lender;</td></tr>
<tr><td></td><td>iii.</td><td>orders (which may be interim orders) approving all "first day" motions shall have been entered (including, without limitation, the cash management order);</td></tr>
<tr><td></td><td>iv.</td><td>other than as set forth herein, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP Lender;</td></tr>
<tr><td></td><td>v.</td><td>an interim debtor-in-possession financing order, substantially on the terms contemplated in this Term Sheet (and otherwise acceptable to the DIP Lender in its sole discretion) (the "<strong>Interim DIP Order</strong>"), shall have been entered by the Bankruptcy Court on or before 12/17/2025 and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender. Notwithstanding anything to the contrary contained herein, funding of the Interim Advance shall be subject to entry of the Interim DIP Order, and funding of the balance of the DIP Commitment shall be subject to entry, within sixty (60) days following the filing of the motion seeking authorizing to enter into the DIP Facility (the "<strong>DIP Motion</strong>"), of a final debtor-in-possession financing order, substantially on the terms contemplated by this Term Sheet and in form and substance acceptable to the DIP Lender (the "<strong>Final DIP Order</strong>" and, together with the Interim DIP Order, collectively, the "<strong>DIP Financing Orders</strong>"), which shall not have been</td></tr>
</table>

ACTIVE 716554869v11

| | |
|---|---|
| | vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP Lender; and |
| | vii.   such other deliverables as the DIP Lender may reasonably require. |
| | Modification of the DIP Financing Orders shall require the consent of the DIP Lender, in its sole discretion. With the exception of condition vi. (entry of DIP Financing Orders), DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| Conditions Precedent to DIP Loans | The obligations of the DIP Lender to make any DIP Loan will be subject to conditions precedent customarily found in loan documents for similar debtor-in-possession financings, including, but not limited to: |
| | i.   the CRO shall be employed by the Debtor; |
| | ii.   (a) with regard to the Interim Advance, the Interim DIP Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with regard to the balance of the DIP Facility Loans, the Final DIP Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay; |

| | |
|---|---|
| | iv. the Debtors shall be in compliance with the terms of the Interim DIP Order or the Final DIP Order, as applicable; |
| | v. the Approved Budget shall demonstrate a need for the funds to be advanced under the DIP Facility; |
| | vi. each Debtor shall have provided a certificate signed by an officer confirming that all of the representations and warranties of the Debtors in this Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; |
| | vii. there shall be no defaults or Events of Default under the terms of this Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and |
| | viii. the Debtors shall be in compliance with the Milestones (as set forth below). |
| | With the exception of condition ii. above (entry of Interim DIP Order and entry of Final DIP Order), the DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| Milestones | Subject to Bankruptcy Court availability, each of the Debtors will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "**Milestones**"):<br><br>i. The Bankruptcy Court shall have entered the Interim DIP Order on or before 12/17/2025. |

| | |
|---|---|
| | ii. The Debtors shall have sought in the Cases the retention of the CRO by the date that is no later than ten (10) days following the filing of the DIP Motion. |
| | iii. By the date that is no later than ten (10) days following the filing of the DIP Motion, the Debtors shall have sought the retention of Cain Brothers, a division of KeyBanc Capital Markets, as investment banker (the "**Investment Banker**"). |
| | iv. The Bankruptcy Court shall have entered the Final DIP Order by the date that is no later than sixty (60) days after the filing of the DIP Motion. |
| | v. The Debtors shall file, by the date that is no later than thirty (30) days after the Petition Date, a motion to approve bidding procedures and to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "**Sale Motion**"). |
| | vi. The Bankruptcy Court shall have entered an order approving the bidding procedures for the sale contemplated by the Sale Motion (the "**Sale**") by the date that is no later than sixty (60) days after the Petition Date. |
| | vii. The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than one hundred and fifty (150) days after the Petition Date. |
| | viii. The Sale shall be consummated by the date that is no later than three-hundred and twenty (320) days after the Petition Date. |
| | ix. An order confirming a liquidating chapter 11 plan shall have been entered by the Bankruptcy Court by the date that is no later than ninety (90) days after consummation of the Sale. |
| | The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion. |

