**67**

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:    (310) 598-4150

*Proposed Counsel to Oroville Hospital, et al.,*
*the Debtors and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>      Debtors and Debtors in Possession. | Lead Case No. 25-26876<br>Jointly Administered With:<br>Case No. 25-26877<br><br>**DCN NAK-7** |
| ☒ Affects All Debtors<br><br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit<br>   Healthcare System<br><br>      Debtors and Debtors in Possession. | Chapter 11<br>Hon. Christopher D. Jaime<br><br><u>Hearing Date</u>: December 11, 2025<br><u>Hearing Time</u>: 11:00 a.m.<br><u>Location</u>:    Courtroom 32<br>              501 I Street, Suite 3-200<br>              Sacramento, California 95814 |

(AMENDED)
### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; <u>(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF</u>

Upon the motion (the "**Motion**"), dated December 9, 2025, of Oroville Hospital (the "**Hospital**") and Orohealth Corporation: A Nonprofit Healthcare System ("**OroHealth**"), debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and Orohealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

180145290.2

and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Case**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) , 503, 506 and 552 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of California (the "**Local Rules**"), seeking, among other things:

(1)     authorization for the Debtors to obtain post-petition loans, advances and other financial accommodations up to **$16,000,000** on an interim basis for a period through and including the date of the Final Hearing (as defined below), and up to an aggregate of **$40,000,000** (the "**DIP Facility**") following entry of a final order approving the Motion (the "**Final Order**"), from UMB Bank, N.A., as successor Series 2019 Bond Trustee, or, as applicable Master Trustee ("**UMB Bank**" or "**DIP Lender**"), to the extent necessary as identified in this Interim Order and the Final Order (collectively, the "**DIP Orders**"), in accordance with all of the lending formulae, sublimits, terms and conditions set forth in the *Secured Superpriority Debtor in Possession Financing Summary of Terms and Conditions*, dated December 11, 2025, attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified, the "**DIP Term Sheet**"), and in accordance with this Order, secured by security interests in and liens upon all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

(2)     authorization for the Debtors to enter into, be bound by, and perform under the DIP Term Sheet (defined below) (together with this Interim Order, the "**DIP Loan Documents**");[2]

(3)     modification of the automatic stay to the extent hereinafter set forth;

(4)     the grant to the DIP Lender of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Term Sheet and DIP Loan Documents (including, loans, fees, costs and any other obligations

---

[2] References to the "DIP Term Sheet" herein shall be construed to encompass the other DIP Loan Documents, if any, that the Debtors and DIP Lender execute, deliver or otherwise enter into before the entry of the Final Order. Unless otherwise defined herein, capitalized terms shall have the definitions set forth in the DIP Term Sheet.

180145290.2

thereunder, the "**DIP Obligations**"); <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall not be payable from the proceeds of any of the estate's causes of action under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and property received or recovered thereby (the "**Avoidance Action Proceeds**");

(5)     authorization for the Debtors to use the proceeds of the DIP Facility and Cash Collateral (as defined below) in accordance with the budget attached hereto as **Exhibit 2** (the "**Approved Budget**") and subject to the terms, restrictions, and other conditions of the DIP Term Sheet;

(6)     authorization for the Debtors to use the proceeds of the loans under the DIP Facility (the "**DIP Loans**"), subject to the terms, restrictions, and other conditions of the DIP Term Sheet, to (a) pay fees and expenses related to the DIP Term Sheet, and (b) fund working capital of the Debtors and other general corporate purposes, in each case, to the extent set forth in and limited by the Approved Budget and permitted under the DIP Loan Documents;

(7)     authorization for the payment of DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Term Sheet;

(8)     subject to the Carve-Out, the DIP Liens, and any "**Permitted Prior Liens**" set forth on Schedule II to the DIP Term Sheet, to provide Adequate Protection of the Prepetition Secured Liens of the Prepetition Secured Creditors (each as defined below) on the terms as more fully set forth in this Interim Order; and

(9)     the setting of a final hearing on the Motion;

The initial hearing on the Motion having been held by this Court on December 11, 2025 (the "**Interim Hearing**"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "**Notice**") was served by the Debtors on (i) the Office of the U.S. Trustee; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis) filed in accordance with Bankruptcy Rule 1007(d); (iii) the agent for the DIP Lender and/or its counsel; (iv) the Prepetition Secured Creditors and/or their counsel; (v) the UMB Bank and/or its counsel; (v) the State of California through the Attorney General for the State of California; (vi) the

180145290.2

1    United States of America through the United States Attorney for the Eastern District of California;

2    and (vii) parties that file with the Court and serve upon the Debtor requests for notice of all maters

3    in accordance with Bankruptcy Rule 2002(i) (collectively, the "**Notice Parties**").; and

4        This Court having reviewed the Motion and any responses and objections thereto, the

5    *Declaration of Robert J. Wentz in Support of Debtors' Emergency Motion for Interim and Final*

6    *Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing, (B) Use*

7    *Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims;*

8    *(II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the*

9    *Automatic Stay;(IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 60,

10   *Declaration of James Moloney in Support of Debtors' Emergency Motion for Interim and Final*

11   *Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing, (B) Use*

12   *Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims;*

13   *(II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the*

14   *Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 61],

15   the *Declaration of Aaron Mursky in Support of Debtors' Emergency Motion for Interim and Final*

16   *Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing, (B) Use*

17   *Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims;*

18   *(II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the*

19   *Automatic Stay;(IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No.

20   62],and the *Declaration of Sean A. Gumbs in Support of Debtors' Emergency Motion for Interim*

21   *and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing,*

22   *(B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense*

23   *Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying*

24   *the Automatic Stay;(IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No.

25   63], the other filings and pleadings made by the Debtors, the evidence and testimony presented at

26   the Interim Hearing, and after due deliberation and consideration and good and sufficient cause

27   appearing therefor,

28

180145290.2

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

      A.    <u>Petition</u>.  On December 8, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  The Debtors continue as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

      B.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and *General Order No. 182* and *General Order No. 223* of the United States District Court for the Eastern District of California.  Venue in this Court over the Chapter 11 Case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.    <u>Notice</u>.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and Local Rule 4001-2.

      D.    <u>Prepetition Secured Obligations with Respect to DIP Collateral</u>.  The holders of Hospital Revenue Bonds, Series 2018 (the "**Series 2018 Bonds**") and the City of Oroville Revenue Bonds (Oroville Hospital), Series 2019 (the "**Series 2019 Bonds**" and, together with the Series 2018 Bonds, the "**Bonds**"), by and through UMB Bank, N.A., in its capacity as Master Trustee (the "**Master Trustee**"), and Tri Counties Bank ("**TCB**" and, together with the Bonds, the "**Prepetition Secured Creditors**") assert prepetition secured interests in certain of Oroville Hospital's accounts receivable, cash, other assets (the "**Cash Collateral**"), and certain real property, as more fully identified in the Motion and the Prepetition Loan Documents (defined below).

      E.    <u>Findings Regarding the Post-Petition Financing</u>.

      (i)    *Postpetition Financing*.  The Debtors have requested from the DIP Lender, and the DIP Lender are willing to extend, certain loans, advances, and other financial accommodations on the terms and conditions set forth in this Order and the DIP Loan Documents.

      (ii)    *Need for Postpetition Financing*.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, pay administrative expenses, including ordinary and necessary operating expenses, and market and sell the Debtors'

180145290.2

assets. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in this Order and the DIP Loan Documents is vital to the Debtors' ability to operate post-petition and to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "**Estates**") through a sale process. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)　*No Credit Available on More Favorable Terms*. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Term Sheet.

(iv)　*Priming of Prepetition Liens; Adequate Protection*. As of the Petition Date, the Debtors were indebted to the Prepetition Secured Creditors under the Prepetition Loan Documents[3] or other applicable law, and such obligations were secured by liens and security interests granted by the Debtors or otherwise arising under applicable law (all such liens and security interests, the "**Prepetition Secured Liens**") on and in the assets of the Debtors to the extent set forth under the Prepetition Loan Documents or such applicable law (all such assets, the "**Prepetition Collateral**"). The priming of the security interests in and liens on the Prepetition Collateral and any other interests of the Debtors' property specified in the DIP Term Sheet under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Term Sheet and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their business for the benefit

---

[3] The "**Prepetition Loan Documents**" means the Master Indenture of Trust, dated as of February 1, 2019, by and between Hospital and UMB Bank, N.A. (as successor to The Bank of New York Mellon Trust Company, N.A.) together with certain related amendments and supplements to the Series 2018 Bond documents and the Series 2019 Bond documents; and the Tri Counties Bank Commercial Security Agreement and related loan documents.

180145290.2

of their Estates and creditors, and the Debtors would not be able to obtain postpetition financing in a sufficient amount without granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, and without waiving the Debtors' or any other parties' right to assert any challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of the aggregate diminution in value (as determined pursuant to the Bankruptcy Code), if any, in the value of the Prepetition Collateral.

(v) *Budget*. The Debtors have prepared and delivered to the DIP Lender the Approved Budget. The Approved Budget has been approved by the DIP Lender pursuant to the terms of the DIP Term Sheet and constitutes an "Approved Budget" under the terms of and as defined in the DIP Term Sheet. The Initial DIP Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, projections for the periods covered thereby. The DIP Lender is relying upon the Debtors' compliance with the Approved Budget in accordance with the terms of the DIP Term Sheet, the other DIP Loan Documents and this Interim Order in determining to enter into the post-petition financing arrangements provided for herein.

