**16**

HAROLD D. ISRAEL (*pro hac vice pending*)
JACK R. O'CONNOR (*pro hac vice pending*)
**LEVENFELD PEARLSTEIN, LLC**
120 S. Riverside Plz., Ste. 1800
Chicago, IL 60606
Phone: 312.346.8380
hisrael@lplegal.com
joconnor@lplegal.com

GREGORY A. ROUGEAU (194437)
BRUNETTI ROUGEAU LLP
235 Montgomery Street, Suite 830
San Francisco, CA 94104
Phone: (415) 992-8957
grougeau@brlawsf.com

Attorneys for Landlord-Creditor
Landmark Healthcare Facilities LLC

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>OROVILLE HOSPITAL, *et al.*,<br><br>Debtors. | Case No. 25-26876<br><br>DCN: GAR-1<br><br>Chapter 11<br>Hon. Christopher D. Jaime<br><br>(Jointly Administered with: 25-26877)<br><br>Date: October 6, 2026<br>Time: 11:00 a.m.<br>Ctrm: 32<br>Judge: Hon. Christopher D. Jaime |

**Reply in Support of Landmark Healthcare Facilities LLC's Motion for Entry of an Order (A) Allowing its Administrative Expense Claim Under 11 U.S.C. § 503(b) and Compelling Debtors to Immediately Pay Same; or, in the Alternative, (B) Compelling OH Debtor to Reject Executory Contract**

# TABLE OF CONTENTS

REPLY ..... 1

A. Landmark has carried its burden under § 503(b)(1)(A). ..... 2

B. The Debtors' speculative valuation of Landmark's postpetition Services is unfounded. ..... 5

C. Section 502(d) has no bearing on Landmark's claim for administrative expense. ..... 7

D. The DIP Budget is not a defense to immediate payment for the postpetition Services. ..... 10

E. The Court must compel the Debtors to reject the CMA if they will not pay for Landmark's Services. ..... 11

CONCLUSION ..... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*, 291 B.R. 283 (Bankr. S.D.N.Y. 2003) ..... 12

*ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 582 F.3d 422 (2d Cir. 2009) ..... 7, 8

*Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC)*, 583 B.R. 494 (B.A.P. 9th Cir. 2018) ..... 5

*Campbell v. United States (In re Davis)*, 889 F.2d 658 (5th Cir. 1989) ..... 8

*In re DAK Indus., Inc.*, 66 F.3d 1091 (9th Cir. 1995) ..... 4

*In re HQ Global Holdings, Inc.*, 282 B.R. 169 (Bankr. D. Del. 2002) ..... 11

*In re Lids Corp.*, 260 B.R. 680 (Bankr. D. Del. 2001) ..... 8

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 107 Cal. Rptr. 2d 645 (2001), *as modified* (June 8, 2001) ..... 3, 4

*In re MicroAge, Inc.*, 291 B.R. 503 (B.A.P. 9th Cir. 2002) ..... 8, 9

*In re Parker North American Corp.* 24 F.3d 1145 (9th Cir. BAP 1994) ..... 8

*In re Southern Produce Dist., Inc.*, 616 B.R. 667 (Bankr. E.D.N.C. 2020) ..... 8

**Statutes**

U.S.C. § 548(a)(1)(B) ..... 10

*11 U.S.C. § 503(b) and* ..... 1

Bankruptcy Code § 362(a) ... 10

Bankruptcy Code § 502(d) ... *passim*

**Other Authorities**

*Memorandum of Points and Authorities* (the "Memo") ... 1

Landmark Healthcare Facilities LLC ("Landmark") through its undersigned counsel, files this reply (the "Reply") to the *Debtors' Opposition to Landmark Healthcare Facilities, LLC's Motion for Entry of an Order (A) Allowing its Administrative Expense Claim Under 11 U.S.C. § 503(b) and to Compel Debtors to Immediately Pay Same; or in the Alternative, (B) Compelling OH Debtor to Reject Executory Contract* (the "Opposition"), (Dkt. 1243) and in further support of its *Motion for Entry of an Order (A) Allowing its Administrative Expense Claim Under 11 U.S.C. § 503(b) and to Compel Debtors to Immediately Pay Same; or in the Alternative, (B) Compelling OH Debtor to Reject Executory Contract* (collectively with all supporting documents and evidence, the "Motion"). (Dkts. 1174-78).