ACTIVE 716554869v11

| | |
|---|---|
| Representations and Warranties | The DIP Documents will contain representations and warranties customary for debtor-in-possession facilities of this size, type and purpose, including: corporate organization; qualification; power; financial condition; no material litigation; no material adverse change (excluding the commencement of the Cases); no conflict with law or contractual obligations; authority; enforceable obligations; governmental approvals; ERISA; taxes; properties; Investment Company Act; material agreements and liens; environmental matters; capitalization; subsidiaries, investments, etc.; true and complete disclosure; restrictive agreements; collateral; security agreements; and any regulatory matters. |
| Reporting and Information | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Debtors provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs and financial condition of the Debtors as the DIP Lender may reasonably request in writing from time to time. |
| Budget; Variance Covenant; Other Financing Covenants | The Debtor will have delivered a 13-week cash flow forecast, prepared in form and substance satisfactory to, and as approved by, the DIP Lender in its discretion (the "Approved Budget"), setting forth cash receipts and the disbursements (including payment of trade payables and expenses, and working capital and other general corporate needs) of the Debtor for the period covered thereby, delivered by the Debtors to the DIP Lender on or before entry of the Interim DIP Order; provided that the Debtors shall deliver every 4 weeks thereafter an updated rolling 13-week cash flow forecast in substantially the same form as the initial Approved Budget and which such updated cash flow forecast shall constitute the "Approved Budget" once approved by the DIP Lender (provided, that, until the DIP Lender approves any such updated cash flow forecast, the most recent 13-week cash flow forecast approved by the DIP Lender shall continue to be the Approved Budget). The Debtors shall maintain a minimum cash balance of $5 million measured weekly. |
| | The Debtor will deliver a weekly variance and compliance report by each Thursday at 5:00 p.m. Pacific time, beginning on the 2nd Thursday following the Petition Date, in a form and with supporting information |

ACTIVE 716554869v11

|  | in detail acceptable to the DIP Lender, showing the comparison of, and the variances between, actual performance to projections for each line item) of the Approved Budget and reconciling the sources, uses and disbursements of cash, for each trailing four-week measurement period (or, solely in the case of the line item for HQAF receipts, each trailing eight-weeks) (each a "**Measurement Period**") ending on the immediately preceding Sunday (each a "**Variance Report**") and simultaneously with the delivery of the Variance Report, a certificate from the Chief Executive Officer, Chief Financial Officer or other senior officer of the Debtors showing the calculation of and compliance (or non-compliance) with the Permitted Variance for such Measurement Period (such non-compliance to constitute an Event of Default). |
|---|---|

ACTIVE 716554869v11

"Permitted Variance" means an unfavorable variance of not greater than:

(i)　　10% between the actual disbursements for the applicable Measurement Period from the projected disbursements for such Testing Period as set forth in the Approved Budget;

(ii)　　15% between the actual receipts for the applicable Measurement Period from the projected receipts for such Testing Period, in each case excluding HQAF receipts, as set forth in the Approved Budget; and

(iii)　　7.5% between the actual HQAF receipts related to Program VIII for the applicable Measurement Period from the projected HQAF receipts related to Program VIII for such Measurement Period, as set for in the Approved Budget.

If the actual variances for such period are less than or equal to the applicable Permitted Variance, the amount by which the actual variances is less than the applicable Permitted Variance shall be carried forward to the next Measurement Period and added to the applicable Permitted Variance for such next Measurement Period; provided that such carryforward, if unused, shall not be permitted to be carried forward to the next two succeeding Measurement Periods.

ACTIVE 716554869v11

| | |
|---|---|
| | The financial advisor for the DIP Lender, the CRO and the financial advisor for the Debtors shall hold bi-weekly calls to discuss the Budget and relevant portions of the Cases, including actual performance against the Approved Budget, status of the Sale process, and business updates. |
| | The Investment Banker shall provide written weekly process reporting to the financial advisor for the DIP Lender and shall hold weekly calls with DIP Lender, the Master Trustee and Directing Bondholders and their advisors. |
| | The DIP Lender may, in its sole discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures. |
| Affirmative Covenants | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender:<br><br>i.    Compliance with the Milestones.<br><br>ii.    The Debtors shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Cases and all applicable laws, rules and regulations, (b) provide reasonable access to the DIP Lender to the Debtor's financial advisors, management team and books and records and other information (including historical information), in all cases, |