(vi) *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of the DIP Loan Documents and this Interim Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors, on the one hand, and the DIP Lender, on the other hand, with all parties being represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code.

(vii) *Good Cause*. The relief requested in the Motion is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all

7

180145290.2

the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

(viii)    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  Any objections that were made (to the extent such objections have not been withdrawn or resolved) are hereby overruled in their entirety.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.    Authorization and Conditions to Financing.

1.1    Motion Granted.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  This Order shall hereinafter be referred to as the "**Interim Order**."

1.2    Authorization to Borrow and Use Loan Proceeds.  The Debtors are hereby authorized to enter into, be bound by, and perform under the DIP Facility and all DIP Loan Documents and to immediately borrow, pursuant to the DIP Term Sheet, an aggregate amount of term loans not to exceed **$16,000,000**, on an interim basis, provided that disbursements of such amount are in accordance with the Approved Budget or any subsequent Approved Budget, the DIP Loan Documents, and this Interim Order.  Upon the entry of this Interim Order, the Debtors shall be authorized to use the Cash Collateral and to draw on the DIP Facility to make any disbursement as specifically provided in the Approved Budget (subject to the permitted variances as set forth in the DIP Loan Documents), but solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

1.3    DIP Loan Documents

1.3.1    Approval.  The DIP Loan Documents and each term, condition, and covenant set forth therein are approved.  All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors, the DIP Lender, and of the Debtors' assumption and adoption of all of the terms, conditions, and

8

180145290.2

covenants of the DIP Term Sheet and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and such fees and expenses, including, without limitation, all of the DIP Lender's professional fees (including attorney fees and expenses), as more fully set forth in the DIP Loan Documents.

        1.3.2   <u>Amendment.</u>  Subject to the terms and conditions of the DIP Term Sheet, the other DIP Loan Documents, and this Interim Order, the Debtors, and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Loan Documents (an "**Amendment**") without further approval or order of the Court and shall provide not less than two (2) business days prior written notice of any Amendment and the proposed effective date thereof to (i) counsel to the Committee, if any, (ii) the Prepetition Secured Creditors, and (iii) the U.S. Trustee; provided that any material Amendment shall also be filed with the Court not less than two business days prior to the proposed effectiveness of such Amendment and shall require Court approval.

Section 2.      <u>Liens; Superpriority Administrative Claim Status.</u>

        2.1   <u>DIP Liens.</u>  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation, or filing of any perfection document or instrument, or the possession or control by the DIP Lender of, or over, any DIP Collateral, without any further action by the DIP Lender, the following valid, binding, continuing, fully perfected, enforceable, and non-avoidable security interests and liens (the "**DIP Liens**") are hereby granted to the DIP Lender (all property identified in clauses 2.1.1 through 2.1.4 below being collectively referred to as the "**DIP Collateral**"):

        2.1.1   <u>Liens Senior to Certain Other Liens.</u>  Pursuant to section 364(c)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected, first priority security interest in and lien ("**DIP First Priority Priming Liens**") upon all encumbered assets of the Debtors of the Debtors, whether now owned or existing or hereafter acquired, created, or arising and wherever located (other than the property identified in Schedule II to the Term Sheet), which DIP First Priority Priming Liens shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually or otherwise, including, without

180145290.2

limitation, the Prepetition Secured Liens, liens or interests granted in favor of third parties in conjunction with section 363, 364 or any other section of the Bankruptcy Code or other applicable law, but subject only to the Carve-Out.

2.1.2    Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected, first priority security interest in and lien (the "**DIP Priority Lien**" and together with the DIP First Priority Priming Liens, the "**DIP Senior Liens**") upon all unencumbered assets of the Debtors, whether now owned or existing or hereafter acquired, created, or arising and wherever located, other than claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "**Avoidance Actions**") or any proceeds or property recovered as a result of any Avoidance Actions, whether by judgment, settlement, or otherwise (the "**Avoidance Proceeds**"). Such DIP Priority Liens shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, subject only to the Carve-Out.

2.1.3    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(1) and (c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien (the "**DIP Junior Liens**") the property listed on Schedule II to the Term Sheet (the "**Excluded Property**"), which DIP Junior Liens shall be junior to the Permitted Priority Liens, but senior to all other liens, claims, or security interests that any other creditor of any of the Debtors and their Estates may have, but subject only to the Carve-Out.

2.1.4    The DIP Liens and the DIP Superpriority Claim (as defined below) (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, (subject to entry of the Final Order) the "equities of the case" exception of section 552 of the Bankruptcy Code, or (subject to entry of the Final Order) section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (x) any other claim in the Chapter 11 Case, including with respect to Prepetition Secured Liens, but subject to the Carve-Out and claims on account of the Permitted Priority Liens (solely with respect to the Excluded Property), (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code

180145290.2

or otherwise, and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Case, upon the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.

2.2     Enforceable Obligations.     The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and its creditors, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Term Sheet, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or based on any Avoidance Actions), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

2.3     Post-Petition Lien Perfection.   This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "**Perfection Act**"). Notwithstanding the foregoing, if the DIP Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lender is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or reasonably required by the DIP Lender, which act or acts shall be deemed to have been accomplished as of the Petition Date, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard

11

180145290.2

to such act in accordance with applicable law.  The DIP Lender may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Lender so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.4     Superpriority Administrative Expense.  For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Lender is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546, 726, or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claim**"); provided, however, that the DIP Superpriority Claim:  (a) shall be subject only to the payment of the Carve-Out; (b) shall be junior and subordinate to claims in respect of the Permitted Priority Liens only with respect to the Excluded Property; and (c) shall be payable out of the Avoidance Proceeds upon entry of the Final Order.  The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtors, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, Avoidance Proceeds), subject to the Carve-Out and Permitted Priority Liens (solely in the case of the Excluded Property).  Other than as expressly provided in the DIP Term Sheet and this Interim Order with respect to the Carve-Out, no costs or expenses of administration,

180145290.2

including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

2.5     Carve-Out.  Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, the DIP Obligations, the DIP Lender's liens, claims, and security interests in the DIP Collateral and the DIP Superpriority Claim, and the Prepetition Secured Obligations, the Prepetition Secured Creditors' liens, claims, and security interests in the Prepetition Collateral, and the Adequate Protection Superpriority Claim, shall, in each instance, be subject to the right of payment of the following expenses (the "**Carve-Out**"):

a.     allowed administrative expenses (i) for fees payable to the Office of the U.S. Trustee pursuant to 28 USC §1930(a)(6) and (ii) for fees required to be paid to the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 156(c), in each case plus interest at the applicable statutory rate; and

b.     all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.

2.6     Use of Cash Collateral.  Subject to the terms and conditions of this Interim Order, the DIP Term Sheet, and the other DIP Loan Documents, the Debtors shall be and are hereby authorized to use, in accordance with the Approved Budget, Cash Collateral and the proceeds of the DIP Facility to, (a) pay fees and expenses related to the DIP Term Sheet and the other DIP Loan Documents, and (b) fund working capital to maintain and, as applicable, operate the Debtors' business and for other general corporate purposes, in each case, to the extent set forth in the Approved Budget and permitted under the DIP Loan Documents.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or the Debtors' use of Cash Collateral, the proceeds of the DIP Facility, or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Term Sheet, the other DIP Loan Documents, or the Approved Budget.  In accordance with the provisions of the DIP

180145290.2

Term Sheet (and without limiting the Debtors' obligations thereunder), the Debtors shall timely deliver to the DIP Lender updated cash flow forecasts and Variance Reports (as defined in the DIP Term Sheet) and comply with all other reporting covenants and obligations described in the DIP Term Sheet.

Section 3.        Approval of DIP Fees

       3.1     In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses, and other amounts payable under the DIP Term Sheet as such become due, including, without limitation, the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "**DIP Fees**"). Upon entry of a Final Order, the DIP Fees are approved, on a final basis, and are deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.

Section 4.        Authorization to Pay Professional Fees of DIP Lender.

       4.1     The Debtors shall pay any and all fees paid or required to be paid in connection with the DIP Loan Documents (including, but not limited to, the professional fees and expenses of the DIP Lender); provided, however, that the fees and expenses of the DIP Lender shall be payable in kind and added to the principal balance of the DIP Facility. No payment shall be made by the Debtors if an objection is made by the Debtors, the Committee, if any, or the U.S. Trustee within seven (7) day period following a request for payment of such fees and expenses (except to the extent such fees and expenses are not subject to the objection) unless consensually resolved by the affected professional and objecting party or approved by the Court.  The fees and expenses paid hereunder shall not otherwise be subject to separate approval by the Court or to the United States Trustee Guidelines.

Section 5.        Sale Process.

       5.1     Sale Process.    The Debtors shall conduct a process to sell (the "**Sale**") substantially all or all of their assets (the "**Acquired Assets**").   Subject to the entry of the Final Order, Permitted Priority Liens, and the Carve-Out, the Debtors are authorized to immediately and indefeasibly distribute directly (or cause any purchaser of the Acquired Assets to immediately and

14

indefeasibly distribute directly) to the DIP Lender, the proceeds from the Sale of the Acquired Assets (other than with respect to proceeds attributable to the Excluded Property to the extent subject to a Permitted Priority Lien), up to the amount of the DIP Obligations outstanding as of the closing of the Sale, including, but not limited to, principal, accrued and unpaid interest, and all outstanding fees and expenses (except to the extent such DIP Obligations are credit bid as part of a purchase of the Acquired Assets as authorized by Section 5.3 below).