In further support of the Motion, Landmark submits the *Supplement to Declaration of Deeni Taylor in Support of Landmark Healthcare Facilities, LLC's Motion for (A) Allowance of Administrative Expense Claim Under 11 U.S.C. § 503(b) and to Compel Debtors to Immediately Pay Same; or (B) Order Compelling Debtors to Reject Executory Contract, in the Alternative* (the "Taylor Supplement") and states as follows:

**REPLY**

The Debtors[1] admit the primary allegations set forth in the Motion. The Debtors were aware of, and continued to accept, Landmark's Services after the Petition Date, retained the benefit of those Services, and paid Landmark nothing for them. They instead ask the Court to ignore the contract between the parties, adopt a new compensation theory, and require Landmark to continue performing while the Debtors preserve the option to assume the CMA for a future purchaser or reorganization process.

The Debtors' position is internally inconsistent. They contend that Landmark's work has little or no ascertainable value, yet they resist rejection because the CMA may remain important to

[1] Capitalized terms used but not defined in this Reply bear the meanings given to them in the *Memorandum of Points and Authorities* (the "Memo") filed by Landmark in support of the Motion, at Docket number 1176.

completing the Tower Project or maximizing estate value. They characterize the longstanding monthly payment as unauthorized, yet the Debtors paid that amount for approximately seventy-eight months. And they invoke § 502(d) as a basis to disallow a § 503(b) administrative expense despite clear circuit court authority holding that § 502(d) does not bar payment of an administrative claim.

The Motion should be granted. The record establishes that Landmark performed postpetition services requested and accepted by the Debtors, and that those services directly benefited the estates. Alternatively, if the Court determines that the amount of Landmark's administrative expense requires further evidence, then the Court should allow the claim in an amount supported by the record, establish a prompt procedure to determine any balance, and require the Debtors to assume and cure or reject the CMA within seven days of entering any order granting the Motion.

**A. Landmark has carried its burden under § 503(b)(1)(A).**

The Debtors assert that Landmark has not met its burden under § 503(b)(1)(A) to show that its postpetition Services were actual and necessary, or that the flat rate charged by Landmark under the CMA is reasonable. This ignores both the facts of this Case, and the mutually beneficial economics of the CMA's flat-rate structure.

Notably, the Debtors do not dispute that Landmark has continued providing Services postpetition. And the Debtors' own evidence demonstrates that Landmark's Services are actual and necessary to their estates. First, the Project is not complete. The Chapple Declaration (as defined in the Opposition) confirms this fact. *See* (Chapple Decl. ¶ 14). The Debtors cannot obtain a certificate of occupancy for the Tower until the Project is complete, which requires the services of a Project Manager.

Second, as the Debtors acknowledge, there is no general contractor at the Project because Modern-Sundt was terminated in March 2024 and never replaced, meaning that Landmark has been sole party overseeing management of the Project since March, 2024. *See* (Opp. at p. 8). The Debtors

wrongly assert, however, that "after the Petition Date, Landmark had significantly reduced its staffing to a single project manager, Miles Fox[.]" *Id.* As set forth in the Fox Declaration and the Taylor Supplement, Landmark's staffing for the Project has not materially changed between pre- and postpetition periods. Mr. Fox has been the main project manager performing the Services since being assigned to the Project, and in the approximately seven and a half years since Landmark has been performing under the CMA, Landmark only assigned additional staff to the Project when the Debtors' demands were more than Mr. Fox could handle by himself. For example, when Modern-Sundt stopped working on the Project in 2024, Landmark assigned an additional employee for approximately one year to facilitate contracting with subcontractors at the site. *See* (Taylor Supp. at p. 2. Following that time, a few other Landmark employees worked on the Project with Mr. Fox, primarily to assist him from time to time with submitting change orders required by the Debtors. *Id.* In short, Landmark's staffing has been consistent for the duration of the Project, both pre- and postpetition.

Third, as the Fox Declaration makes clear, the Debtors have not reduced the Services they requested that Landmark perform, but instead recently asked Landmark to *expand* its services by requesting that Landmark continue performing *past* issuance of a certificate of occupancy, through licensure. *See* (Fox Decl. ¶ 8).