ACTIVE 716554869v11

| | |
|---|---|
| | including with respect to strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions) during normal business hours, and (c) operate in the ordinary course of business. |
| | iii.   Compliance with the Approved Budget, subject to the Permitted Variances, and delivery of each Proposed Budget and Variance Report. |
| | The DIP Lender may, in its sole discretion, waive any of the above affirmative covenants. |
| Negative Covenants | The DIP Documents will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender: |
| | i.   The Debtors will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings, except with respect to any additional funding sought from the Funding Bondholders as contemplated herein. |
| | ii.   The Debtors shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree. |
| | iii.   Without the prior written consent of the DIP Lender, the Debtors will not sell, lease or otherwise transfer or dispose of any material assets of the Debtors, other than in the ordinary course of business, pursuant to the Sale, or otherwise in accordance with the Approved Budget. |
| | iv.   The Debtors shall not open any new deposit or securities accounts; provided however, the Debtors may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender. |
| | The Debtors shall not do or cause to be done any |

| | |
|---|---|
| | of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, other than Permitted Liens (as defined in the applicable |

documents); (b) purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Debtors as of the Petition Date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) the contemplated Sale, (iii) asset sales in the ordinary course of business and consistent with past practice and (iv) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender;

ACTIVE 716554869v11

| | |
|---|---|
| | (f) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (g) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the Approved Budget. |
| | v.    Such additional covenants as the DIP Lender and the Debtors may agree. |
| | The DIP Lender may, in its sole discretion, waive any of the above negative covenants. |

| Events of Default | The DIP Facility shall contain events of default usual and customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as determined by the DIP Lender (each an "**Event of Default**"): |
|---|---|
| | i. the Interim DIP Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended, or shall not have been entered on or before December 17, 2025; |
| | ii. the Final DIP Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended, or shall not have been entered within sixty (60) days after the DIP Motion is filed; |
| | iii. failure of the Debtors to retain and continually employ a CRO acceptable to the DIP Lender; |
| | iv. failure of the Debtors to comply in any material respect with the terms of the applicable DIP Financing Order; |
| | v. the failure of the Debtors to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any negative covenant or certain other customary affirmative covenants in the Term Sheet or |

|  | with any other covenant or agreement contained in the DIP Financing Orders or DIP Documents in any respect or (d) comply with any other covenant or agreement contained in this Term Sheet subject, in the case of the foregoing clause (d), to a grace period of five (5) business days; |
|  | vi. other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Lender, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
|  | vii. any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Cases, or (c) the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (vii); |
|  | viii. the Bankruptcy Court shall enter one or more orders during the pendency of the Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $1 million to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor; |

| | ix. | any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
|---|---|---|
| | x. | the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |
| | xi. | the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget); |
| | xii. | the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Loans or such other treatment acceptable to the DIP Lender, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation; |
| | xiii. | any Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
| | xiv. | the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "**Committee**"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; |
| | xv. | the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral; |

ACTIVE 716554869v11

| | | |
|---|---|---|
| | xvi. | the inaccuracy in any material respect of any representation of any Debtor when made or deemed made; |
| | xvii. | the failure to meet any Milestone; |
| | xviii. | entry of an order by the Bankruptcy Court in favor of any Committee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the DIP Lender, (ii) sustaining an objection to claims of the DIP Lender, or (iii) avoiding any liens held by the DIP Lender; and |
| | xix. | the Termination Date (as defined below) shall have occurred. |
| Remedies | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: | |
| | i. | issue a written notice (the "**Remedies Notice**") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "**Remedies Notice Parties**") declaring the occurrence of the Termination Date (as defined below); |
| | ii. | issue a Carve-Out Notice (as defined below); |
| | iii. | declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; |
| | iv. | declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "**Termination Notice**"); and |
| | v. | charge the default rate of interest under the DIP Facility. |

| | During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "**Remedies Notice Period**"), the DIP Lender and/or Debtors may seek an emergency hearing (a "**Stay Relief Hearing**") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this Term Sheet, the Interim DIP Order, and/or the Final DIP Order, as applicable. |
| | Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law. |
| | During the Remedies Notice Period, the Debtors shall be authorized to use cash collateral in accordance with the Approved Budget. |
| Maturity/Termination Date | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of:<br><br>i. December 31, 2026 (the "**Scheduled Maturity Date**");<br><br>ii. the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases;<br><br>iii. the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use cash |