        5.2    <u>Milestones</u>.  As a condition to funding under the DIP Facility, the Debtors shall achieve the Milestones as set forth in the DIP Term Sheet.

        5.3    <u>Credit Bid Rights</u>.  Subject to entry of the Final Order, in connection with any Sale, the DIP Lender shall have the right to credit bid with respect to the DIP Collateral any portion or all of the Debtors' outstanding DIP Obligations pursuant to Bankruptcy Code section 363(k), and any bid submitted by the DIP Lender shall be deemed a "qualified bid" under any bidding procedures entered in this Chapter 11 Case, subject to payment of the Carve-Out and the Permitted Prior Liens.

Section 6.    <u>Cash Management System; Control Over Debtor's Accounts</u>.  The Debtors shall maintain their existing cash management system to the extent set forth in the DIP Loan Documents unless the DIP Lender, in its sole and absolute discretion, consents in writing to any proposed modification to such cash management system; <u>provided</u>, <u>however</u>, that the Debtors shall be authorized, at the direction of the DIP Lender, to enter into amendments to their existing cash management agreements.  The DIP Lender shall be deemed without any further action of any kind, to have "control" over all of the Debtors' deposit accounts.

Section 7.    <u>Proof of Claim</u>.  Any order entered, or to be entered, by the Court concerning the establishment of a bar date for the filing of any claims or administrative expenses in the Chapter 11 Case or in any Successor Case shall not apply to the DIP Lender.

Section 8.    <u>Default; Rights and Remedies; Relief from Stay</u>.

        8.1    <u>Events of Default</u>.  The occurrence and continuation of any of the following events, unless waived by the DIP Lender in its sole discretion, shall constitute an "**Event of Default**" under this Interim Order and the DIP Loan Documents, and the DIP Lender shall provide notice of

180145290.2

any such Event of Default to the Debtors, the U.S. Trustee, and lead counsel to the Committee, if any:

        a.     the entry of an order staying, reversing, vacating, or otherwise modifying this Interim Order without the prior written consent of the DIP Lender;

        b.     the failure of the Debtors to retain and continually employ the CRO as set forth in the Term Sheet;

        c.     failure of the Debtors to comply in any material respect with the terms of this Interim Order

        d.     non-compliance with any Variance Covenant or have an Approved Budget,

        e.     other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" orders, or other orders reasonably satisfactory to the DIP Lender, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables;

        f.     (i) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (iii) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Cases, or (iv) the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clause (ii) or clause (iii) of this subsection;

        g.     the Bankruptcy Court enters one or more orders during the pendency of the Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $1 million to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor;

180145290.2

h.      any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility;

i.      the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates;

j.      the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget);

k.      the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Loans or such other treatment acceptable to the DIP Lender, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation;

l.      subject to responding to requests by the Committee or other parties in interest, any Debtor (i) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (ii) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender;

m.      the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "**Committee**"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender;

n.      the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral;

o.      the inaccuracy in any material respect of any representation of any Debtor when made or deemed made;

p.      the failure to meet any Milestone; and

17

180145290.2

q.      the Termination Date shall have occurred.

8.2      <u>Rights and Remedies Upon Event of Default</u>.   Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time:

a.      issue a written notice (the "**Remedies Notice**") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "**Remedies Notice Parties**") declaring the occurrence of the Termination Date (as defined below);

b.      declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors;

c.      declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "**Termination Notice**"); and

d.      charge the default rate of interest under the DIP Facility.

8.3      <u>Remedies Notice Period</u>.

a.      During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "**Remedies Notice Period**"), the DIP Lender and/or Debtors may seek an emergency hearing (a "**Stay Relief Hearing**") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under the Term Sheet or the Interim DIP Order, as applicable.

b.      Upon expiration of the Remedies Notice Period, if a motion

180145290.2

seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law.

        c.     During the Remedies Notice Period, the Debtors shall be authorized to use cash collateral in accordance with the Approved Budget.

    8.4    <u>Termination Date</u>.  The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of the following (each, a "**Termination Date**"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender, or further order of the Court.:

        a.     January 8, 2027 (the "**Scheduled Maturity Date**");

        b.     the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases;

        c.     the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use cash collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing;

        d.     the first business day on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto;

        e.     the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;

        f.     the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or

180145290.2

g.     the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility.

Section 9.     <u>Good Faith</u>.   The terms of this Interim Order were negotiated in good faith and at arm's length by and among the Debtors, and the DIP Lender.  The DIP Lender shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.  The liens, claims, and other covenants and payments as set forth in the DIP Term Sheet, the DIP Loan Documents, and this Interim Order, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral, critical, and essential components of the DIP Facility provided by the DIP Lender to the Debtors.

Section 10.     <u>Other Rights and Obligations</u>.

10.1     <u>No Modification or Stay of This Interim Order</u>.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Interim Order, any of the DIP Loan Documents, or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of the Chapter 11 Case (each, a "**Subject Event**"), (i) the acts taken by the DIP Lender in accordance with this Interim Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lender's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by the DIP Lender in accordance with this Interim Order, and the liens granted to the DIP Lender in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Lender pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code to the maximum extent applicable.

10.2     <u>Power to Waive Rights; Duties to Third Parties</u>.  Subject to any further order of this Court, the DIP Lender, in their sole and absolute discretion, shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order in respect of the DIP Lender (the "**DIP Lender Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).

180145290.2

Any waiver by the DIP Lender of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lender.

10.3    <u>Setoff and Return of Goods</u>. The Debtors shall not, without the consent of the DIP Lender in its sole and absolute discretion, (a) enter into any agreement to return any goods to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

10.4    <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of the DIP Lender , to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

10.5    <u>Binding Effect of Interim Order</u>.

10.5.1    Immediately upon entry by this Court, this Interim Order shall be valid and binding upon and inure to the benefit of the DIP Lender the Prepetition Secured Creditors, the Debtors and the property of the Debtors' Estates, all other creditors of the Debtors, any Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in the Chapter 11 Case, any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case.

180145290.2

10.5.2  Any order dismissing the Chapter 11 Case or a Successor Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Superpriority Claim and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full in cash, and (b) this Court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim and the DIP Liens.  In the event any Court modifies any of the provisions of this Interim Order or the DIP Loan Documents following a Final Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lender pursuant to this Interim Order, including with respect to the DIP Collateral, or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications, and (ii) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

10.6     Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment. All postpetition advances and other financial accommodations under the DIP Term Sheet and the other DIP Loan Documents are made in reliance on this Interim Order and there shall not at any time be entered in the Chapter 11 Case, or in any Successor Case, any order (other than the Final Order) which (a) authorizes the use of Cash Collateral or the proceeds of the DIP Facility except as expressly permitted hereunder or in the DIP Loan Documents, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender herein unless, in each instance (i) the DIP Lender shall have given its express prior written consent with respect thereto (such consent to be in the DIP Lender's absolute and sole discretion and no such consent being implied from any other action, inaction or acquiescence by the DIP Lender , or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in cash in accordance with the terms of the DIP Term Sheet and the other DIP Loan Documents, including, without limitation, all debts and obligations of the Debtors to the  DIP Lender which arise or result from the obligations,

22

180145290.2

loans, security interests, and liens authorized herein, on terms and conditions acceptable to the DIP Lender. The security interests and liens granted to or for the benefit of the DIP Lender hereunder and the rights of the DIP Lender pursuant to this Interim Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors without the express prior written consent of the DIP Lender (such consent to be in the DIP Lender's absolute and sole discretion).

10.7    <u>No Owner/Operator Liability</u>.  In determining to make any loan under the DIP Term Sheet or any Order related to the DIP Term Sheet or the obligations created thereunder, or in exercising any rights or remedies as and when permitted pursuant to the DIP Term Sheet or any Order related to the DIP Term Sheet or the obligations created thereunder, the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

10.8    <u>Waivers</u>.  Subject to entry of the Final Order:

a.    the Final DIP Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral or the Pre-Petition Bond Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Master Trustee, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Master Trustee; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral or by the Master Trustee on the Pre-Petition Bond Collateral;

180145290.2

b.      the Final DIP Order shall provide that the DIP Lender and the Master Trustee shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code; and

c.      furthermore, subject to entry of the Final DIP Order, each Debtor in the Cases and its estate shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender or the Master Trustee on any property acquired by such Debtor or its estate or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral or the Master Trustee upon the Pre-Petition Bond Collateral.

10.9    Marshalling/552(b).  Subject to entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral.  Subject to entry of the Final Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, products, offspring, or profits of any of the DIP Collateral.

10.10    Indemnification.  The Final DIP Order shall provide that the Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and

180145290.2

out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

10.11   Term; Termination.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among the Debtors and the DIP Lender authorized by this Interim Order may be terminated pursuant to the terms of the DIP Term Sheet.

10.12   Objections Overruled.  All objections to the entry of this Interim Order are, to the extent not withdrawn or resolved, hereby overruled in their entirety.

Section 11.    Adequate Protection to Prepetition Secured Creditors.  This Court finds, that the adequate protection provided in this Interim Order (the "**Adequate Protection**") is reasonable and calculated to protect the interests of the Prepetition Secured Creditors.