Fourth, the Debtors' argument that the flat rate charged by Landmark under the CMA does not constitute reasonably equivalent value for the Services performed should be disregarded due to the Debtors' own course of dealing under the CMA, regularly paying Landmark its flat monthly fee for ***78 consecutive months***. *See* (Taylor Decl. 2:16-19); *see also Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1050-51, 107 Cal. Rptr. 2d 645, 652 (2001), *as modified* (June 8, 2001) (interpreting California law to find parties' course of dealing over years established meaning of contract terms). Moreover, Landmark's agreement to provide

Additional Services under the CMA at a flat monthly rate was entirely reasonable. Most if not all, construction projects are front-loaded, requiring significantly more work at the beginning of a project and fluctuating as the project proceeds. To account for these inevitable fluctuations in construction activity during a project, a flat rate structure provides budgetary clarity to an owner, and ensures that the project manager is fairly compensated for its tenure at a project, especially if the project is delayed through no fault of the project manager. *See* (Fox Decl. ¶ 8) (describing Landmark's Services and Debtors' requests to expand the scope of such Services). Landmark further notes that in the Opposition, the Debtors wholly ignore the significant costs they will incur if they reject the CMA.

Fifth, the Debtors' monthly operating reports (the "MORs") constitute an admission that the Project costs are actual and necessary administrative expenses, including a specific line item in each report to recap monthly cash disbursements for "Tower Construction." *See* (Dkts. 494-95, 569, 684, 790, 967, 1016, 1156, 1231). From the Petition Date through the end of August 2026, The Debtors have paid approximately $363,873.00 under this line item, but not a penny to Landmark for ensuring the work paid for was performed. *Id.*

Finally, the Debtors complain that Landmark submitted no timesheets. As discussed above and in the Motion, the CMA is not an hourly engagement and there is no requirement under the CMA to provide timesheets.

Landmark has satisfied its burden under § 503(b)(1)(A) as articulated under *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995). The Services were provided to the Debtors postpetition, and directly, substantially benefited the estates. The Motion should be granted and Landmark's claim should be allowed.

**B. The Debtors' speculative valuation of Landmark's postpetition Services is unfounded.**

The Debtors' reliance on *Boruff v. Cook Inlet Energy LLC (In re Cook Inlet Energy LLC),* 583 B.R. 494, 502-03 (B.A.P. 9th Cir. 2018) ("*Cook Inlet II*") is misplaced as *Cook Inlet II* is fully distinguishable. The *Cook Inlet II* court evaluated an employee's unsubstantiated claim for administrative expenses for salary and wages after his employment contract had been rejected by the debtor-employer. *See id.* at 502 (claimant's postpetition efforts were ill-defined, unproductive, and duplicative of another professional's work). In fact, the *Cook Inlet II* court expressly acknowledged that a contract rate impacts a court's determination to allow an administrative expense claim, requiring that the claimant carry its burden under § 503(b). *See id.* at 502-03.

The CMA has not been rejected, and Landmark has substantiated the Services it has continuously provided with respect to an on-site management of an incomplete, critical capital project that will, as set forth in the First Day Declaration, increase licensed beds from 133 to 211 and bring the hospital into seismic compliance by January 1, 2030. (Dkt. 20 ¶ 37). The Debtors cannot describe the Tower Project as central to their enterprise when seeking first-day relief, and then as marginal when the bill comes due, particularly when the OH Debtor agreed to this rate and paid it regularly for six and a half years. *See* (Taylor Decl. 2:16-19).

The Debtors create out of thin air a formula they believe results in an appropriate "valuation" of the postpetition Services under *Cook Inlet II*, resulting in *total* compensation to Landmark of $19,586.95. (Opp. at p. 14). This self-serving reconstruction of the CMA should be given no weight as it is contrary to the express terms of the CMA, the course of dealing of the parties, and the reasonable value of the Services provided to the Debtors prepetition and postpetition as set forth in the CMA. Specifically, the argument fails for the following four reasons:

*First*, section 13(a) of the CMA sets forth a fee of 2.5% of the "Project Costs" for the Project as a whole. It is a total-compensation provision, not a billing mechanism. Section 13(d) of the CMA

discusses timing of payments, stating that "payments for services shall be made monthly in proportion to the services performed," and expressly applies only "[u]nless otherwise agreed." The Debtors' argument—that payment is limited by the proportion of Project Costs incurred in a specific month—imposes a nonexistent requirement into section 13(d). *See* (Taylor Decl. Ex. 1, § 13(d)).