| | |
|---|---|
| | collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing; |
| | iv.    the first business day on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto; |
| | v.    the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; |
| | vi.    the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or |
| | vii.    the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility |
| | (each, a "**Termination Date**"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender. |
| Carve out | Notwithstanding anything to the contrary in this Term Sheet or the DIP Financing Orders, the DIP Facility shall be subject and subordinate to the Carve-Out. |
| | The "**Carve-Out**" shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), and (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice) |

| Credit Bidding | The Final DIP Order shall provide that the DIP Lender and the Master Trustee shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Facility Loans and the Bond Obligations in whole or in part, in connection with any sale or disposition of assets by the Debtors in the Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
|---|---|

| Waivers | The Final DIP Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral or the Pre-Petition Bond Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Master Trustee, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Master Trustee; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral or by the Master Trustee on the Pre-Petition Bond Collateral. |
|---|---|
| | The Final DIP Order shall provide that the DIP Lender and the Master Trustee shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. |
| | Furthermore, subject to entry of the Final DIP Order, each Debtor in the Cases and its estate shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender or the Master Trustee on any property acquired by such Debtor or its estate or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral |

ACTIVE 716554869v11

| | or the Master Trustee upon the Pre-Petition Bond Collateral. |
|---|---|
| No Marshalling | The Final DIP Order shall provide that the DIP Lender may exercise all remedies available under this Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final DIP Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
| Indemnification: | The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |
| Miscellaneous | This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that |

| | |
|---|---|
| | would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Lender. |
| Governing Law | The laws of the State of California (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |

ACTIVE 716554869v11

IN WITNESS WHEREOF, this DIP Sheet is duly executed as of the date first set forth above.

**BORROWERS:**

**OROVILLE HOSPITAL**

By: _____
Name:
Title:

**OROHEALTH CORPORATION**

By: _____
Name:
Title:

**DIP LENDER:**

**UMB BANK, N.A., AS SERIES 2019 BOND TRUSTEE AND MASTER TRUSTEE, AS APPLICABLE**

By: _____
Name:  Gavin Wilkinson
Title:  Senior Vice President

Schedule I

DIP LENDER

The DIP Lender herein is UMB Bank, N.A., as successor Series 2019 Bond Trustee as described below.

The City of Oroville (the "**Issuer**") issued its Revenue Bonds (Oroville Hospital) Series 2018 in the original aggregate principal amount of $19,600,000 (the "**Series 2018 Bonds**") pursuant to the Amended and Restated Bond Indenture dated as of June, 2018 (the "**Series 2018 Bond Indenture**"), by and between the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Series 2018 Bond Trustee**"). In connection with the issuance of the Series 2018 Bonds, the Borrower, as Obligated Group Representative, on behalf of itself and the other Members of the Obligated Group and U.S. Bank National Association, as successor to MUFG Union Bank, N.A. ("**U.S. Bank**"), entered into that certain Amended and Restated Continuing Covenant Agreement dated as of June, 2018 (the "**Continuing Covenant Agreement**"). The proceeds of the Series 2018 Bonds were loaned by the Issuer to the Borrower pursuant to that certain Amended and Restated Loan Agreement dated as of June, 2018 (the "**Series 2018 Loan Agreement**").

Pursuant to that certain Bond Indenture dated as of February 1, 2019 (the "**Series 2019 Bond Indenture**" and, together with the Series 2018 Bond Indenture, the "**Bond Indentures**"), by and between the Issuer and The Bank of New York Mellon Trust Company, N.A., as Bond Trustee (the "**Prior Bond Trustee**"), the Issuer issued its Revenue Bonds (Oroville Hospital) Series 2019 in the original aggregate principal amount of $195,630,000 (the "**Series 2019 Bonds**," and, together with the Series 2018 Bonds, the "**Bonds**"). The proceeds of the Series 2019 Bonds were loaned by the Issuer to the Borrower pursuant to that certain Loan Agreement, dated as of February 1, 2019 (the "**Series 2019 Loan Agreement**, and, together with the Series 2018 Loan Agreement, the "**Loan Agreements**").