11.1   Prepetition Secured Party Adequate Protection Liens and Additional Liens to Secure the Prepetition Secured Obligations.  As adequate protection for the Prepetition Secured Creditors, the Prepetition Secured Creditors, in accordance with sections 361 and 363(e) of the Bankruptcy Code, are hereby granted, for the benefit of the Prepetition Secured Creditors, additional and replacement valid, binding, enforceable, non-avoidable, *pari passu*, and perfected postpetition security interests and liens (the "**Adequate Protection Liens**") upon all Prepetition Collateral (collectively, the "**Adequate Protection Collateral**"), in each case solely to secure the aggregate diminution in value (as determined pursuant to the Bankruptcy Code), if any, in the value of the Prepetition Collateral; *provided that* the Adequate Protection Liens shall be subject to any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition

180145290.2

Secured Creditors.  The Adequate Protection Liens are subject and subordinate to (A) the Carve-Out and (B) the Permitted Prior Liens.

   11.2   507(b) Claims.   Notwithstanding the provision of Adequate Protection hereunder, the Prepetition Secured Creditors are hereby granted, solely to the extent of the diminution in value (as determined pursuant to the Bankruptcy Code), if any, in the value of the Prepetition Collateral, an allowed administrative expense claim pursuant to section 507(b) as well as sections 364(c)(1), 503(b) of the Bankruptcy Code (each, a "**Adequate Protection Superpriority Claim**") with super-priority over all other administrative expenses and all other claims against the Debtors or their Estates of any kind or nature whatsoever, but in all cases subject and subordinate to the Carve-Out, the DIP Superpriority Claim, and the Permitted Prior Liens.  Subject to the foregoing, the Adequate Protection Superpriority Claim shall be payable from and have recourse to all Prepetition Collateral, except the proceeds or property recovered pending the entry of the Final Order.

   11.3   The Master Trustee is hereby granted a valid, enforceable, fully perfected security interests in and liens upon all of the Debtor's rights in property of the Debtor's estate as of the Petition Date, and all of the Debtor's rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, subject only to (1) the liens and security interests granted to the DIP Lender pursuant to the DIP Facility, in this Order and the Final DIP Order, as the case may be, (2) valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, and (3) the Carve-Out;

   11.4   Additional Adequate Protection for the Master Trustee. As further adequate protection for the use of the Master Trustee's cash collateral and consent to the priming liens in its Prepetition Collateral granted to the DIP Lender hereunder and as set forth more fully in the DIP Term Sheet: (i) it shall receive the proceeds from the closing of the sale of its Pre-Petition Collateral, after satisfaction of the DIP Facility, and payment of and/or reserve for the Carve-Out; (ii) it shall receive good faith cooperation of the Debtors and appropriate access to real property in the event the Master Trustee wants to commission an appraisal of any real property that is DIP Collateral or its Prepetition Collateral; (iii) the Debtors must, during the pendency of these Cases, comply with

180145290.2

certain covenants in the Bond Documents, including those relating to prohibited uses, tax covenants, continuing disclosure, special services, compliance with certain Master and Bond Indenture terms, insurance and tax-exempt status; provided, however, the Debtors shall not be required to comply with financial covenants set forth in the Bond Documents; and (iv) it shall be provided the same access to Debtors' personnel and professionals and to financial and other reporting to the DIP Lender as required under the DIP Facility.

11.5 <u>Additional Adequate Protection to TCB</u>. Notwithstanding anything in this Interim Order, the DIP Term Sheet, the DIP Loan Documents or otherwise, in accordance with sections 361 and 363(e), TCB, (a) shall retain its existing first priority security interests and liens in the deposit accounts of Debtor Oroville Hospital at TCB; (b) is granted as adequate protection additional and replacement valid, binding, enforceable, non-avoidable and perfected post-petition security interests and liens to the same nature, extent, validity and priority as its prepetition liens upon all post-petition bankruptcy estate cash in the deposit accounts of Debtor Oroville Hospital at TCB; and (c) is granted additional and replacement valid, binding, enforceable, non-avoidable and perfected post-petition security interests and liens to the same nature, extent and validity in all post-petition cash of these jointly administered estates wherever located or held *pari passu* with DIP Lender. In addition, TCB shall retain its security interests and liens, to the same nature, extent, priority and validity immediately prior to the Petition Date, in the equipment more fully described in Exhibit A to applicable commercial security agreement executed by Debtor Oroville Hospital to TCB, and the equipment more fully described in the Exhibits A to the UCC filings of TCB with the California Secretary of State.

11.6 <u>Resolution of Med One Informal Objection</u>. Notwithstanding anything in this Interim Order to the contrary, nothing contained herein including, but not limited to, the DIP Liens granted to DIP Lender, shall in any way attach to, impact, impair, encumber, prime, or otherwise affect (i) any equipment or other property leased, rented, or otherwise provided by Med One Capital Funding, LLC or Med One Equipment Rental, LLC, or any or their subsidiaries, affiliates, or assigns (collectively, "<u>Med One</u>"), to the Debtors, or either of them, or any subsidiary or affiliate of the Debtors, or either of them, or (ii) any equipment or other property of the Debtors, or either of them,

27

or any subsidiary or affiliate of the Debtors, or either of them, in which Med One has a valid and properly perfected security interest in and/or lien on such property. Med One reserve any and all respective rights, remedies, and protections under sections 361, 362, 363, and 364 of the Bankruptcy Code.

Section 12.      Findings and Conclusions.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable, as of the Petition Date, immediately upon execution hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

Section 13.      Interim Order Governs.  In the event that any provision of this Interim Order conflicts with any term of the DIP Loan Documents, this Interim Order shall govern.

Section 14.      Retention of Jurisdiction.  The Court has and will retain jurisdiction to interpret and enforce the provisions of this Interim Order.

Section 15.      Final Hearing and Response Dates.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for January 12, 2026, at 10:00 a.m. (prevailing Pacific time) before this Court (the "**Final Hearing**").  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to the Committee counsel.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel for the Debtors, Fox Rothschild LLP, 10250 Constellation Boulevard, 9th Floor, Los Angeles, CA 90067, Attn: Keith Owens & Nicholas Koffroth; (b) counsel for the DIP Lender, Greenberg Traurig LLP, One International Place, Suite 2000, Boston, MA, 02110, Attn: Colleen Murphy, Kevin Walsh, and Chris Marks; (c) counsel for TCB, Boutin Jones, Inc., 555 Capitol Mall, Suite 1500, Sacramento, CA 95814, Attn: Tom Mouzes; and (d) U.S. Trustee, 501 I Street, Room 7-500, Sacramento, CA 95814, Attn: Jason Blumberg; and shall be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of California, in each case, to allow actual receipt

180145290.2

1    of the foregoing no later than **December 31, 2025**.  Replies to any oppositions shall be filed and

2    serve not later than **January 7, 2026**.

3

4    **Dated:**  December 15, 2025

5

6                                              Christopher D. Jaime, Chief Judge

7                                              United States Bankruptcy Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

180145290.2

**APPROVED AS TO FORM:**

**GREENBERG TRAURIG LLP**

By _____

    COLLEEN A. MURPHY (admitted *pro hac vice* )
    KEVIN J. WALSH (admitted *pro hac vice* )
    CHRISTOPHER MARKS (admitted *pro hac vice*)
    One International Place, Suite 2000
    Boston, Massachusetts 02110
*Counsel to UMB Bank N.A., in its capacities as 2019*
*Bond Trustee, Master Trustee, and DIP Lender*


**BOUTIN JONES INC.**

By  */s/ Thomas G. Mouzes*

    THOMAS G. MOUZES (SBN 099446)
    BASHAR AHMAD (SBN 258619)
    555 Capitol Mall, Suite 1500
    Sacramento, California 95814
*Counsel to Tri Counties Bank*

180145290.2

**<u>Exhibit 1</u>**

**DIP Term Sheet**

# OROVILLE HOSPITAL, ET AL.

## Secured Superpriority Debtor in Possession Financing
## Summary of Terms and Conditions

### December 11, 2025

The following is a summary of proposed terms and conditions by the DIP Lender for the establishment of a senior secured term loan facility in favor of Oroville Hospital, and its sole corporate member, OroHealth Corporation, each in its capacity as debtor-in-possession (collectively, the "**Debtors**" or the "**Borrowers**") in the chapter 11 cases (the "**Cases**") to be commenced in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "**Bankruptcy Court**" or "**Court**") on or before December 8, 2025 (the "**Petition Date**").