*Second*, the Debtors' denominator is wrong, even by their own reading. "Project Costs" is defined expansively in section 13(a) of the CMA to include all hard and soft costs, architectural and engineering fees, consulting agreements, the Prime Contract, every other Contract and all Modifications to any of them, and the Reimbursable Costs identified in the Transition Agreement—which section 13(a) deems "earned upon execution of this Agreement" for fee-calculation purposes. *See* (Taylor Decl. Ex. 1 § 13(a)).

But the Debtors instead argue that Project Costs should be measured "by invoice date" (Chapple Decl. ¶ 11), a measurement found nowhere in the CMA, and one that systematically excludes work Landmark performed to procure and document the five new subcontracts described in the Fox Declaration.

*Third*, the Debtors' analysis produces an absurd result. Under it, the slower the Project moves and the less the estate spends, the less Landmark is entitled to be paid, notwithstanding that a stalled, contractor-less project in an active chapter 11 case demands more management attention, not less. The Debtors also unbelievably seek to fault *Landmark* because "[t]he Tower Project has progressed slowly since the Petition Date" when they fail to articulate a single fact establishing that any delays have been Landmark's responsibility. (Opp. at 12).

*Fourth*, the parties' own conduct forecloses the Debtors' speculative valuation of the postpetition Services. From July 2019 through August 2025, by the Debtors' own count, the OH Debtor paid Landmark $87,279.43 per month, without objection, without demanding a cost-based reconciliation, and without ever asserting that the invoices departed from the CMA or the value

provided by Landmark. The Debtors now ask the Court to find that their own management misread the CMA every month for more than seven years and overpaid Landmark by $2.94 million without noticing. That is not a defense to an administrative claim; it is an admission that the Debtors clearly understood their obligations under the CMA.

In the event the Court does not defer to the contractual rate in the CMA, Landmark is prepared to prove at an evidentiary hearing on the Motion that the reasonable value of the Services equals or exceeds the contract rate under the CMA through (a) the parties' six-and-a-half-year course of performance and payment; (b) the market cost of engaging a replacement project manager and a party to assume Owner Builder support functions at this stage of a seven-year hospital project in an active chapter 11; and (c) the delay costs, preservation costs, and lien and inspection exposure the estates would incur during any transition. (Fox Decl. ¶¶ 9–10).

The Debtors have submitted no valuation evidence of any kind; no market rate analysis, no comparable engagement for comparison, no expert, and not even an estimate of what replacement performance would cost if Landmark ceased providing the Services. By contrast, Landmark satisfied its burden under *Bildisco* and *Klein Sleep* that the contractual rate in the CMA is reasonable through the Taylor Declaration, Fox Declaration, and Taylor Supplement, and the Motion should be granted.

**C. Section 502(d) has no bearing on Landmark's claim for administrative expense.**

Ignoring clear case law to the contrary, the Debtors argue that § 502(d) of the Bankruptcy Code provides an independent basis for the Court to disallow Landmark's claims for postpetition administrative expenses, or alternatively, a basis to defer payment of Landmark's administrative expense claims. This argument collapses under its own weight.

The majority of courts addressing § 502(d) in relation to administrative expense claims hold § 502(d)'s application is limited only to allowing claims arising under § 502 and has no application to request for payment of administrative expenses under § 503(b). *See ASM Capital, LP v. Ames*

*Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 582 F.3d 422, 427-32 (2d Cir. 2009); *In re Lids Corp.*, 260 B.R. 680, 683-84 (Bankr. D. Del. 2001) (holding that "administrative expense claims are accorded special treatment under the Bankruptcy Code and are not subject to section 502(d)."). The Ninth Circuit, in limited circumstances inapplicable here, has taken a contrary approach under *In re MicroAge, Inc.*, 291 B.R. 503 (B.A.P. 9th Cir. 2002), holding that § 502(d) may be raised as a *defense* to an administrative expense claim. *See MicroAge*, 291 B.R. at 512-13. Landmark submits that the more recent reasoning of *Ames* (following the reasoning of *Lids)* adheres to the plain language of the Bankruptcy Code and should be adopted by the Court. *See Ames*, 582 F.3d 422 ("'To construe § 502(d)'s disallowance as applicable to expenses under § 503—a section with its own scope, purpose, and conditions—is to expand the scope of § 502(d)'s disallowance beyond its plain meaning.'") (quoting *In re Beasley Forest Products, Inc. v. Durango Ga. Paper Co. (In re Durango Ga. Paper Co.)*, 297 B.R. 326, 330 (Bankr. S.D.Ga. 2003)).