The Borrower and The Bank of New York Mellon Trust Company, N.A., as Master Trustee (the "**Prior Master Trustee**") entered into that certain Master Indenture of Trust dated as of February 1, 2019, as amended or supplemented (the "**Master Indenture**") evidencing the Borrower's obligation to pay the amounts due thereunder.

Pursuant to that certain Related Supplement for Obligation No. 1, the Borrower issued its Oroville Hospital Obligation No. 1 ("**Obligation No. 1**") in the original principal amount of $19,600,000 for the benefit of the Series 2018 Bond Trustee, to evidence the obligation of the Borrower under the Series 2018 Loan Agreement to make payments sufficient to pay the principal of, premium, if any, and interest on the Series 2018 Bonds.

Pursuant to that certain Related Supplement for Obligation No. 2, the Borrower issued its Oroville Hospital Obligation No. 2 ("**Obligation No. 2**") in the original principal amount of $19,600,000 for the benefit of U.S. Bank, to evidence the obligations of the Borrower under the Continuing Covenant Agreement.

Pursuant to that certain Related Supplement for Obligation No. 3, the Borrower issued its Oroville Hospital Obligation No. 3 ("**Obligation No. 3**" and, together with Obligation No. 1 and Obligation No. 2, the "**Bond Obligations**") in the principal amount of $195,630,000 for the benefit of the Series 2019 Bond Trustee, as successor to the Prior Bond Trustee, to evidence the obligation of the Borrower under the Series 2019 Loan Agreement to make payments sufficient to pay the principal of, premium, if any, and interest on the Series 2019 Bonds.

The Bond Obligations due under the Master Indenture are secured by liens on certain of the Borrower's assets including pursuant to a certain Deed of Trust and Assignment of Rents dated as of February 1, 2019 (the "**Deed of Trust**"), relating to the Borrower's real property and certain other assets.

Effective August 17, 2023, pursuant to that certain Instrument of Removal and Appointment dated August 17, 2023, The Bank of New York Mellon Trust Company, N.A., was removed as master trustee under the Master Indenture and as bond trustee under the 2019 Bond Indenture, and UMB Bank, N.A. was appointed as master trustee (the "**Master Trustee**") under the Master Indenture and as bond trustee under the Series 2019 Bond Indenture (the "**Series 2019 Bond Trustee**") and has accepted such appointments.

The holders of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds (the "**Series 2019 Directing Bondholders**") have directed the Series 2019 Bond Trustee to enter into the DIP Facility.

The Master Indenture, the Bond Indentures, the Loan Agreements, the Bond Obligations, the Deed of Trust, the Continuing Covenant Agreement and all of the other documents executed in connection with the issuance of the Bonds are referred to herein as the "**Bond Documents**." The Bond Obligations are secured by (i) all of the Debtor's personal property, and (ii) all of the real property subject to the Deed of Trust (the "**Pre-Petition Bond Collateral**")

<u>Schedule II</u>

DEBTORS' ADDITIONAL REAL ESTATE

1.  2625 Olive Hwy, Oroville, CA (residential property);

2.  2703 Fay Way, Oroville, CA (residential property - clinic management);

3.  2794 Fay Way, Oroville, CA (residential property – expansion offices);

4.  2734 Gilmore Lane, Oroville, CA (office space for IT functions);

5.  2625 Olive Highway, Oroville, CA( psych. residency offices);

6.  2711 Oro Dam Blvd., Oroville, CA (residential housing for students);

7.  2713 Oro Dam Blvd., Oroville, CA (residential housing for students);

8.  2971 & 2981 Olive Highway, Oroville, CA (procedure suite/medical practice);

9.  3579 Oro Dam Blvd., Oroville, CA (RHC clinic (medical/dental));

10. 1611 Feather River Blvd., Oroville, CA (medical offices);

11. 2220 5th Avenue, Oroville, CA (physical therapy practice);

12. 2828 Feather River Blvd., Oroville, CA (cabinet shop);

13. 1169 Plumas Ave., Oroville, CA  (short term residential care); and

14. 2721 Olive Hwy, Oroville, CA (medical offices).