This term sheet (together with the exhibits hereto, the "**Term Sheet**") shall be a binding agreement upon execution, subject to, the entry of the Interim DIP Order with respect to the DIP Facility Loans (as defined below). The obligation of the DIP Lender to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim DIP Order or the Final DIP Order (as defined below), the terms of the Interim DIP Order or the Final DIP Order (as applicable) shall govern.

| | |
|---|---|
| Borrowers | Oroville Hospital and OroHealth Corporation |
| Joint and Several Liability | The liability of the Debtors for the obligations, indebtedness and liabilities created under or pursuant to this Term Sheet, the Interim DIP Order, the agreements, documents, notes and instruments executed and delivered to evidence the post-petition financing contemplated by this term sheet (collectively, the "**DIP Documents**") and together with this Term Sheet, the Interim DIP Order and the Final DIP Order (collectively, the "**DIP Financing Documents**") shall be joint and several. |
| DIP Lender | UMB Bank, N.A., as successor Series 2019 Bond Trustee as described in Schedule I attached hereto; and one or more holders of the Bonds to the extent necessary as identified in the DIP Orders (collectively, the "**DIP Lender**"). |
| Directing Bondholders; Bondholders | The "**Directing Bondholders**" with respect to the DIP Lender are the beneficial owners of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds, as those terms are described and defined in |

| | Schedule I attached hereto. The Directing Bondholders with respect to the Master Trustee (defined in Schedule I hereto) are the beneficial owners of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds and the Series 2018 Bonds, as those terms are described and defined in Schedule I attached hereto. The "**Bondholders**" are the beneficial owners of the outstanding Series 2019 Bonds and Series 2018 Bonds. |
|---|---|
| Facility | The DIP Lender will provide to the Borrowers a priming, senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") consisting of a multiple-draw delayed draw term loan facility in the aggregate maximum principal amount of up to $40 million (the "**DIP Commitment**" and each portion thereof drawn by the Debtor, the "**DIP Loan(s)**"). The DIP Commitment is sourced $24 million from funds held by the DIP Lender under the Bond Indentures and $16 million from funds to be advanced to the DIP Lender from the Funding Bondholders (defined below). |
| | The DIP Facility will be made available to the Debtors through an initial maximum aggregate amount of up to $16 million in accordance with the Approved Budget (the "**Interim Advance**") following the entry of the Interim DIP Order (defined below). Following entry of the Final DIP Order, additional draws under the DIP Facility will be made available on a regular basis to be agreed upon in accordance with an Approved Budget in the aggregate amount not to exceed $24 million. Further additional draws may be made on 5 days' notice, as needed and agreed to by the DIP Lender, subject to Court approval. |
| | The $16 million of the DIP Commitment will be provided by one or more Bondholders (the "**Funding Bondholders**") to the DIP Lender to be used as necessary to support the operations of the Debtors in accordance with an Approved Budget. These additional funds would be advanced to the Debtors on the same terms and conditions as the $24 million portion of the DIP Facility. |
| | Pending the entry of the Final DIP Order, the DIP Lender shall be afforded all of the protections contained in the Interim DIP Order. |

| | |
|---|---|
| Purpose | The DIP Loans shall be available to fund in accordance with the Approved Budget and the applicable DIP Financing Order: (i) working capital and maintenance capital expenditure requirements of the Debtors, (ii) operating expenses of the Debtors, (iii) fees and expenses of the DIP Lender and its professionals; provided, however, that the fees and expenses payable to the DIP Lender shall be payable in kind and added to the principal balance of the DIP Facility, and (iv) other line items in accordance with the terms of the Approved Budget. |
| | Neither the proceeds of the DIP Loans nor the Master Trustee's cash collateral shall be transferred to or used by any entity other than a Debtor, except as permitted by the DIP Lender, approved by the Court, or as set forth in the Approved Budget. |
| | No portion of the DIP Loans, the Carve-Out (as defined below) or any cash collateral of the Master Trustee or the DIP Lender shall be used to assert any claim or cause of action or make any objection against the DIP Lender, the Master Trustee, the Bondholders, or their advisors, agents and subagents, and/or challenging any claim or lien of the Master Trustee or the validity or enforceability of the Bond Documents (as defined in Schedule I hereto), and/or challenging any pre-petition payment or transfer to the Master Trustee; provided that any DIP Loans used to pay any counsel of and financial advisor to the Committee, if any is formed, to investigate any of the foregoing shall not exceed $25,000.00 in the aggregate. |
| Interest Rate; Fees | The DIP Loans shall accrue interest at 10.75%, with a default interest rate of an additional 2.00%, each of which shall be payable monthly in kind and added to the principal balance of the DIP Facility. |
| | The DIP Facility shall provide for an exit fee of 3.0% percent of the DIP Commitment (the "**Exit Fee**") fully earned and non-refundable upon entry of the Final DIP Order and payable on the DIP Termination Date (as defined below). |

| Priority and Security | Subject to the Carve-Out (as defined below), all obligations of the Debtors under the DIP Facility (the "**DIP Obligations**") shall be: |
|---|---|
| | i.   entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, subject only to the Carve-Out (as defined below) (the "**DIP Superpriority Claims**"). The DIP Superpriority Claims may be repaid from any cash of the Debtor, including without limitation, cash collateral, provided, however, that the DIP Superpriority Claims shall not be payable from the proceeds of any of the estate's causes of action under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**") and property received or recovered thereby (the "**Avoidance Action Proceeds**"); |
| | ii.   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), except the property listed on Schedule II attached hereto and Avoidance Action Proceeds (such liens, subject only to the Carve-Out); |
| | iii.   secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in |

|  | existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens, the property set forth on Schedule II hereto, and the Carve-Out; |
| --- | --- |
|  | iv. secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, including without limitation each Debtor's equity interests in affiliated entities, including, without limitation, Oroville Medical Complex, LLC, 1000 Executive Parkway, LLC, Oroville Medical Partners, LLC, OHPAC Partners, LLC, and Oroville Solar Partners, LLC, , and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising – such lien, together with the liens described in clauses (i) through (iii) above, the "**DIP Liens**" and the collateral described in clauses (i) through (iv) above, collectively, the "**DIP Collateral**"), which liens shall be subject to the Carve-Out. |
|  | The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral. |
|  | The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor. |

---

[1] The DIP Documents shall include a schedule of Permitted Prior Liens.

180104438.3

| | The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Bond Documents, and any other Permitted Prior Liens, if any. |
| | The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim DIP Order without the requirement of any further action by the DIP Lender; provided that if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| Adequate Protection | The Master Trustee will consent to the use of its cash collateral pursuant to a cash collateral order (which may be subsumed within the Interim DIP Order and the Final DIP Order) consistent with this Term Sheet and in accordance with the Approved Budget. Upon an Event of Default, the Master Trustee shall be subject to the Remedies Notice procedure before termination of the Debtors' use of cash collateral. |
| | As adequate protection to the Master Trustee for any diminution in the value of the Master Trustee's interests in the collateral granted under the Bond Documents (as defined in Schedule I) (the "**Pre-Petition Bond Collateral**") resulting from (i) the priming of the Master Trustee's liens by the Liens in favor of the DIP Lender granted pursuant to the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use of the cash collateral pursuant to section 363(c) of the Bankruptcy Code, (iii) the use, sale or lease of the Pre-Petition Bond Collateral (other than the cash collateral) pursuant to section 363(c) of the Bankruptcy Code, and/or (iv) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Master Trustee shall: |

| | i. | be granted replacement liens on, and security interests in, the Pre-Petition Bond Collateral subject only to (1) the liens on, and security interests in, the Pre-Petition Bond Collateral granted to the DIP Lender pursuant to the DIP Facility, the Interim DIP Order and the Final DIP Order, as the case may be, (2) valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, and (3) the Carve-Out; |
| | ii. | be granted a valid, enforceable, fully perfected security interests in and liens upon all of the Debtor's rights in property of the Debtor's estate as of the Petition Date, and all of the Debtor's rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, subject only to (1) the liens and security interests granted to the DIP Lender pursuant to the DIP Facility, the Interim DIP Order and the Final DIP Order, as the case may be, (2) valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, and (3) the Carve-Out; |
| | iii. | be granted an allowed superpriority administrative expense claim which shall have priority (except with respect to the liens and superpriority claims granted to the DIP Lender in connection with the DIP Facility, the replacement liens granted pursuant to clause (a), above, and the Carve Out), in any of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered |

| | |
|---|---|
| | pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final DIP Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code; provided, however, that the Superpriority Claims shall not be payable from the Avoidance Action Proceeds.<br><br>iv. receive a reaffirmation from the Debtors that they will, during the pendency of the Cases, comply with certain covenants in the Bond Documents, including those relating to prohibited uses, tax covenants, continuing disclosure, special services, compliance with certain Master and Bond Indenture terms, insurance and tax-exempt status; provided, however, the Debtors shall not be required to comply with financial covenants set forth in the Bond Documents;<br><br>v. receive the proceeds from the closing of the sale of the Hospital, after satisfaction of the DIP Loan, and payment of and/or reserve for the Carve-Out;<br><br>vi. receive good faith cooperation of the Debtors and appropriate access to real property in the event the Master Trustee wants to commission an appraisal of any real property that is DIP Collateral or Pre-Petition Bond Collateral; and<br><br>vii. be provided the same access to Debtors' personnel and professionals and to financial and other reporting to the DIP Lender as required under the DIP Facility. |
| Closing Date | The first business date on which the DIP Conditions Precedent below shall have been satisfied and the making of the Interim Advance shall have occurred (the "**Closing Date**"), which is expected to be within one (1) business day of entry of the Interim DIP Order. |
| DIP Conditions Precedent | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent to be set forth in this Term Sheet deemed necessary or appropriate by the DIP Lender, including but not limited to: |

|  | |
|---|---|
|  | iii. orders (which may be interim orders) approving all "first day" motions shall have been entered (including, without limitation, the cash management order); |
|  | iv. other than as set forth herein, the Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP Lender; |
|  | v. an interim debtor-in-possession financing order, substantially on the terms contemplated in this Term Sheet (the "**Interim DIP Order**"), shall have been entered by the Bankruptcy Court on or before 12/17/2025 and shall not have been vacated, reversed or stayed, appealed, or modified or amended without the prior written consent of the DIP Lender. Notwithstanding anything to the contrary contained herein, funding of the Interim Advance shall be subject to entry of the Interim DIP Order, and funding of the balance of the DIP Commitment shall be subject to entry, within sixty (60) days following the filing of the motion seeking authorizing to enter into the DIP Facility (the "**DIP Motion**"), of a final debtor-in-possession financing order, substantially on the terms contemplated by this Term Sheet (the "**Final DIP Order**" and, together with the Interim DIP Order, collectively, the "**DIP Financing Orders**"), which shall not have been |

| | |
|---|---|
| | vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the DIP Lender; and |
| | vii.   such other deliverables as the DIP Lender may reasonably require. |
| | Modification of the DIP Financing Orders shall require the consent of the DIP Lender or Court approval. With the exception of condition vi. (entry of DIP Financing Orders), DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| Conditions Precedent to DIP Loans | The obligations of the DIP Lender to make the Interim Advance shall only be subject to sections (i) and (ii)(a), (iii), (v), (vi), and (vii). The obligations of the DIP lender to make any other advances shall be subject to the following: |
| | i.   the CRO shall be employed by the Debtor; |
| | ii.   (a) with regard to the Interim Advance, the Interim DIP Order shall have been entered and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and (b) with regard to the balance of the DIP Facility Loans, the Final DIP Order shall have been entered in a form acceptable to the DIP Lender in its sole and exclusive discretion and shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay; |