In any event, applying *MicroAge* does not alter the result here. *MicroAge* stands for the very limited proposition that § 502(d) can be raised as a defense to paying a claim for administrative expenses in a case *where an avoidance action had been fully adjudicated*. *Id.* That is not the case here. As the Fifth Circuit, has articulated, § 502(d) "is designed to be triggered *after* a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate." *Campbell v. United States (In re Davis)*, 889 F.2d 658, 661–62 (5th Cir. 1989) (emphasis added).

Courts addressing the application of § 502(d) require that there be an actual determination by a court that a party is liable for an avoidable transfer before § 502(d) is triggered. *See, e.g., In re Southern Produce Dist., Inc.*, 616 B.R. 667, 671-73 (Bankr. E.D.N.C. 2020) (citing *In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003); *Davis* 889 F.2d at 661-62); *accord In re Parker North American Corp.* 24 F.3d 1145, 1155 (9th Cir. BAP 1994) (citing *Committee of Unsecured*

*Creditors v. Commodity Credit Corp. (In re KF Dairies)*, 143 B.R. 734, 737 (9th Cir. BAP 1992) in holding that § 502(d) confers no affirmative relief, and that a party does not invoke it until after liability for an avoidable transfer is established).

In line with *MicroAge*, the facts here do not trigger § 502(d), because there has been no judicial determination regarding the Debtors' newly-alleged and unsupported avoidance claims against Landmark, much less an active dispute between the parties. The Debtors have no judgment against Landmark, have not filed an adversary proceeding to avoid and recover any transfers, and have not made a demand on Landmark. Instead, the Debtors raise this issue for the first time in the Opposition, insinuating that it *may* be the case that they made avoidable transfers to Landmark, relying on speculative statements in the Chapple Declaration qualified by the concession that the Debtors' "investigation and analysis is ongoing." (Chapple Decl. ¶ 11); (Opp. at p. 13 n.6.) The Debtors filed these Chapter 11 Cases on December 8, 2025. They have done nothing with respect to Landmark until now, and an unfiled, unsubstantiated allegation about potentially avoidable transfers is not a defense to payment of an administrative claim.

In other words, *MicroAge* did not transform § 502(d) into a self-effectuating stay against administrative expense claim requests. Instead, § 502(d) only disallows the claim of an entity that has been judicially determined to be a transferee of an avoidable transfer under the Bankruptcy Code, unless the transferee "has paid the amount, or turned over any such property, for which such entity or transferee is liable." 11 U.S.C. § 502(d). Thus, § 502(d) presupposes that a court has *already made a determination of liability* that the transferee has failed to satisfy. Again, there has been no such determination in this case.

Finally, the Debtors place a thinly-veiled threat in the Opposition, alleging that they have suddenly determined they might have been paying too much under the CMA, raising the specter of

constructive fraudulent transfer claims against Landmark.[2] To prevail on such a claim, the Debtors would have to satisfy each of the elements of U.S.C. § 548(a)(1)(B) (or its companion state statute). None of the elements are addressed the Opposition, exposing this as an act of desperation. The Debtors do not contend that Landmark failed to perform under the CMA, instead concocting a formula that defies the parties' course of dealing and the plain language of the CMA. The Motion should therefore be granted.

**D. The DIP Budget is not a defense to immediate payment for the postpetition Services.**

In the Opposition, the Debtors reveal why they have not been paying their obligations to Landmark as they come due. "[T]he Debtors are operating under strict budget constraints and milestones . . ." and the DIP Budget approved by the Court "does not include any amounts for payments to Landmark." (Opp. at p. 18). This is not a defense, however, and suggests that the Debtors' estates are administratively insolvent, putting all creditor recoveries at risk in these Chapter 11 Cases. If that is the case, then perhaps the Case should be dismissed (conversion is not an option given that the Debtors are nonprofits). When the Debtors sought approval of the DIP Budget, they were aware of Landmark, the CMA, and the importance of ensuring the Project is completed as part of the Debtors' overall restructuring plan. *See* (Dkt. 20, Wentz Decl. ¶ 37). The Debtors and their DIP Lender cannot, by omitting a line item, extinguish an administrative obligation the estates continue to incur every month by accepting Landmark's performance under the CMA. If the Amended DIP Budget cannot accommodate the Services, the answer is for the Debtors to release

[2] The Debtors also included an allegation and reservation of rights in the Opposition with respect to Landmark's May 4 Letter, asserting that it violated the automatic stay under § 362(a) of the Bankruptcy Code. *See* (Opp. at p. 9, n.5). As set forth in the May 4 Letter and in the Motion, however, Landmark submitted a proposal to the Debtors' counsel as part of a broader negotiation. While the proposal called for a settlement and payment of Landmark's Claim for prepetition amounts, Landmark never ceased providing postpetition Services under the CMA, did not threaten to suspend postpetition Services on account of the Claim, and the Debtors suffered no harm as a result of the May 4 Letter, to which they never responded. In fact, the Debtors requested that Landmark provide the May 4 Letter so they could understand the full amount owed to Landmark under the CMA. *See* (Taylor Supp. at p. 3).