180104438.3

| | |
|---|---|
| | iii. the Debtors shall be in compliance with the terms of the Interim DIP Order or the Final DIP Order, as applicable; |
| | iv. the Approved Budget shall demonstrate a need for the funds to be advanced under the DIP Facility; |
| | v. each Debtor shall have provided a certificate signed by an officer confirming that all of the representations and warranties of the Debtors in this Term Sheet or the DIP Documents, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; |
| | vi. there shall be no defaults or Events of Default under the terms of this Term Sheet or the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender; and |
| | vii. the Debtors shall be in compliance with the Milestones (as set forth below). |
| | With the exception of condition ii. above (entry of Interim DIP Order and entry of Final DIP Order), the DIP Lender may, in its sole discretion, waive any of the above conditions precedent. |
| Milestones | Subject to entry of the Final DIP Order and the availability of the Bankruptcy Court, each of the Debtors will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "**Milestones**"):<br><br>i. The Bankruptcy Court shall have entered the Interim DIP Order on or before 12/17/2025. |

| | |
|---|---|
| | ii. The Debtors shall have sought in the Cases the retention of Michael Lane as chief restructuring officer, or any other person(s) acceptable to the DIP Lender (the "**CRO**"), the CRO by the date that is no later than ten (10) days following the filing of the DIP Motion. |
| | iii. By the date that is no later than ten (10) days following the filing of the DIP Motion, the Debtors shall have sought the retention of Cain Brothers, a division of KeyBanc Capital Markets, as investment banker (the "**Investment Banker**"). |
| | iv. The Bankruptcy Court shall have entered the Final DIP Order by the date that is no later than sixty (60) days after the filing of the DIP Motion. |
| | v. The Debtors shall file, by the date that is no later than thirty (30) days after the Petition Date, a motion to approve bidding procedures and to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "**Sale Motion**"). |
| | vi. The Bankruptcy Court shall have entered an order approving the bidding procedures for the sale contemplated by the Sale Motion (the "**Sale**") by the date that is no later than sixty (60) days after the Petition Date. |
| | vii. The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than May 15, 2026. |
| | viii. The Sale shall be consummated by the date that is no later than December 31, 2026. |
| | ix. An order confirming a liquidating chapter 11 plan shall have been entered by the Bankruptcy Court by the date that is no later than ninety (90) days after consummation of the Sale. |
| | The extension of any Milestone is subject to the consent of the DIP Lender at its sole discretion or further Court order. |

| | |
|---|---|
| Representations and Warranties | Unless otherwise ordered by the Court, the Final DIP Order will contain representations and warranties customary for debtor-in-possession facilities of this size, type and purpose, including: corporate organization; qualification; power; financial condition; no material litigation; no material adverse change (excluding the commencement of the Cases); no conflict with law or contractual obligations; authority; enforceable obligations; governmental approvals; ERISA; taxes; properties; Investment Company Act; material agreements and liens; environmental matters; capitalization; subsidiaries, investments, etc.; true and complete disclosure; restrictive agreements; collateral; security agreements; and any regulatory matters. |
| Reporting and Information | Reporting requirements usual and customary for financings of this type, including, without limitation, the requirement that the Debtors provide the DIP Lender, with reasonable promptness, such information regarding the operations, business affairs and financial condition of the Debtors as the DIP Lender may reasonably request in writing from time to time. |
| Budget; Variance Covenant; Other Financing Covenants | The Debtor has delivered a 13-week cash flow forecast approved by, the DIP Lender which is attached to the Interim DIP Order (the "**Approved Budget**"), setting forth cash receipts and the disbursements (including payment of trade payables and expenses, and working capital and other general corporate needs) of the Debtor for the period covered thereby, delivered by the Debtors to the DIP Lender on or before entry of the Interim DIP Order; provided that the Debtors shall deliver every 4 weeks thereafter an updated rolling 13-week cash flow forecast in substantially the same form as the initial Approved Budget and which such updated cash flow forecast shall constitute the "Approved Budget" once approved by the DIP Lender (provided, that, until the DIP Lender approves any such updated cash flow forecast, the most recent 13-week cash flow forecast approved by the DIP Lender shall continue to be the Approved Budget). The Debtors shall maintain a minimum cash balance of $5 million measured weekly.<br><br>The Debtor will deliver a weekly variance and compliance report by each Thursday at 5:00 p.m. Pacific time, beginning on the 2nd Thursday following the Petition Date, in a form and with supporting information |

| | in detail acceptable to the DIP Lender, showing the comparison of, and the variances between, actual performance to projections for each line item) of the Approved Budget and reconciling the sources, uses and disbursements of cash, for each trailing four-week measurement period (or, solely in the case of the line item for HQAF receipts, each trailing eight-weeks) (each a "**Measurement Period**") ending on the immediately preceding Sunday (each a "**Variance Report**") and simultaneously with the delivery of the Variance Report, a certificate from the Chief Executive Officer, Chief Financial Officer or other senior officer of the Debtors showing the calculation of and compliance (or non-compliance) with the Permitted Variance for such Measurement Period (such non-compliance to constitute an Event of Default). |
|---|---|

"Permitted Variance" means an unfavorable variance of not greater than:

(i)     10% between the actual disbursements for the applicable Measurement Period from the projected disbursements for such Testing Period as set forth in the Approved Budget;

(ii)    15% between the actual receipts for the applicable Measurement Period from the projected receipts for such Testing Period, in each case excluding HQAF receipts, as set forth in the Approved Budget; and

(iii)   7.5% between the actual HQAF receipts related to Program VIII for the applicable Measurement Period from the projected HQAF receipts related to Program VIII for such Measurement Period, as set for in the Approved Budget.

If the actual variances for such period are less than or equal to the applicable Permitted Variance, the amount by which the actual variances is less than the applicable Permitted Variance shall be carried forward to the next Measurement Period and added to the applicable Permitted Variance for such next Measurement Period; provided that such carryforward, if unused, shall not be permitted to be carried forward to the next two succeeding Measurement Periods.

| | |
|---|---|
| | The financial advisor for the DIP Lender, the CRO and the financial advisor for the Debtors shall hold bi-weekly calls to discuss the Budget and relevant portions of the Cases, including actual performance against the Approved Budget, status of the Sale process, and business updates.<br><br>The Investment Banker shall provide written weekly process reporting to the financial advisor for the DIP Lender and shall hold weekly calls with DIP Lender, the Master Trustee and Directing Bondholders and their financial advisors.<br><br>The DIP Lender may, in its sole discretion, waive or extend any of the foregoing Approved Budget or Variance reporting or approval procedures, unless otherwise ordered by the Court. |
| Affirmative Covenants | The DIP Documents will contain affirmative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited, to the following as reasonably determined by the DIP Lender:<br><br>　i.　Compliance with the Milestones.<br><br>　ii.　The Debtors shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Cases and all applicable laws, rules and regulations, (b) provide reasonable access to the DIP Lender to the Debtor's financial advisors, management team and books and records and other information (including historical information), in all cases, |

<table>
<tr>
<td></td>
<td>including with respect to strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions) during normal business hours, and (c) operate in the ordinary course of business.</td>
</tr>
<tr>
<td></td>
<td>iii.　Compliance with the Approved Budget, subject to the Permitted Variances, and delivery of each Proposed Budget and Variance Report.</td>
</tr>
<tr>
<td></td>
<td>The DIP Lender may, in its sole discretion, waive any of the above affirmative covenants, unless otherwise ordered by the Court.</td>
</tr>
<tr>
<td>Negative Covenants</td>
<td>Unless otherwise ordered by the Court, the Final DIP Order will contain negative covenants customary for debtor-in-possession facilities of this size, type and purpose including, but not limited to, the following as reasonably determined by the DIP Lender:

i.　The Debtors will not seek any other debtor-in-possession financing with liens senior or *pari passu* to the DIP Lender's liens during the pendency of its bankruptcy proceedings, except with respect to any additional funding sought from the Funding Bondholders as contemplated herein.

ii.　The Debtors shall not use any funds or the proceeds of the DIP Facility in a manner or for a purpose other than in accordance the Approved Budget, or on such other terms as the DIP Lender may agree.

iii.　Without the prior written consent of the DIP Lender, the Debtors will not sell, lease or otherwise transfer or dispose of any material assets of the Debtors, other than in the ordinary course of business, pursuant to the Sale, or otherwise in accordance with the Approved Budget.