Landmark from its obligations under the CMA—which is precisely the alternative relief the Motion requests.

Timing of payment of an allowed administrative expense rests in the Court's discretion. *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002). Courts weigh the prejudice to the claimant, the estate's ability to pay all administrative claims in full, and the risk of a race to the debtor's assets. Each factor favors immediate payment here. Landmark is not a trade creditor sitting on a stale invoice. It is a vendor that has been asked to keep performing, every day, for nine months, while absorbing nearly $1 million of costs between its pre- and postpetition exposure on the Project, with no indication that the Debtors intend to assume the CMA and cure its unpaid obligations, much less pay what they owe as administrative expenses of these Chapter 11 Cases.

The Debtors also state, without qualification, that "[s]ince filing these Chapter 11 Cases, the Debtors have paid their post-petition debts as they become due in the ordinary course of business." (Chapple Decl. ¶ 18.) This begs the question, then, as to why the MORs show that from April through August 2026, the OH Debtor's accounts payable balance grew by more than 22%, from $9.586 million at the end of April to approximately $11.748 million at the end of August. *See* (Dkts. 790, 967, 1016, 1156, 1231). Either the Debtors are misleading the Court, or they have decided to discriminate unfairly against Landmark to help fund the costs of administering the Chapter 11 Cases. In either event, the Debtors' arguments regarding the DIP Budget have no bearing on the relief sought in the Motion.

**E. The Court must compel the Debtors to reject the CMA if they will not pay for Landmark's Services.**

Landmark cannot be forced to continue to be an involuntary DIP lender. In requesting that the Court deny Landmark's alternative request for relief, the Debtors admit that Landmark's Services are in fact essential to the Debtors' continued reorganization efforts and their desire for

"optionality" in these Chapter 11 Cases. (Opp. at p. 18), but they simultaneously lack the ability to pay for the Services. Landmark should not be forced to bear this risk on behalf of the Debtors.

The *Adelphia* factors set forth in the Memo favor Landmark, despite the Debtors' protestations to the contrary. *see* (Dkt. 1176 at pp. 10-11); *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292-93 (Bankr. S.D.N.Y. 2003). And notably, the factor the Debtors ignore the most relevant factor: their failure to satisfy postpetition obligations under the very contract they wish to keep alive. *Id.* at 293. The Debtors seek to retain an option on a contract while refusing to pay the option premium. Section 365 confers breathing room; it does not confer a right to specific performance without compensation.

Landmark is not trying to short circuit any reorganization process. It merely seeks to be paid while it continues, at the Debtors' request, to preserve the asset on which that process depends. If the Debtors conclude they cannot pay, Landmark must be released from its obligations to continue to perform under the CMA.

**CONCLUSION**

The Debtors cannot have their cake and eat it too. They admit that the Project must be completed as part of their reorganization efforts, and Landmark is entitled to an allowed administrative expense claim against the Debtors and their estates totaling no less than $698,235.44 for Services provided under the CMA from the Petition Date through and including August 31, 2026, immediate payment of $174,558.86 to Landmark for postpetition services performed pursuant to the CMA in September and October, 2026, and payment of $87,279.43, monthly, for continuing postpetition services performed by Landmark to the OH Debtor under the CMA. Alternatively, if the Court denies the primary relief sought in the Motion in whole or in part, the Court should compel the OH Debtor to reject the CMA, and the Court should grant any other, further relief it deems appropriate under the circumstances.

Date: September 29, 2026

BRUNETTI ROUGEAU LLP

By: */s/ Gregory A. Rougeau*
GREGORY A. ROUGEAU

LEVENFELD PEARLSTEIN, LLC

By: */s/ Harold D. Israel*
HAROLD D. ISRAEL
JACK O'CONNOR

Attorneys for Creditor
Landmark Healthcare Facilities LLC