iv.　The Debtors shall not open any new deposit or securities accounts; provided however, the Debtors may open deposit or securities accounts if such account is pledged to the DIP Lender and the DIP Lender has received an account control agreement in form and substance reasonably acceptable to the DIP Lender.</td>
</tr>
</table>

|  | The Debtors shall not do or cause to be done any of the following: (a) create, incur, assume or permit to exist any indebtedness or liens, other than in respect of the DIP Facility, other than Permitted Liens (as defined in the applicable |
| --- | --- |

documents); (b) purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned subsidiary immediately prior to such merger, consolidation or amalgamation) any equity interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to or guarantees of the obligations of, or make or permit to exist any investment or any other interest in any other person other than the subsidiaries of the Debtors as of the Petition Date; (c) merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Borrower or any subsidiary of any Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) the contemplated Sale, (iii) asset sales in the ordinary course of business and consistent with past practice and (iv) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice; (d) incur or make any dividend or distribution (whether in cash, property, securities or otherwise), investment, loan or other payment without the prior written consent of the DIP Lender, other than as expressly contemplated under the Approved Budget; (e) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to the DIP Lender;

| | |
|---|---|
| | (f) engage in any activities that would result in any Borrower becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; or (g) transfer any cash or cash equivalents that constitute DIP Collateral to a subsidiary of any Borrower without the prior written approval of the DIP Lender (other than as expressly contemplated under the Approved Budget. |
| | v.    Such additional covenants as the DIP Lender and the Debtors may agree. |
| | The DIP Lender may, in its sole discretion, waive any of the above negative covenants, unless otherwise ordered by the Court. |

| Events of Default | The following shall constitute events of default (each an "**Event of Default**"): |
|---|---|
| | i.      the Interim DIP Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended, or shall not have been entered on or before December 17, 2025; |
| | ii.      the Final DIP Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, modified or amended, or shall not have been entered within sixty (60) days after the Interim Order is entered; |
| | iii.      failure of the Debtors to retain and continually employ the CRO; |
| | iv.      failure of the Debtors to comply in any material respect with the terms of the applicable DIP Financing Order; |
| | v.      the failure of the Debtors to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with the covenants set forth in the Final DIP Order |

|  | ; |
|  | vi.    other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget to the extent authorized by one or more "first day" orders, or other orders reasonably satisfactory to the DIP Lender, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; |
|  | vii.   any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 trustee or an examiner (other than a fee examiner) with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed, (b) any other superpriority claim or grant of any other lien (including any adequate protection lien) other than as provided for herein which is *pari passu* with or senior to the claims and liens of the DIP Lender shall be granted in any of the Cases, or (c) the filing of any pleading by any Debtor seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (vii); |
|  | viii.  the Bankruptcy Court shall enter one or more orders during the pendency of the Cases granting relief from the automatic stay to the holder or holders of any lien evidencing indebtedness in excess of $1 million to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor; |

| | | |
|---|---|---|
| | ix. | any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility; |
| | x. | the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates; |
| | xi. | the consummation of a sale of any material portion of the DIP Collateral without the DIP Lender's prior written consent (other than through the contemplated Sale or a sale in the ordinary course of business that is contemplated by the Approved Budget); |
| | xii. | the confirmation of a plan of reorganization or liquidation that does not provide for payment in full in cash of the DIP Facility Loans or such other treatment acceptable to the DIP Lender, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation; |
| | xiii. | subject to responding to requests by the Committee or other parties in interest, any Debtor (A) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender; |
| | xiv. | the entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in these Cases by the U.S. Trustee (each, a "**Committee**"), any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the DIP Lender, or (ii) avoiding any liens held by the DIP Lender; |
| | xv. | the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the DIP Collateral; |

180104438.3

| | |
|---|---|
| | xvi. the inaccuracy in any material respect of any representation of any Debtor when made or deemed made; |
| | xvii. the failure to meet any Milestone; and |
| | xviii. the Termination Date (as defined below) shall have occurred. |
| Remedies | Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: |
| | i. issue a written notice (the "**Remedies Notice**") (which may be by e-mail) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "**Remedies Notice Parties**") declaring the occurrence of the Termination Date (as defined below); |
| | ii. issue a Carve-Out Notice (as defined below); |
| | iii. declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; |
| | iv. declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "**Termination Notice**"); and |
| | v. charge the default rate of interest under the DIP Facility. |

| | |
|---|---|
| | During the five business (5) days immediately following the date the DIP Lender delivers a Remedies Notice to the Remedies Notice Parties (the "**Remedies Notice Period**"), the DIP Lender and/or Debtors may seek an emergency hearing (a "**Stay Relief Hearing**") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under this Term Sheet, the Interim DIP Order, and/or the Final DIP Order, as applicable.<br><br>Upon expiration of the Remedies Notice Period, if a motion seeking emergency relief has not been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit the DIP Lender to exercise any and all remedies against the DIP Collateral permitted under state law.<br><br>During the Remedies Notice Period, the Debtors shall be authorized to use cash collateral in accordance with the Approved Budget. |
| Maturity/Termination Date | The DIP Facility shall automatically terminate without further notice or court proceedings on the earliest to occur of:<br><br>i.    January 8, 2027 (the "**Scheduled Maturity Date**");<br><br>ii.    the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases;<br><br>iii.    the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use cash |

| | |
|---|---|
| | collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing; |
| | iv. the first business day on which the Interim DIP Order expires by its terms or is terminated, unless the Final DIP Order has been entered and become effective prior thereto; |
| | v. the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; |
| | vi. the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; or |
| | vii. the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility |
| | (each, a "**Termination Date**"), unless extended with the prior written consent (which may be by e-mail) of the DIP Lender, or further order of the Court. |
| Carve out | Notwithstanding anything to the contrary in this Term Sheet or the DIP Financing Orders, the DIP Facility shall be subject and subordinate to the Carve-Out. |
| | The "**Carve-Out**" shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), and (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice) |

| | |
|---|---|
| Credit Bidding | The Final DIP Order shall provide that the DIP Lender and the Master Trustee shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Facility Loans and the Bond Obligations in whole or in part, in connection with any sale or disposition of assets by the Debtors in the Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |

| Waivers | The Final DIP Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral or the Pre-Petition Bond Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Master Trustee, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Master Trustee; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral or by the Master Trustee on the Pre-Petition Bond Collateral. |
| | The Final DIP Order shall provide that the DIP Lender and the Master Trustee shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. |
| | Furthermore, subject to entry of the Final DIP Order, each Debtor in the Cases and its estate shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender or the Master Trustee on any property acquired by such Debtor or its estate or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral |

| | |
|---|---|
| | or the Master Trustee upon the Pre-Petition Bond Collateral. |
| No Marshalling | The Final DIP Order shall provide that the DIP Lender may exercise all remedies available under this Term Sheet and the DIP Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final DIP Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans. |
| Indemnification: | The Final DIP Order shall provide that the Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. |

page

| Governing Law | The laws of the State of California (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
|---|---|
| Bankruptcy Court Authority | Notwithstanding anything to the contrary herein, the Parties agree that any dispute between the Parties, including, but not limited to, any dispute related to the exercise of discretion by the DIP Lender or the Debtors, shall be resolved by the Bankruptcy Court. |

IN WITNESS WHEREOF, this DIP Sheet is duly executed as of the date first set forth above.

**BORROWERS:**

**OROVILLE HOSPITAL**

By: _____
Name:

Title:

**OROHEALTH CORPORATION**

By: _____
Name:

Title:

**DIP LENDER:**

**UMB BANK, N.A., AS SERIES 2019 BOND TRUSTEE AND MASTER TRUSTEE, AS APPLICABLE**

By: _____
Name:

Title:

Schedule I

DIP LENDER

The DIP Lender herein is UMB Bank, N.A., as successor Series 2019 Bond Trustee as described below.

The City of Oroville (the "**Issuer**") issued its Revenue Bonds (Oroville Hospital) Series 2018 in the original aggregate principal amount of $19,600,000 (the "**Series 2018 Bonds**") pursuant to the Amended and Restated Bond Indenture dated as of June, 2018 (the "**Series 2018 Bond Indenture**"), by and between the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Series 2018 Bond Trustee**"). In connection with the issuance of the Series 2018 Bonds, the Borrower, as Obligated Group Representative, on behalf of itself and the other Members of the Obligated Group and U.S. Bank National Association, as successor to MUFG Union Bank, N.A. ("**U.S. Bank**"), entered into that certain Amended and Restated Continuing Covenant Agreement dated as of June, 2018 (the "**Continuing Covenant Agreement**"). The proceeds of the Series 2018 Bonds were loaned by the Issuer to the Borrower pursuant to that certain Amended and Restated Loan Agreement dated as of June, 2018 (the "**Series 2018 Loan Agreement**").

Pursuant to that certain Bond Indenture dated as of February 1, 2019 (the "**Series 2019 Bond Indenture**" and, together with the Series 2018 Bond Indenture, the "**Bond Indentures**"), by and between the Issuer and The Bank of New York Mellon Trust Company, N.A., as Bond Trustee (the "**Prior Bond Trustee**"), the Issuer issued its Revenue Bonds (Oroville Hospital) Series 2019 in the original aggregate principal amount of $195,630,000 (the "**Series 2019 Bonds**," and, together with the Series 2018 Bonds, the "**Bonds**"). The proceeds of the Series 2019 Bonds were loaned by the Issuer to the Borrower pursuant to that certain Loan Agreement, dated as of February 1, 2019 (the "**Series 2019 Loan Agreement**, and, together with the Series 2018 Loan Agreement, the "**Loan Agreements**").

The Borrower and The Bank of New York Mellon Trust Company, N.A., as Master Trustee (the "**Prior Master Trustee**") entered into that certain Master Indenture of Trust dated as of February 1, 2019, as amended or supplemented (the "**Master Indenture**") evidencing the Borrower's obligation to pay the amounts due thereunder.

Pursuant to that certain Related Supplement for Obligation No. 1, the Borrower issued its Oroville Hospital Obligation No. 1 ("**Obligation No. 1**") in the original principal amount of $19,600,000 for the benefit of the Series 2018 Bond Trustee, to evidence the obligation of the Borrower under the Series 2018 Loan Agreement to make payments sufficient to pay the principal of, premium, if any, and interest on the Series 2018 Bonds.

Pursuant to that certain Related Supplement for Obligation No. 2, the Borrower issued its Oroville Hospital Obligation No. 2 ("**Obligation No. 2**") in the original principal amount of $19,600,000 for the benefit of U.S. Bank, to evidence the obligations of the Borrower under the Continuing Covenant Agreement.

Pursuant to that certain Related Supplement for Obligation No. 3, the Borrower issued its Oroville Hospital Obligation No. 3 ("**Obligation No. 3**" and, together with Obligation No. 1 and Obligation No. 2, the "**Bond Obligations**") in the principal amount of $195,630,000 for the benefit of the Series 2019 Bond Trustee, as successor to the Prior Bond Trustee, to evidence the obligation of the Borrower under the Series 2019 Loan Agreement to make payments sufficient to pay the principal of, premium, if any, and interest on the Series 2019 Bonds.

The Bond Obligations due under the Master Indenture are secured by liens on certain of the Borrower's assets including pursuant to a certain Deed of Trust and Assignment of Rents dated as of February 1, 2019 (the "**Deed of Trust**"), relating to the Borrower's real property and certain other assets.

Effective August 17, 2023, pursuant to that certain Instrument of Removal and Appointment dated August 17, 2023, The Bank of New York Mellon Trust Company, N.A., was removed as master trustee under the Master Indenture and as bond trustee under the 2019 Bond Indenture, and UMB Bank, N.A. was appointed as master trustee (the "**Master Trustee**") under the Master Indenture and as bond trustee under the Series 2019 Bond Indenture (the "**Series 2019 Bond Trustee**") and has accepted such appointments.

The holders of a majority of the aggregate outstanding principal amount of the Series 2019 Bonds (the "**Series 2019 Directing Bondholders**") have directed the Series 2019 Bond Trustee to enter into the DIP Facility.

The Master Indenture, the Bond Indentures, the Loan Agreements, the Bond Obligations, the Deed of Trust, the Continuing Covenant Agreement and all of the other documents executed in connection with the issuance of the Bonds are referred to herein as the "**Bond Documents**." The Bond Obligations are secured by (i) all of the Debtor's personal property, and (ii) all of the real property subject to the Deed of Trust (the "**Pre-Petition Bond Collateral**")

## Schedule II

a) Any lien of a lender listed below solely with respect to the mortgaged real property listed across such lender to the extent such lien is, as of the Petition Date, valid, enforceable, properly perfected and non-avoidable.

| Lendor | APN # | Address |
| --- | --- | --- |
| First Citizens | 013-190-028-000 | 2784 Fay Way |
| First Citizens | 013-190-027-000 | 2786 Fay Way |
| First Citizens | 013-190-055-000 | 2788 Fay Way |
| First Citizens | 013-190-007-000 | 2635 Olive Highway |
| First Citizens | 013-190-005-000 | 2655 Olive Highway |
| First Citizens | 013-270-041-000 | 2734 Gilmore Lane |
| First Citizens | 013-190-058-000 | 2711 Oro Dam Blvd |
| First Citizens | 013-190-019-000 | 2713 Oro Dam Blvd |
| First Citizens | 035-430-140-000 | 2220 5th Avenue |
| First Citizens | 035-340-015-000 | 2828 Feather River Blvd. |
| First Citizens | 013-190-004-000 | 2665 Olive Highway |
| First Citizens | 013-190-002-000 | 2685 Olive Highway |
| First Citizens | 013-190-003-000 | 2675 Olive Highway |
| First Citizens | 013-190-006-000 | 2645 Olive Highway |
| First Citizens | 013-260-062-000 | 2721 Olive Highway |
| Trisha L. Hopps | 052-222-005-000 | 5543 Black Olive Drive |
| Trisha L. Hopps | 052-222-006-000 | 5537 Black Olive Drive |
| Mechanics Bank | 033-390-054-000 | 3579 Oro Dam Blvd. |
| Mechanics Bank | 013-300-119-000 | 2971 & 2981 Olive Highway |

b) Any properly perfected lien of Tri-Counties Bank in equipment that was not released as of the Petition Date.

180104438.3

**<u>Exhibit 2</u>**

**Approved Budget**

**Oroville Hospital, et. al.**
*13-Week DIP Budget as of 12/11/25*

($ '000s)

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13-Weeks |
| Week ending | 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan | 6-Feb | 13-Feb | 20-Feb | 27-Feb | 6-Mar | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | 6,772.8 | 6,856.8 | 6,681.2 | 5,724.5 | 6,669.9 | 7,385.0 | 6,985.0 | 8,154.7 | 6,117.2 | 6,117.2 | 6,517.2 | 6,117.2 | 6,079.7 | 86,178.5 |
| **Payroll & Benefits** | | | | | | | | | | | | | | |
| Physician Payments | - | (6,704.0) | - | - | - | (6,600.0) | - | - | - | - | (6,600.0) | - | - | (19,904.0) |
| Payroll | (1,889.3) | (4,050.6) | (1,889.3) | (4,015.9) | (1,889.3) | (4,050.6) | (1,889.3) | (4,050.6) | (1,854.6) | (4,050.6) | (1,889.3) | (4,050.6) | (1,854.6) | (37,424.8) |
| Employee Benefits | (1,698.8) | (943.5) | (253.0) | (1,278.7) | (253.0) | (443.5) | (253.0) | (443.5) | (1,088.3) | (443.5) | (253.0) | (443.5) | (1,088.3) | (8,883.3) |
| **Total Payroll & Benefits** | (3,588.1) | (11,698.1) | (2,142.3) | (5,294.7) | (2,142.3) | (11,094.1) | (2,142.3) | (4,494.1) | (2,942.9) | (4,494.1) | (8,742.3) | (4,494.1) | (2,942.9) | (66,212.1) |
| **Disbursements** | | | | | | | | | | | | | | |
| Suppliers | (750.0) | (1,978.8) | (2,882.5) | (2,511.4) | (2,385.1) | (2,559.4) | (1,949.7) | (2,218.7) | (1,951.0) | (2,114.1) | (1,951.1) | (2,224.1) | (1,883.8) | (27,359.8) |
| Affiliates [1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | (234.8) | - | - | (399.9) | - | - | - | - | (593.5) | - | - | - | (433.3) | (1,661.5) |
| Tower | - | (80.0) | (291.9) | - | - | - | - | (481.9) | - | - | - | (481.9) | - | (1,335.8) |
| UST / PCO Fees | (6.7) | (6.7) | (6.7) | (6.7) | (6.7) | (6.7) | (6.7) | (306.7) | (6.7) | (6.7) | (6.7) | (6.7) | (6.7) | (386.7) |
| Utility Deposits | - | (306.1) | - | - | - | - | - | - | - | - | - | - | - | (306.1) |
| CRO | (75.0) | - | - | - | (75.0) | - | - | - | (75.0) | - | - | - | (75.0) | (300.0) |
| **Total Disbursements [2]** | (1,066.5) | (2,371.5) | (3,181.1) | (2,918.0) | (2,467.0) | (2,566.0) | (1,956.4) | (3,007.3) | (2,626.2) | (2,120.7) | (1,957.8) | (2,712.7) | (2,398.8) | (31,349.9) |
| **Cash Flow from Operations** | 2,118.3 | (7,212.8) | 1,357.8 | (2,488.1) | 2,060.6 | (6,275.1) | 2,886.3 | 653.4 | 548.1 | (497.6) | (4,182.9) | (1,089.6) | 738.1 | (11,383.5) |
| **Beginning Balance** | 6,469.6 | 18,587.8 | 11,375.0 | 12,732.9 | 10,244.7 | 12,305.3 | 6,030.2 | 8,916.5 | 9,569.9 | 10,118.0 | 9,620.4 | 7,437.6 | 6,348.0 | 6,469.6 |
| Change in Cash | 2,118.3 | (7,212.8) | 1,357.8 | (2,488.1) | 2,060.6 | (6,275.1) | 2,886.3 | 653.4 | 548.1 | (497.6) | (4,182.9) | (1,089.6) | 738.1 | (11,383.5) |
| (+) DIP Funding | 10,000.0 | - | - | - | - | - | - | - | - | - | 2,000.0 | - | - | 12,000.0 |
| **Ending Available Cash** | 18,587.8 | 11,375.0 | 12,732.9 | 10,244.7 | 12,305.3 | 6,030.2 | 8,916.5 | 9,569.9 | 10,118.0 | 9,620.4 | 7,437.6 | 6,348.0 | 7,086.1 | 7,086.1 |

(1) Contractual payments to affiliates are not reflected in the budget during this period.

(2) The Debtors' professionals and UCC advisors when selected will incur professional fees during this period, the payment timing of which is to be discussed.